# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| JULIE O'SHAUGHNESSY, INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>PLAINTIFF.<br><br>v.<br><br>YOUNG LIVING ESSENTIAL OILS, LC D/B/A YOUNG LIVING ESSENTIAL OILS, MARY YOUNG, AND JARED TURNER<br><br>DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 1:19-CV-412<br><br><br>CLASS ACTION<br>PURSUANT TO 18 U.S.C. §§ 1961-1968 |

## FIRST AMENDED CLASS ACTION COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15 and this Court's Scheduling Order [Dkt. 38], Plaintiff Julie O'Shaughnessy ("Plaintiff" or "Julie"), individually and on behalf of all those similarly situated, files her First Amended Class Action Complaint against Defendants Young Living Essential Oils, LC d/b/a Young Living Essential Oils ("Young Living"), Mary Young ("Young"), and Jared Turner ("Turner") (collectively, "Defendants"), for damages and other relief under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), and alleges as follows:

## I.
### INTRODUCTION

1.    Young Living operates an illegal pyramid scheme created under the guise of selling essential oils for quasi-medicinal purposes.  In truth, Young Living is nothing more than a

cult-like organization falsely peddling the ever-elusive promise of financial success and an alternative lifestyle.

2.      Julie O'Shaughnessy, and hundreds of thousands of putative class members just like her, paid and lost hundreds (and in some cases thousands) of dollars to become Young Living Essential Rewards enrollees ("Members") based upon the promise of financial health (which Young Living calls "abundance") and physical health, all through its brand of essential oils. Of course, the promise of riches and alternative health remedies are simply the hook used to grow Young Living's base of recruits, which is the true purpose of the organization and the source of immense profits—for the Defendants, not the Members.

3.      Young Living falsely represents to its Members that participation in Young Living—which necessarily requires regular monthly payments—will result in spiritual and material riches as long as they continue to solicit additional recruits to become Members of the Young Living family.

4.      But that promise is nothing more than a pipe dream for Young Living's millions of Members. In reality, Defendants have created nothing more than an unlawful pyramid scheme—the cornerstone of which is Young Living's emphasis on new member recruitment over the sale of products.

5.      To wit, based on Young Living's own public disclosures, 94% of total Members earn an average of $1 per month in sales commissions, and more than half of those who joined in 2016 alone made no commissions at all. Worse still, these same Members were nevertheless required to spend hundreds of dollars on Young Living products to remain active Members. As such, the average *loss* per Member in 2016 was approximately $1,175. At bottom, the only way

to make any money through Young Living is to get paid for recruiting new Members and building a "down line"—which is a telltale characteristic of an unlawful pyramid scheme.

6.      In short, Defendants have conducted business in an unlawful fashion and Plaintiff and the putative class seek to hold them accountable for such behavior.

## II.
### PARTIES

7.      Plaintiff and putative class representative Julie O'Shaughnessy is a resident of Austin, Texas.  In 2015, Julie became a Young Living representative after being recruited by a friend at a party designed for that purpose.  Julie paid $100 to become a Young Living Member, and has since expended thousands of dollars as part of her participation in the Young Living scheme, all of which is now lost.

8.      Plaintiff and Members are told by Defendants that they make money not solely from the efforts of a promoter or third party, but instead from their own efforts, which each Member controls.  Plaintiff and class members did not join Young Living through any type of investment contract.  Plaintiff and Members are designated as independent contractors by Young Living.  Plaintiff and Members recruit, but they also sell essential oils.  Plaintiff and Members must individually and at their own direction and significant personal effort, sell essential oils and recruit new members.  Each Member is expressly encouraged to establish her own goals, hours, and methods of sale.  Young Living tells Members that they alone will be responsible for the development of their business, and that advancement to a higher-level of membership will return the greatest income opportunity.

9.      Defendant Young Living Essential Oils, LC is a Utah limited liability company with its principal offices and headquarters located in Lehi, Utah.  Young Living claims to "create abundance" for its Members.  In reality, Young Living creates abundance only for itself, by

selling prospective Members on its fantastical and cult-like culture—all of which revolves around the self-authored mythology of its recently deceased founder, Gary Young, and his fraudulent peddling of essential oils as a medicinal remedy. Young Living has been served with process by serving its registered agent, Corporation Service Company, 15 West South Temple, Suite 1701, Salt Lake City, UT 84101, and has appeared.

10. Defendant Mary Young is an individual and a citizen and resident of the State of Utah. Defendant Mary Young is Young Living's chief executive officer, and Gary Young's widow. According to written reports, Ms. Young has a long history of involvement with other multi-level marketing ("MLM") companies, and authored "D. Gary Young: The World Leader in Essential Oils," a central piece of the Young Living cult's lore, which in turn is critical to the Defendants' schemes.[1] Mary Young has been served with process at 1831 N Fort Canyon Rd, Alpine, UT 84004 or at her place of business, 3125 Executive Parkway, Lehi, Utah 84043, and has appeared.

11. Defendant Jared Turner is an individual and a citizen and resident of the State of Utah. Defendant Jared Turner is Young Living's president and chief operating officer. According to his biography, Mr. Turner has spent more than two decades working for various MLM operations. Jared Turner has been served with process at 12686 S Wilding Way, Draper, UT 84020 or at his place of business, 3125 Executive Parkway, Lehi, Utah 84043, and has appeared.

---

[1] According to Mr. Young's biography, while working as a logger in the State of Washington, Mr. Young was struck by a falling tree, which resulted in a fractured skull, ruptured spinal cord, and nineteen broken bones. After being told he would never walk again, Mr. Young claims to have healed himself through a 252-day dietary regimen of nothing but water and lemon juice. By comparison, the medicinal qualities and potential for financial rewards ascribed to essential oils by Young Living are not nearly as believable.

### III.
### ADDITIONAL NON-PARTIES

12.     Gary D. Young, who died in early 2018, was the founder of Young Living.

13.     Mr. Young's colorful 30 year history as the founder and CEO of Young Living included such memorable moments as: (a) being prosecuted for practicing medicine without a license on multiple occasions; (b) running a now shuttered "Young Living Research Clinic" in Springville, Utah, (subsequently replaced by a Young Living clinic in Ecuador) where he employed a quack physician convicted of manslaughter; and (c) allegations he nearly killed a patient through vitamin C infusions which caused renal failure.[2]

### IV.
### JURISDICTION & VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. 1332(d)(2). The Court also has subject matter jurisdiction over this RICO action under 28 U.S.C. § 1331 and 18 U.S.C.A. § 1964(c).

15.     This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965. The district courts in this Circuit have interpreted § 1965(b) of the civil RICO act to provide for nationwide personal jurisdiction in a RICO action over nonresident Defendants—here, Young and Turner—if Plaintiff can establish personal jurisdiction over at least one Defendant under 1965(a). That is the case here, as Defendant Young Living has conceded that this Court has personal jurisdiction over it. *See* Dkt. 40, p. 13.

---

[2] *See* Rachel Monroe, *How Essential Oils Became the Cure for Our Age of Anxiety*, THE NEW YORKER, October 9, 2018. Mr. Young was also the subject of an investigative report in which workers at his Tijuana based "medical clinic" represented to an undercover investigative reporter from the Los Angeles Times (who had provided the clinic with a blood sample) that he had "aggressive cancer and liver dysfunction" which required immediate, expensive therapy at the clinic. When the clinic workers were confronted with the fact the blood sample was provided by a healthy tabby cat named "Boomer," they responded the cat likely had leukemia. According to Ms. Moore's article, Boomer is alive and well, despite Young Living's gloomy diagnosis.

16.     To wit, the recognized purpose of 18 U.S.C. § 1965(b) is to allow a plaintiff to bring all RICO defendants before one Court for a single trial.  The prerequisite to exercising such personal jurisdiction under § 1965(b) is the presence of at least one other defendant who is properly before the Court under § 1965(a).  Moreover, this Circuit has held that the exercise of personal jurisdiction in this manner does not offend traditional notions of fair play and substantial justice, so long as all of the defendants reside in the United States, as is the case here.

17.     Additionally, each of the Defendants are subject to this Court's personal jurisdiction because they "transact affairs" in the Western District of Texas.  And pursuant to 18 U.S.C. §§ 1965(b) and (d), each of the Defendants may be served with process wherever they may be found.

18.     Young Living has conceded that it is subject to personal jurisdiction before this Court.  As to Defendants Young and Turner, each is also subject to personal jurisdiction in this Court under the Texas Long Arm Statute, which extends to the limits of the Due Process Clause of the Fourteenth Amendment.  There is specific jurisdiction over Defendants Young and Turner because each has purposefully directed activities at and in Texas, and this litigation results from alleged injuries which relate to those activities.  For example, Defendant Young came to Texas at least twice to speak to putative class members to promote the pyramid scheme, once in 2015 at the Annual Convention in Grapevine, Texas (which was videotaped and distributed nationwide), and then again in Dallas, Texas in 2018 (where the video of Young promoting Young Living through a recruiting "Beauty School" was posted to Young Living's YouTube channel).  Defendant Turner posted his trip to the Annual Convention in Grapevine, Texas in 2015 on his various social media platforms, which show him repeatedly promoting and furthering the pyramid scheme.  To be clear, Defendants Young and Turner came to Texas to promote and

further the illegal pyramid scheme, and Plaintiff's and class members' injuries relate to the promotion and furtherance of that illegal pyramid scheme. Accordingly, this Court has personal jurisdiction over the Defendants.

19.    Venue is proper in this District, and this Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Defendants are citizens of, residents of, are found within, have agents within, are doing business in, and/or transact their affairs in this District, and the activities of the Defendants which give rise to the claims for relief occurred in this district. Moreover, Plaintiff is also a resident of this District. No enforceable mandatory venue agreement exists between Plaintiff and Defendants, such that venue for this action exists elsewhere. Moreover, no "private" or "public" factors exist making venue more convenient in another judicial district, or which justify disturbing Plaintiff's choice of venue in this district, which as noted above, is the district in which Plaintiff and numerous members of the putative class reside.

## V.
### FACTS

### A.    How the Young Living Pyramid Scheme Works

20.    Young Living purports to sell "essential oils" via a complicated MLM operation. The complex and intentionally hard-to-understand multi-layer compensation/participation structure of Young Living is a hallmark of illegal MLM pyramid schemes.

21.    While many consider every MLM company to be inherently fraudulent, the Federal Trade Commission has outlined some guidelines it considers critical to distinguishing an illegal pyramid scheme from a "legitimate" MLM. For example, a legal MLM program must structure its compensation so that the members are paid primarily based on sales of goods and/or services to those outside the plan. By contrast, an illegal pyramid scheme overwhelmingly

rewards its participants for recruitment of new members rather than product sales made to persons outside the pyramid structure.

22.     Here, the Defendants are operating an illegal pyramid scheme, in no small part because the financial success of any Young Living Member is overwhelmingly dependent on the recruitment of new people into the Young Living sales force—*i.e.,* the defining characteristic of an illegal pyramid scheme versus a legitimate MLM company.  Specifically, Young Living sells the fleeting promise of financial rewards—what it calls "abundance"—through the unrelenting recruitment of new Members.  Young Living's very structure ensures that every new Member will almost certainly lose large sums of money, chasing the elusive promise of "abundance" by trying to recruit additional new Members from an ever-shrinking pool of available candidates.

23.     And Young Living's Members' losses are compounded by its structure, which requires its Members to continuously purchase (and as a result, hold) an ever-growing inventory of unused product, in direct violation of the 70/30 rule established in the FTC's 1979 *Amway* ruling.[3]

## (1)     Young Living Encourages the Recruitment of Members over Retail Sales

24.     In order to join Young Living, new Members must first purchase a "starter kit" from an existing Member.  A basic starter kit consists of an order of a single, 5 ml bottle of "stress away" essential oil, samples of other various oils, an atomizer, sample business cards, "Essential Oils Magazine," "Essential Edge News," and miscellaneous other "resources" for new Members.  The cost of a starter kit ranges from $100 (for a basic kit) up to $260 for "premium" kits.  The vast majority of new Members opt for the premium kits, largely because the recruiters are actively encouraged by Young Living to push the premium kits over the starter kits.

---

[3] *See In the Matter of Amway Corporation*, 93 F.T.C. 618, 679-80 (1979).

25.    Once a new Member enrolls, Young Living pays a cash bonus to the "up line" Member who recruited the new "down line" Member to incent its existing Members to recruit as many new down line Members as possible.[4]

26.    The payment of the cash enrollment bonus, however, is not the only manner in which Members are actively and repeatedly encouraged to focus their efforts on the recruitment of new Members.

27.    A cursory review of Young Living's compensation structure makes abundantly clear recruiting is prioritized over the sale of product in the Young Living system—to a fault.[5]

28.    As Members attempt to move through the Young Living compensation system, their only opportunity to earn enough income to cover the cost of Membership is by recruiting new Members and then encouraging their down line Members to also recruit aggressively.  And this undoubtedly is by design.

29.    To move up the pyramid and to be eligible to receive commissions, Young Living Members must enroll in the Essential Rewards ("ER") program and maintain their active enrollment in ER by purchasing a minimum amount of Young Living products on a monthly basis, which is referred to as personal volume or "PV."

30.    Young Living gives each product a PV value, where each point is roughly equivalent to each dollar of goods purchased.  So a $10 product would typically have a PV value of 10.  The minimum PV value to maintain active enrollment in ER is 50, but to earn commissions on a downline, the minimum PV increases to 100.  In Julie's case, she purchased at

---

[4] When Julie joined in 2015, the cash bonus was $50.  Today it is $25.

[5] A true and correct copy of the Young Living Compensation Plan was attached as Exhibit A to the Original Complaint.  *See* Dkt. 1 at p.38.

least $100 of Young Living product each month in order to maintain her eligibility to earn commissions.

31.     The products that comprise a Member's PV are purchased at a 24% discount and, at least theoretically, can be resold by each Member, who could retain any difference between the discount and the retail price for which they might sell the product.  But there is no real incentive for a Member to try to become a reseller of oils as opposed to becoming a recruiter of more down line members for two important reasons.  First, there's no real opportunity for a Member to profit from becoming a reseller of oils at a mark-up because anyone can buy the oils at the discounted "wholesale" price directly from Young Living.  Second, Members do not earn any commissions on the PV they purchase from Young Living.  Instead, Members earn commissions only from (a) starter kits sold to newly recruited Young Living Members, and (b) the Organizational Group Volume, or OGV, purchased by their down-line Members either recruited personally by them, or recruited by their down-line Members.  Importantly, no Member may earn a commission except through new member recruitment.

32.     And even more shocking is that Young Living doesn't even pay earned commissions to most of those lucky few who are able to amass a down line that purchases the minimum level of OGV each month.  To the contrary, if a Member's earned commission is less than $25 in a single month, Young Living will not pay that commission to the Member.  Instead, Young Living issues a credit, which can be used by the Member only to buy more product.  So if a Member's OGV isn't large enough each month to trigger a commission check, her only option is to recruit even more Members in hopes of driving up her OGV.

33.     This is not a system designed to sell product to those outside the pyramid.  Rather, the entire system is designed for one purpose:  to recruit new Members to grow the illegal pyramid.

34.     To support the pyramid's need to bring in new blood, Young Living presents its Members with a dizzying array of bonuses and other compensation benefits earned solely through the recruitment of additional Members.  And those benefits all come with Membership titles meant to falsely convey to new Members the promise of wealth—such as "Gold," "Platinum," and potentially, the elusive title of "Royal Crown Diamond."

35.     The problem is, these higher tiers are virtually unattainable.  In order to move up the pyramid and share in the abundance of promised riches, a Member's required minimum OGV increases dramatically.  For example, in order to earn the relatively low rank of "Star," a new Member must have an OGV of 500, and the Member's minimum PV of 100 doesn't count towards the 500 OGV.  In other words, a Member is required to recruit new Members to move up the pyramid and earn commissions.  And because Members are not rewarded for additional PV purchased personally, the only conceivable way for a Member to move up in rank is by achieving the near impossible—*i.e.,* the creation of a down line consisting of *thousands of* recruits.

36.     Consider, for example, Young Living's highest rank of "Royal Crown Diamond." The required OGV is a staggering 1,500,000.  In order to meet an OGV of 1,500,000, a Member would need a down line of more than 15,000 members each purchasing the minimum PV.  And because attrition and failure to order minimum PV is not uncommon, it is likely a Member would actually need a down-line consisting of many multiples of that number.  Thus, it is not surprising that an infinitesimally small number of Members have ever actually achieved any meaningful

success.  Indeed, while Young Living brazenly touts the achievement of becoming a "Royal Crown Diamond" as within the grasp of all of its Members, a mere 46 have ever achieved this goal.  Young Living claims it has 3,000,000 active Members, but does not report on the number of former Members.  Thus, only .0015% of active Members have made it to the top of the pyramid, and the percentage of all Members is very likely much, much smaller.

37.     Thus, the overwhelming majority of Young Living Members lose money by paying far more into the scheme than they receive, while those few at the top reap untold riches, funded by all of the lower level Members paying into the system.  This is the very definition of an illegal pyramid scheme.

**(2)     Young Living Members are Encouraged to Violate the 70/30 Amway Rule**

38.     Beyond Young Living's overwhelming dependence on recruitment income, Young Living's status as an unlawful pyramid scheme is further evidenced by its brazen violation of the so-called 70/30 rule.  In the Federal Trade Commission's seminal 1979 *Amway* ruling, it concluded that Amway did not operate as a pyramid scheme, in part, because Amway required its representatives to submit proof of resale demonstrating no more than 30% of purchased product was for personal use or storage before permitting its representatives to purchase additional product—thus the term "70/30."

39.     The 70/30 rule is designed to prevent an MLM from encouraging its Members to continuously order new product for sale (sometimes referred to as "inventory loading") in order to be eligible to earn commission.  Here, Young Living's compensation system actually requires its Members to inventory load product.  If a Member fails to meet her minimum monthly PV, she is not eligible to earn any commissions on her down line's OGV no matter how large that OGV may be.

40.     Young Living is well aware of the 70/30 rule.  Its policies and guidelines even say that no more than 30% of ordered PV can be stored prior to purchasing additional inventory.  But this is mere lip-service.  Young Living does absolutely nothing to enforce this policy, and is well-aware that it is routinely violated.  It has no method of compliance in place, and it requires no proof that its Members are actually selling their PV.  Any Member can order as much PV as she wants, whenever she wants.  And Young Living turns a blind eye, because doing so helps further its scheme.

41.     And, unlike MLMs that sell physically large products, which impedes inventory loading, the opposite is true of Young Living's products.  Young Living's oils are contained in small, easily stored vials, which actually facilitate inventory loading.  Most vials contain only 5 ML to 15 ML and each one can sell for $20+.  At that size and price, a single closet shelf would be enough space for a failing Young Living Member to store literally thousands of dollars in unsold product, hoping against hope that her down line OGV will grow large enough to trigger a meager commission.

### (3)    Young Living Is In Fact an Illegal Pyramid Scheme

42.     By any measure, Young Living is unequivocally a pyramid scheme.

43.     Numerous government agencies, legal opinions and experts have all recognized that MLM companies like Young Living, which emphasize member recruitment over product sales, earn the majority of their revenue from member recruitment, and make no effort to enforce the "70/30" rule, are in fact illegal pyramid schemes.[6]

---

[6] *See e.g., Stull v. YTB Intern., Inc.*, CIV. 10-600-GPM, 2011 WL 4476419, *5 (S.D. Ill. Sept. 26, 2011) (noting fact travel based pyramid scheme's revenues were largely derived from new recruits supported allegation it was a pyramid scheme).

44.    Indeed, in 2015 the FTC sued Arizona based Vemma Nutrition Company in the District Court of Arizona for running an illegal pyramid scheme utilizing the exact pay structure and model utilized by Young Living.[7]

45.    In December 2016 Vemma admitted it was running an illegal pyramid scheme and agreed to a judgment which included $238 million in monetary damages, as well as an injunction which prohibits Vemma from, *inter alia*, engaging in the very same acts which the Defendants are engaging in here.[8]

46.    Specifically (and just like Vemma), the overwhelming majority of representatives will not even recoup the money that they paid to Young Living to become a Member and be part of Young Living's sales force.

47.    Conversely (and just like Vemma), Young Living's enormous revenue is largely staked in the money it receives from its own representatives to be part of the sales force, and the products its sales force are required to purchase to remain an active Essential Rewards enrollee.

48.    Federal courts have recognized that the operation of a pyramid scheme such as Young Living constitutes fraud.  Pyramid schemes make money for those at the top of the pyramid and victimize those at the bottom who cannot find recruits.  Accordingly, pyramid schemes are inherently fraudulent.  The Defendants' operations are also a pyramid scheme because they are based on false promises of vast financial rewards, which are impossible to

---

[7] *See FTC v. Vemma Nutrition Co., et al.*, 15 CV 01578 –PHX (D. Ariz.) (ECF No. 1).

[8] *See* FTC Release "Vemma Agrees to Ban on Pyramid Scheme Practices to Settle FTC Charges." https://www.ftc.gov/news-events/press-releases/2016/12/vemma-agrees-ban-pyramid-scheme-practices-settle-ftc-charges (Dec. 15, 2016). More recently, Dallas-based Advocare, in the face of the FTC's allegations it was also running an illegal pyramid scheme, agreed to a $150 million fine levied by the FTC and to completely change its business model such that members no longer recruit at all, and instead only sell Advocare products directly. *See* FTC Release "FTC Settlement Ends Advocate's Alleged Pyramid Scheme and Bans Defendants from Multi-Level Marketing"  https://www.ftc.gov/news-events/blogs/business-blog/2019/10/ftc-settlement-ends-advocares-alleged-pyramid-scheme-bans (Oct. 2, 2019).

achieve for new Members who enter at the bottom of the pyramid and who have no realistic chance of moving up the ladder.

49.     Ultimately, the Members are financially induced by Defendants to recruit new representatives to join the sales force through materially false representations about the Young Living pyramid scheme.  By emphasizing recruitment over product sales, Young Living crosses the threshold from legitimate MLM into an illegal pyramid scheme.

50.     The rewards Members can achieve in this case are dependent on virtually endless recruitment into the scheme in which people are exploited and have virtually no chance to get a return on their investment, let alone achieve the high financial gains Defendants induced these representatives to believe they would achieve.  All of the Defendants participate in the illegal fraud through their statements and actions in furtherance of Young Living's operations as an illegal pyramid scheme.

51.     The members of the Enterprise agreed to engage in a RICO conspiracy.  More specifically, the Enterprise was structured in the following manner, and the members and other persons or entities associated with and employed by the Enterprise, or in conspiracy with it or its members, agreed to function in the following roles:

    a.      Gary Young created Young Living and the Young Living Foundation (the "Foundation") for the purposes of running the scheme, and promoted each, along with others, for the purpose of defrauding the overwhelming majority of Young Living Members who sit at the bottom of the Young Living pyramid scheme.  Young, Turner and other members of the RICO conspiracy agreed to use false and fraudulent pretenses to deceive Plaintiff and class members through materially misleading statements of fact and non-disclosure of important facts about Young Living.

b.      The Foundation participated in the scheme through its purported charitable endeavors, which provide the Enterprise with a patina of legitimacy.  Notably, nearly all pyramid schemes involve the creation of a foundation for this very purpose.

c.      The individual Defendants each participated in the operation of the Enterprise and performed a role that was essential to its operation and continued success.  Mary Young is a co-founder along with Gary Young, and currently acts as the Chief Executive Officer of Young Living and the Enterprise.  Since 2012, Jared Turner has served as the Chief Sales Officer, the Chief Sales and Marketing Officer, the Chief Operating Officer, and is currently the President and COO of Young Living and the Enterprise.

d.      The success of the Enterprise's pyramid scheme would not be achieved but for the agreed, active, willing participation of each Defendant.  For example, Defendant Young wrote and created the fictional biography of Gary Young, through which the scheme's fraudulent promises of spiritual and financial "abundance" were developed.  Later, Young took over operation and management of the scheme, and she and Turner agreed to perpetuate the scheme.

e.      Likewise, numerous other individuals including Turner were responsible for the development of fraudulent marketing materials through which materially misleading statements of fact and non-disclosures of important facts are disseminated.

f.      The success of the Enterprise's fraudulent pyramid scheme made it possible for the members of the Enterprise to enjoy substantial illegal financial benefits through the fraudulent payment of enormous sums by Young Living Members to be part of the Young Living pyramid scheme.

52.     Through this Enterprise, significant harm has been and continues to be endured by unsuspecting Members.

53.     Through the predicate acts and other acts stated herein, the Foundation and the Individual Defendants agreed and intended to further an endeavor of Young Living which, if completed, would satisfy all of the elements of a substantive RICO offense (18 U.S.C. § 1962(c)), and adopted the goal of furthering or facilitating the endeavor in violation of 18 U.S.C. § 1962(d).  For example, but without limitation, Young Living operates the website and email servers used to promote and operate the illegal pyramid scheme.  Jared Turner and Mary Young design, operate, and maintain the overall structure of the pyramid, which is promoted and operated through the mails and interstate wires.  The Foundation assists in promoting and marketing the illegal pyramid scheme through the mails and interstate wires.

54.     In order to effect the illegal objectives of the Enterprise, Young Living, the Foundation, Young, Turner, and other known and unknown members of the Enterprise committed, either directly or indirectly, thousands upon thousands of overt acts of wire and mail fraud in violation of 18 U.S.C. §§ 1341 and 1343.  The Enterprise's daily operations require use of the wires and mails.  Young Living publishes a website that is hosted in New York and disseminated electronically across the wires to millions of users located throughout the United States.  The website is used to both advertise the pyramid scheme by promoting its many mythical benefits, and to operate the pyramid scheme through on line purchases of product.

55.     Young Living promotes the pyramid scheme using emails, electronic newsletters, Facebook, and videos posted to hosting sites like YouTube and Vimeo.  Young Living sends emails electronically to Members using interstate wires from news@younglivingcomms.com to promote advertising campaigns, such as live Facebook feeds.  Young Living also hosts a virtual

office that allows Members to send mass marketing emails through one or more Young Living email servers that electronically distribute emails to all Members from domains including NO-ReplyYoungLiving@bold.com and custserv@youngliving.com.  The product that Young Living requires all ER enrollees to purchase monthly is distributed to the Members via United States mail and private interstate couriers.  Young Living's countless acts of wire and mail fraud have taken place thousands of times every day for over two decades; they undoubtedly demonstrate continuity and relationship and constitute a pattern of racketeering activity because: (1) they had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and not isolated events; and (2) they consisted of a series of related predicate acts that extended over a substantial period of time.

**B.    Plaintiff's Experience Confirms Young Living is a Pyramid Scheme**

56.    In 2015, Julie joined Young Living as a Member, after attending a Young Living party hosted by a close friend.  Julie was initially interested in the quasi-medicinal claims associated with Young Living's oils, and was also persuaded the operation of a Young Living distributorship might at least cover the cost of paying approximately $100 for a "starter kit" and the right to resell Young Living products as a Member.

57.    Thereafter, Julie began making monthly payments to Young Living in order to satisfy her PV requirement, and to ensure she could receive both the potential commissions of her "down line" as well as the 24% wholesale discount on the product she was purchasing.

58.    Of course, like the overwhelming majority of Members, Julie found recruitment and sale of products difficult, if not impossible.  Indeed, since joining Young Living, Julie has only been able to recruit a handful of new Members as her "down-line," which makes her chances of even breaking even as a Young Living Member impossible.  But even with little success in recruiting down line members, Julie dutifully purchased her minimum 100 PV every

month so she wouldn't lose the chance to earn a commission from her down line's OGV.  Julie bought product month after month whether she needed it or not (she didn't), and whether she had any hope of re-selling it to someone else (she couldn't) without Young Living ever questioning whether she was re-selling at least 70% of her purchases.

59.     By the time Julie realized she had been victimized by Young Living, she had purchased more than $4,700 worth of product, but "earned" a commission of only $385 from her down line.[9]  She estimates she has accumulated about 2-3 years' worth of product if she were to try to use it all herself, including at least one unopened bottle from her initial purchase way back in 2015.  Because the vials are so small, Julie had no clue how much inventory she had been loading in an effort to chase the elusive promise of down line commissions.

60.     Julie's experience is hardly an aberration.  The income statistics for Young Living confirm the fact that only an infinitesimal number of Members ever manage to make a profit. For example, the Young Living 2015 U.S. Income Disclosure Statement (the year Julie joined Young Living) states the average annual income for all Members in 2015 was $30, or approximately 1/3 the cost of joining and far less than the $100 monthly minimum payment required to maintain status as a commission-eligible ER Member.[10]

61.     According to the 2016 Young Living Disclosure Statement, the average annual income for all Members fell to $25, or approximately a 1/4 of the cost of joining the Young Living scheme.[11]

---

[9] Young Living never actually paid any commissions to Julie because she never earned more than $25 in any single month.  Instead, the earned commissions simply accrued to Julie's account.

[10] And remember, these "Member" statistics don't include former Members, whose net income would be less than $0.

[11] In 2018, Young Living (likely to obscure the fact they had been operating an illegal pyramid scheme) created a two-tiered membership system that distinguishes between "preferred customers" and "business builders." Preferred customers now pay for the right to receive discounts on Young Living products but do not recruit other Members or sell products.  Business builders continue to recruit new members and sell products in the hope of one

## VI.
### RACKETEERING VIOLATIONS (RICO)

62.    The members of the Enterprise agreed to engage in a RICO conspiracy.  More specifically, the Enterprise was structured in the following manner, and the members and other persons or entities associated with and employed by the Enterprise, or in conspiracy with it or its members, agreed to function in the following roles:

a.    Gary Young created Young Living and the Foundation for the purposes of running the scheme, and promoted each, along with others, for the purpose of defrauding the overwhelming majority of Young Living Members who sit at the bottom of the Young Living pyramid scheme.  Young, Turner and other members of the RICO conspiracy agreed to use false and fraudulent pretenses to deceive Plaintiff and class members through materially misleading statements of fact and non-disclosure of important facts about Young Living.

b.    The Foundation is an independent 501c(3) corporation and is not a subsidiary of Young Living.  Members are automatically enrolled as nonvoting members of the Foundation.  The Foundation says "the privileges associated with this class of membership include the invitation to participate (at the member's own expense where applicable) in certain member-participation charitable activities, the right to receive periodic reports of the charitable activities and accomplishments of the Foundation" to support the charitable purpose of the Foundation.  The Foundation itself promotes the essential oils, and raises money at Young Living events.

---

day earning enough money to cover the enormous costs of being a Member.  As discussed *infra,* this action concerns the pyramid scheme operated by Young Living prior to 2018, and does not involve Young Living's transition to this new, two-tiered system—which is nothing more than an effort to obscure its unlawful business model by skewing the statistics in its income reporting statements.  Indeed, it only serves to underscore the fact Young Living operates as a pyramid scheme.

c.      The Foundation participated in the scheme through its purported charitable endeavors, which provide the Enterprise with a patina of legitimacy.  Notably, nearly all pyramid schemes involve the creation of a foundation for this very purpose.  Here, Defendants use the Foundation as entry into global markets through purportedly charitable endeavors, expanding the reach of the RICO scheme.

d.      The individual Defendants each participated in the operation of the Enterprise and performed a role that was essential to its operation and continued success.  Mary Young is a co-founder along with Gary Young, and currently acts as the Chief Executive Officer of Young Living and the Enterprise.  Since 2012, Jared Turner has served as the Chief Sales Officer, the Chief Sales and Marketing Officer, the Chief Operating Officer, and is currently the President and COO of Young Living and the Enterprise.

e.      The success of the Enterprise's pyramid scheme would not be achieved but for the agreed, active, willing participation of each Defendant.  For example, Defendant Young wrote and created the fictional biography of Gary Young, through which the scheme's fraudulent promises of spiritual and financial "abundance" were developed.  Later, Young took over operation and management of the scheme, and she and Turner agreed to perpetuate the scheme.

f.      Likewise, numerous other individuals including Turner were responsible for the development of fraudulent marketing materials through which materially misleading statements of fact and non-disclosures of important facts are disseminated.

g.      The success of the Enterprise's fraudulent pyramid scheme made it possible for the members of the Enterprise to enjoy substantial illegal financial benefits through

the fraudulent payment of enormous sums by Young Living Members to be part of the Young Living pyramid scheme.

63.     Through this Enterprise, significant harm has been and continues to be endured by unsuspecting Members.

**Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343)**

64.     Young, Turner, and Young Living, by and through each other and the Enterprises alleged in Counts 1-3 (*infra*), engaged in a systematic and ongoing scheme with the intent to defraud, deceive, mislead, and/or fraudulently induce O'Shaughnessy, and hundreds of thousands of putative class members, to pay and lose hundreds (and in some cases thousands) of dollars to become Young Living Members.  Young, Turner, and Young Living knowingly devised or knowingly participated in a scheme or artifice to defraud O'Shaughnessy and other class members or to obtain the money or property of O'Shaughnessy and other class members by means of false or fraudulent pretenses, representations, or promises in violation of 18 U.S.C. §§ 1341, 1343.

65.     Young, Turner, and Young Living's business practices described above are contrary to public policy or fail to measure up to the reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society in violation of 18 U.S.C. §§ 1341, 1343.

66.     Young, Turner, and Young Living could foresee that the U.S. Mail or interstate wires would be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in or carrying out the scheme, within the meaning of 18 U.S.C. §§ 1341, 1343.

67.     In particular, Young, Turner, and Young Living knew or could foresee that the U.S. Mail or interstate wires would be used to transmit sales, marketing and promotional materials in furtherance of their scheme to defraud (*see* ¶¶ 67-97).

68.     Young, Turner, and Young Living acting singly and in concert, personally and through the Enterprise(s) alleged in Counts 1-3 (*infra*), used the U.S. Mail or interstate wires or caused the U.S. Mail or interstate wires to be used "for the purpose of" advancing, furthering, executing, concealing, conducting, participating in, or carrying out a scheme to with the intent to defraud O'Shaughnessy and other class members, within the meaning of 18 U.S.C. §§ 1341, 1343.

69.     It is not possible for Plaintiffs to plead with particularity all instances mail/wire fraud that advanced, furthered, executed, and concealed the scheme because the particulars of many such communications are within the exclusive control and within the exclusive knowledge of Young, Turner, Young Living and other presently unknown individuals.

70.     By way of example, however, Young, Turner, and Young Living specifically used the U.S. Mail or interstate wires or caused the U.S. Mail or interstate wires to deliver each and every false, deceptive and misleading statement described in paragraphs 67-100 (*supra*), including but not limited to the false, deceptive and misleading communications identified therein.   To be clear, all of those communications were false, deceptive and misleading because they presented the company as a legitimate MLM when in fact it was a pyramid scheme; all those communications were for the purpose of advancing and carrying out that scheme.

71.     All of the wire communications described herein crossed interstate and international borders by reason of the technology used to transmit the communications.

72.     Some or all of the communications described herein have appeared and continue to appear on Young Livings' website since the date of their original posting.

73.     Each and every use of the U.S. Mail or interstate wires described herein was committed by Young, Turner, and Young Living with the specific intent to defraud O'Shaughnessy and other class members or to obtain the property of O'Shaughnessy and other class members by

means of false or fraudulent pretenses, representations, or promises. Young, Turner, and Young Living's acts of mail/wire fraud in violation of 18 U.S.C. §§ 1341, 1343 constitute racketeering activity as defined by 18 U.S.C. § 1961(1)(B).

74.    O'Shaughnessy and other class members justifiably relied on Young, Turner, and Young Living's fraudulent representations and omissions made pursuant to the above-described scheme in that, among other things, Young, Turner, and Young Living's fraudulently and deceptively induced O'Shaughnessy and other class members to pay and lose hundreds (and in some cases thousands) of dollars to become Young Living Members, as set forth with more particularity above, and such conduct was the "but for" and proximate cause of those losses.

### SPECIFIC ACTS OF WIRE FRAUD

75.    On October 14, 2015, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York. As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using account credits and credit card. The order was placed and payment was made in the amount of $126.82 via the use of interstate wires. Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

76.    On October 21, 2015, Young Living sent a mass marketing email from customerservice@youngliving.com to Julie and thousands of other Members throughout the United States using interstate wires. This email contained imbedded hyperlinks to web-hosted articles promoting the illegal pyramid scheme, including a list of live cult-like events during which fever-pitched-speakers attempt to motivate the faithful into recruiting more and more members. The imbedded hyper-links pointed back to Young Living's New York hosted website. Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

77.     On November 5, 2015, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment was made in the amount of $129.07 via the use interstate wires.  Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

78.     On December 13, 2015, Young Living sent an email from custserv@youngliving.com to Julie via United States interstate wires.  This email contained a confirmation of an online order that Julie had placed for the purchase of product from Young Living's website.  Julie's purchase of product was made to maintain her active enrollment in ER, and Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

79.     On January 4, 2016, Young Living sent an email from custserv@youngliving.com to Julie via United States interstate wires.  This email contained a confirmation of an online order that Julie had placed for the purchase of product from Young Living's website.  Julie's purchase of product was made to maintain her active enrollment in ER, and Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

80.     On January 13, 2016, a Young Living Member doing business as Choosing Healthy Life, Inc. sent a mass marketing email to Julie and all other Members throughout the United States using the Young Living virtual office listserv, noreply@youngliving.com.  The purpose of this email was to promote various live events, where speakers try to convince Young Living Members that they can live an "abundant life" by recruiting new members for the illegal pyramid.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

81.    On February 18, 2016, Young Living sent a mass marketing email from customerservice@youngliving.com to Julie and thousands of other Members throughout the United States using interstate wires.  This email contained imbedded hyperlinks to web-hosted articles promoting the illegal pyramid scheme, including a list of live cult-like events during which fever-pitched-speakers attempt to motivate the faithful into recruiting more and more members.  The imbedded hyper-links pointed back to Young Living's New York hosted website. Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

82.    On July 22, 2016, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment in the amount of $112.09 was made via the use interstate wires.  Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

83.    On November 1, 2016, a Young Living Member doing business as Essential Families, LLC sent a mass marketing email to Julie and other Members throughout the United States using the Young Living virtual office listserv, noreply@youngliving.com.  The purpose of this email was to advertise a Young Living promotion that offered rewards for new member signups:  "Enroll 25 new members . . . and receive a Young Living branded iPad Pro (retail value $599)!"  "AND the top 2 enrollers will win an all-expense paid trip to Ecuador with the Young Living Foundation!!"  The email also invited Members to join the "Business Builders group on Facebook," which promotes recruitment of new Members as a business model.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

84.    On May 4, 2017, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment in the amount of $125.05 was made via the use interstate wires.  Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

85.    On June 27, 2017, a Young Living Member doing business as Max and Karen Hopkins, LLC sent a mass marketing email to Julie and the other Members throughout the United States using the Young Living virtual office listserv, noreply@youngliving.com.  The purpose of this email was to promote a live event taking place in Tulsa, Oklahoma during October 2017, which was described as "a motivating event designed to take your business to the next level and beyond."  Of course, the only way to move to the next level in the Young Living pyramid is to recruit new members, and this event was advertised as offering "empowering speakers [who] will help you discover how to take action regarding . . . business building."  "Business building" is Young Living's euphemism for recruiting more Members.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

86.    On September 8, 2017, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment was made in the amount of $120.06 via the use interstate wires.  Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

87.    On April 30, 2018, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using a credit card.  The order was placed and payment was made in the amount of $145.86 via the use interstate wires.  Defendants' use of interstate wires for this transaction was in furtherance of their illegal pyramid scheme.

88.    On December 24, 2018, a Young Living Member doing business as Choosing Healthy Life, Inc. sent a mass marketing email to Julie and the other Members throughout Texas using the Young Living virtual office listserv, noreply@youngliving.com, which is hosted on servers in New York.  The purpose of this email was to promote a live event taking place in the Woodlands, Texas during January 2019, which was described as "a full day of Young Living . . . inspiration, goal setting for 2019 and more with special speakers . . . ."  Of course, "goal setting" in the Young Living pyramid means only one thing:  recruit more members.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

89.    On January 28, 2019, Young Living hosted a Facebook Live event on its Training and Education Facebook page.  This was a live event broadcast to Members throughout the United States via Facebook's platform using interstate wires.  In this event, Young Living offered training by Casey Weigand, "who shar[ed] insider tips on how to attract new members and help them successfully launch their new business" of recruiting more new Members.  This Facebook Live event was promoted via a mass marketing email sent to Julie and the other Members throughout the United States directly from Young Living using its news@younglivingcomms.com email domain.  Defendants' use of interstate wires was in furtherance of their illegal pyramid scheme.

90.     All of these wires were fraudulent because Defendants knew that this was an illegal pyramid scheme and promoted and furthered it anyway, with the intent to defraud Plaintiff and Members.

### SPECIFIC ACTS OF MAIL FRAUD

91.     On May 16, 2015, Defendants shipped an order of essential oils to Julie using a private courier involved in interstate transport.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  Defendants' use of the private interstate courier was in furtherance of their illegal pyramid scheme.

92.     On May 16, 2015, Defendants sent to Julie a monthly newsletter entitled "The Essential Edge" using a private interstate courier.  The newsletter is published by Defendants and includes promotional/marketing materials designed to promote the illegal pyramid scheme. Among other items in the newsletter, there was a profile of a "Diamond" level Member who claimed that Young Living provided "financial freedom" to her and her husband, and an advertisement for the 2015 International Grand Convention, "Light the Fire," to be held in Dallas, Texas in August of 2015.  Defendants' use of the private interstate courier to disseminate the newsletter was in furtherance of their illegal pyramid scheme.

93.     On July 6, 2015, Defendants sent to Julie a monthly newsletter entitled "The Essential Edge" using a private interstate courier.  The newsletter is published by Defendants and includes promotional/marketing materials designed to promote the illegal pyramid scheme. Among other items in the newsletter, there was a "Founder's Message" column, in which Gary Young promoted Young Living as "a remarkable avenue to pursue and realize your biggest dreams.  Imagine your life with the financial freedom [and] time freedom . . . you've only dreamed of.  That's the Young Living lifestyle."  There's also a "Building Your Business"

column that encourages recruitment of new members by "be[ing] vulnerable and real with them," and touts "the financial blessings of being Young Living members."  Defendants' use of the private interstate courier to disseminate the newsletter was in furtherance of their illegal pyramid scheme.

94.     On October 14, 2015, Defendants shipped an order of essential oils to Julie using the United States mail.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  Defendants' use of the mails was in furtherance of their illegal pyramid scheme.

95.     On December 5, 2015, Defendants shipped an order of essential oils to Julie using the United States mail.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  Defendants' use of the mails was in furtherance of their illegal pyramid scheme.

96.     On July 22, 2016, Defendants shipped an order of essential oils to Julie using a private courier involved in interstate transport.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  Defendants' use of the private interstate courier was in furtherance of their illegal pyramid scheme.

97.     On May 4, 2017, Defendants shipped an order of essential oils to Julie using a private courier involved in interstate transport.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  Defendants' use of the private interstate courier was in furtherance of their illegal pyramid scheme.

98.    On October 27, 2017, Defendants shipped an order of essential oils to Julie using a private courier involved in interstate transport.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  Defendants' use of the private interstate courier was in furtherance of their illegal pyramid scheme.

99.    On April 30, 2018, Defendants shipped an order of essential oils to Julie using the United States mail.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales. Defendants' use of the mails was in furtherance of their illegal pyramid scheme.

100.    On August 25, 2018, Defendants shipped an order of essential oils to Julie using the United States mail.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales. Defendants' use of the mails was in furtherance of their illegal pyramid scheme.

101.    All of these mailings were fraudulent because Defendants knew that this was an illegal pyramid scheme and promoted and furthered it anyway, with the intent to defraud Plaintiff and Members.

## A.    **Interstate Commerce**

102.    Defendants have engaged in activities that affect interstate commerce.

103.    Defendants have transmitted, caused to be transmitted, or invited others to transmit materials, by mail or private or commercial carriers, for the purpose of executing their scheme or artifice with intent to defraud in violation of 18 U.S.C. § 1341.

104.    Defendants have transmitted, caused to be transmitted, and invited others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures, or sounds

for the purpose of executing their scheme or artifice with intent to defraud in violation of 18 U.S.C. § 1343.

## VII.
### CLASS ACTION ALLEGATIONS

105.    Plaintiff brings this suit as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3).

106.    The class is defined as follows:

**All United States residents who joined Young Living prior to December 31, 2016 and enrolled as Essential Rewards members.  The following are excluded from this class:  Defendants and their officers, directors, counsel, and subsidiaries, along with immediate family members of individual Defendants.**

107.    The putative class easily meets Rule 23(a)'s numerosity requirement.  Indeed, the class is believed to number well over one hundred thousand members.

108.    Plaintiff's claims are typical of the claims of the class in that each became a Young Living Member because each was unsuspectingly induced to join the pyramid scheme.

109.    This case presents questions of law or fact common to class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

110.    The questions of law and/or fact common to the class include, but are not limited to:

a.    Whether Defendants were operating an unlawful pyramid scheme;

b.    Whether Defendants' unlawful operation of a pyramid scheme violates 18 U.S.C. § 1961(5);

c.    Whether Defendants engaged in a conspiracy to violate 18 U.S.C. § 1961(5);

    d.      Whether Defendants engaged in acts of mail and/or wire fraud when operating the Young Living pyramid scheme;

    e.      Whether Defendants are liable to the class as a result of their participation in the Young Living pyramid scheme; and

    f.      Whether the class has sustained damages, and if so, what is the measure of damages.

111.   Plaintiff will fairly and adequately represent the interests of the class because Plaintiff's claims are typical of those of the class and Plaintiff's interests are fully aligned with those of the class. Plaintiff has retained attorneys that are experienced and skilled in complex class action litigation.

112.   Class action treatment is superior to any other method of proceeding for the fair and efficient adjudication of the controversy alleged herein because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

113.   Defendants have acted on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. If Plaintiff proves Defendants operate a pyramid scheme in violation of the RICO Act, the Court should enjoin Defendants from operating that pyramid scheme in the future.

114.   The questions of law and/or fact that are common to the class predominate over any questions affecting only individual class members.

115.   Finally, a class action under Federal Rule of Civil Procedure 23(b)(3) is superior because:

a.    No class member has an interest in individually controlling the prosecution of his/her/its separate action.  No class member can be expected to incur the cost of attorneys' fees and costs to recover the amounts spent by each to join Young Living and operate as a Member of Young Living.  While such amounts are significant to each Member, they are not enough to justify the costs of litigation individually, and no one would chose to do so on that basis;

b.    There is no other pending litigation over these issues;

c.    It is manifestly desirable to concentrate the litigation of the class' claims in Texas and this district; and

d.    The Court will encounter no difficulties in managing this case as a class action.

## VIII.
### CAUSES OF ACTION

### COUNT I

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT**

**(FEDERAL RICO)**

**(Against Young and Turner)**

**18 U.S.C. § 1962(c)**

116.    Plaintiff realleges and restates paragraphs 1-115, as if fully set forth herein, and further states:

**(Defendant Persons / Enterprises)**

117.    Young and Turner constitute an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c), in that they are "a group of individuals associated in fact" (hereinafter referred to as the "Individual Enterprise").

a.  Young and Turner share the common purposes of (among other things) making money through and advancing the business interest of Young Living and of intentionally defrauding O'Shaughnessy and other class members of money.

b.  Young and Turner are related in that they are employees, officers or agents of Young Living.

c.  The Individual Enterprise possesses sufficient longevity for its members to carry out their purpose(s) in that the Individual Enterprise has operated since July 2012 (at a minimum), continues to operate, and continues to fraudulently induce O'Shaughnessy and other class members to purchase Young Living products and to invest money as Young Living Members, as set forth more fully above.

Young and Turner are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of an Individual Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the specific acts of wire and mail fraud (*see* ¶¶ 75-101).

118.    In the alternative, Young Living, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c). Young and Turner are each a "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of Young Living through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c). Said pattern of racketeering activity consisted of, but was not limited to, the specific acts of wire and mail fraud (*see* ¶¶ 75-101).

119.    At all relevant times, the enterprises alleged above were engaged in, and their activities affected, interstate commerce and foreign commerce.

**(Pattern of Racketeering Activity)**

120.    All of the acts of racketeering described above were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud O'Shaughnessy and other class members, their common result was to defraud O'Shaughnessy and other class members; Young, and Turner, personally or through Young Living, their agent or agents, directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; the class members (including O'Shaughnessy) were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

121.    All of the acts of racketeering described in paragraphs 75-101 were continuous so as to form a pattern of racketeering activity in that Young and Turner have engaged in the predicate acts since 2012 (at a minimum) and/or the acts of racketeering threaten to continue indefinitely because the acts of racketeering are the regular way in which Young Living does and continues to do business as described above, demonstrating that acted Defendants knowingly and with specific intent to deceive, for the purpose of causing pecuniary loss to Plaintiff and the class and financial gain to Defendants.

122.    As a direct ("but for") and proximate result of, and by reason of, the activities of Young and Turner and their conduct in violation of 18 U.S.C. § 1962(c), O'Shaughnessy and other class members were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, O'Shaughnessy and other class members suffered damages as a result of buying into Defendants' pyramid scheme.  O'Shaughnessy, on behalf of herself and all

other class members, is therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

123.    Pursuant to 18 U.S.C. § 1964(a), Young and Turner should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## COUNT II

## (FEDERAL RICO CONSPIRACY)

### (Against Young and Turner)

### 18 U.S.C. § 1962(d)

124.    Plaintiff realleges and restates paragraphs 1-123 as if fully set forth herein and further state:

125.    As alleged in Count I, one or more of the following individuals violated 18 U.S.C. § 1962(c): Young and Turner.  Any person(s) who is found to have violated 18 U.S.C. § 1962(c) is hereafter referred to as the "Operator/Manager" for the remainder of this Count.

126.    Young and Turner conspired with the Operator/Manager(s) to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprises through a pattern of racketeering activity (*see* ¶¶ 75-101) in violation of 18 U.S.C. § 1962(d).  In particular, Young and Turner intended to or agreed (*see* ¶¶ 60-65) to further an endeavor of the Operator/Manager(s) which, if completed, would satisfy all of the elements of a substantive RICO criminal offense (18 U.S.C. § 1962(c)) and adopted the goal of furthering or facilitating the criminal endeavor.

127.    The class members (including O'Shaughnessy) were injured by Young's and Turner's acts of racketeering that are unlawful under the RICO statute, which included (among other acts) acts of mail and wire fraud (as described in paragraphs 75-101) committed through the enterprises alleged in Count I, demonstrating that acted Defendants knowingly and with specific intent to deceive, for the purpose of causing pecuniary loss to Plaintiff and the class and financial gain to Defendants.

128.    As a direct ("but for") and proximate result of, and by reason of, the activities of Young and Turner, and their conduct in violation of 18 U.S.C. § 1962(c), O'Shaughnessy and other class members were injured in its business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, O'Shaughnessy and other class members were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c).  Among other things, O'Shaughnessy and other class members suffered damages as a result of buying into Defendants' pyramid scheme. O'Shaughnessy, on behalf of herself and all other class members, is therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

129.    Pursuant to 18 U.S.C. § 1964(a), Young and Turner should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by their violation of 18 U.S.C. § 1962(c).

## <u>COUNT III</u>

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT

### (FEDERAL RICO)

### (Against Young Living)

### 18 U.S.C. § 1962(c)

130.    Plaintiff realleges and restates paragraphs 1-137 as if fully set forth herein and further state:

**(Defendant Persons / Enterprises)**

131.    The Young Living Foundation, as a legal entity, constitutes an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4) & 1962(c).  Young Living is each "person," within the meaning of 18 U.S.C. §§ 1961(3) & 1962(c), who individually conducted, participated in, engaged in, and operated and managed the affairs of the Young Living Foundation through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) & 1962(c).  Said pattern of racketeering activity consisted of, but was not limited to, the acts of wire and mail fraud (*see* ¶¶ 75-101).

132.    At all relevant times, the Young Living Foundation was engaged in, and its activities affected, interstate commerce and foreign commerce.

**(Pattern of Racketeering Activity)**

133.    All of the acts of racketeering described in paragraphs 64-101 were related so as to establish a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1962(c), in that their common purpose was to defraud O'Shaughnessy and other class members, their common result was to defraud O'Shaughnessy and other class members; Young Living, personally or through its agents (including Young and Turner), directly or indirectly, participated in all of the acts and employed the same or similar methods of commission; the class members (including O'Shaughnessy) were the victims of the acts of racketeering; and/or the acts of racketeering were otherwise interrelated by distinguishing characteristics and were not isolated events.

134.    To be clear, all of those communications in paragraphs 75-101 were false, deceptive and misleading because they presented the company as a legitimate MLM when in fact it was a

pyramid scheme; all those communications were for the purpose of advancing and carrying out that scheme.

135.    All of the acts of racketeering described in paragraphs 64-101 were continuous so as to form a pattern of racketeering activity in that Young Living has engaged in the predicate acts since 2012 (at a minimum) and/or the acts of racketeering threaten to continue indefinitely because the acts of racketeering are the regular way in which Young Living does and continues to do business (described in paragraphs 64-74), demonstrating that acted Defendants knowingly and with specific intent to deceive, for the purpose of causing pecuniary loss to Plaintiff and the class and financial gain to Defendants.

136.    As a direct ("but for") and proximate result of, and by reason of, the activities of Young Living and its conduct in violation of 18 U.S.C. § 1962(c), O'Shaughnessy and other class members were injured in their business or property, within the meaning of 18 U.S.C. § 1964(c). Among other things, O'Shaughnessy and other class members suffered damages as a result of buying into Defendants' pyramid scheme.  O'Shaughnessy, on behalf of herself and all other class members, is therefore, entitled to recover threefold the damages sustained together with the cost of the suit, including costs, reasonable attorneys' fees and reasonable experts' fees.

137.    Pursuant to 18 U.S.C. § 1964(a), Young Living should be restrained from further violating 18 U.S.C. § 1962(c) and should disgorge all ill-gotten profits earned by its violation of 18 U.S.C. § 1962(c).

## IX.
### JURY DEMAND

138.    Plaintiff and putative class demand a trial by jury.

# X.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the putative class pray for judgment against Defendants as follows:

a.      An order certifying the putative class and appointing the undersigned class counsel;

b.      A judgment against Defendants;

c.      Damages in the amount of the financial losses incurred by Plaintiff and class members as a result of Defendants' conduct and for injury to their business and property, all as result of Defendants' violations of 18 U.S.C. §§ 1962(c) and (d), and that such sum be trebled in accordance with 18 U.S.C. § 1964(c).

d.      Temporary and permanent injunctive relief enjoining Defendants from further unfair, unlawful, fraudulent and/or deceptive acts, including but not limited to supporting the pyramid scheme;

e.      The costs of investigation and litigation reasonably incurred, as well as attorneys' fees in accordance with 18 U.S.C. § 1964(c);

f.      For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

Respectfully submitted,

**NIX PATTERSON, LLP**
3600 N Capital of Texas Highway
Suite B350
Austin, Texas 78746
(512) 328-5333 (telephone)
Austin Tighe
State Bar No. 20023900
atighe@nixlaw.com

**DUGGINS WREN MANN & ROMERO, LLP**
600 Congress Avenue, Ste. 1900
P. O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300 (telephone)
Robert E. Linkin
State Bar No. 00795773
rlinkin@dwmrlaw.com

**DuBOIS, BRYANT & CAMPBELL, LLP**
303 Colorado Street, Suite 2300
Austin, TX  78701
(512) 457-8000 (telephone)
J. David Rowe
State Bar No. 00794564
drowe@dbcllp.com


By:    */s/ Robert E. Linkin*
          Robert E. Linkin
          rlinkin@dwmrlaw.com

**ATTORNEYS FOR PLAINTIFF**
**Julie O'Shaughnessy, Individually, and on**
**Behalf of All Others Similarly Situated**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has been served on January 15, 2020, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

By: _/s/ Robert E. Linkin_
Robert E. Linkin