IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____ )

Julie O'Shaughnessy,               )
                                   )
        Plaintiff,                 )
                                   )      Case No. 2:20-cv-00470-HCN-DBP
vs.                                )
                                   )
Young Living Essential             )
Oils, LC, et al.,                  )
                                   )
        Defendants.                )
_____ )


**MOTION HEARING VIA ZOOM BEFORE THE**

**HONORABLE HOWARD C. NIELSON, III**


Wednesday, March 17, 2021


Time:  1:00 p.m. to 2:38 p.m.


Reported by Teena Green, RPR, CRR, CBC

        United States Courthouse
        351 South West Temple, 7.430
        Salt Lake City, Utah   84101
        (801) 910-4092
        teena_green@utd.uscourts.gov

1                            **APPEARANCES**

2    FOR THE PLAINTIFF:

3    CHRISTOPHER M. VON MAACK, ESQ.
     MCNEILL VON MAACK
4    175 South Main Street, Suite 1050
     Salt Lake City, Utah   84111
5    (801) 823-6464
     vonmaack@mvmlegal.com
6
     ROBERT E. LINKIN, ESQ.
7    MUNCK WILSON MANDALA LLP
     2801 Via Fortuna Drive Suite 630
8    Austin, Texas   78746
     (737) 201-1616
9    rlinkin@munckwilson.com

10   AUSTIN PATRICK TIGHE, ESQ.
     NIX PATTERSON
11   3600 North Capital of Texas, Highway B350
     Austin, Texas   78746
12   (512) 328-5333
     atighe@nixlaw.com
13
     J. DAVID ROWE, ESQ.
14   DUBOIS BRYANT & CAMPBELL LLP
     303 Colorado Street, Suite 2300
15   Austin, Texas   78701
     (512) 457-8000
16   drowe@dbcllp.com

17   FOR THE DEFENDANT YOUNG LIVING ESSENTIAL OILS:

18   JEFFREY J. HUNT, ESQ.
     PARR BROWN GEE & LOVELESS
19   101 South 200 East, Suite 700
     Salt Lake City, Utah   84111
20   (801) 532-7840
     jhunt@parrbrown.com
21
     JEREMY A. FIELDING, ESQ.
22   KIRKLAND & ELLIS LLP
     1601 Elm Street
23   Dallas, Texas   75201
     (214) 972-1754
24   jeremy.fielding@kirkland.com

25

1                    **APPEARANCES CONTINUED**

2    JAMES GRANT JONES, ESQ.
     KIRKLAND & ELLIS LLP
3    609 Main Street
     Houston, Texas    77002
4    (713) 836-3347
     grant.jones@kirkland.com
5
     OLIVIA ARDEN ADENDORFF, ESQ.
6    RACHAEL A. REZABEK, ESQ.
     KIRKLAND & ELLIS LLP
7    1601 Elm Street Suite 2700
     Dallas, Texas    75201
8    (214) 972-1674
     rachael.rezabek@kirkland.com
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    March 11, 2021                                    1:03 p.m.

2                    **P R O C E E D I N G S**

3           **THE COURT:**  Good afternoon.

4           We're here for a video hearing in *Julie O'Shaughnessy*

5    *versus Young Living Essential Oils, LC, et al.*,

6    Case No. 2:20-cv-470.  The purpose of this hearing is to hear

7    argument on Docket No. 98, Defendant's Motion to Dismiss.

8           Now, I know you've introduced yourself to the courtroom

9    deputy, but for purposes of the record I'm going to ask for

10   appearances of counsel.

11          First, counsel for plaintiff.

12          **MR. VON MAACK:**  Your Honor, Chris Von Maack on behalf

13   of plaintiff.  And I must say, the pandemic beard suits you.

14          **THE COURT:**  Thank you.

15          **MR. HUNT:**  Your Honor, Jeff Hunt on behalf of the

16   Young Living defendants.  And appearing today also on behalf of

17   Young Living is Jeremy Fielding, Olivia Adendorff, and I

18   believe maybe Grant Jones from the Kirkland & Ellis firm in

19   Dallas, Texas.

20          And the client representatives at the hearing, Your

21   Honor, are Joe Cannon, who is the CEO of Young Living, and Brent

22   Bishop, who is the chief legal officer, and Saul Speirs, who is

23   in-house counsel for Young Living.

24          **MR. LINKIN:**  Your Honor, this is Robert Linkin from

25   Austin, Texas.  We represent the plaintiff, Julia

1   O'Shaughnessy.  I'm here with Austin Tighe of Nix Patterson and

2   David Rowe from Dubois Bryant & Campbell.

3          MR. VON MAACK:  I think you're muted, Your Honor.

4          THE COURT:  Sorry, there was a doorbell in the

5   background that I was trying to mute out.

6          All right.  Do we have other counsel that's not entered

7   an appearance yet or that's not made --

8          MR. TIGHE:  Yes, Your Honor, also with Kirkland &

9   Ellis is Rachael Rezabek, so she's also appearing on behalf of

10  the defendant, Your Honor.

11          MS. REZABEK:  Good afternoon, Your Honor.

12          THE COURT:  Good afternoon, Ms. Rezabek.

13          All right.  Anyone else that we've missed?

14          Okay.  Give me just one moment.

15          (A recess was taken.)

16          THE COURT:  All right.  I apologize for that delay.

17  All right.  I think we'd finished with appearances.

18          Now, because we are holding this hearing by

19  videoconference, we need to be careful to ensure that the

20  reporter can create an accurate transcript, especially given the

21  number of counsel that we have.

22          First, please state your name and role each time you

23  begin speaking, unless I specifically ask you to speak in a way

24  that leaves no question who is talking.

25          Second, please speak slowly and clearly.

1          Third, please do not speak over each other or interrupt

2     and please speak only when directed to.

3          I will give each party the opportunity to make the

4     points and arguments that it wishes to make, but we will need to

5     take turns.

6          And finally, I see that all of you are doing this,

7     please put your microphone on mute when you are not speaking to

8     reduce background noise.

9          Now, in terms of logistics, will we be having -- who

10    will be arguing for the defendants?  Will it be a single counsel?

11    Will it be multiple counsel?  Who is hoping to do that?

12         **MR. FIELDING:**  Yes, Your Honor, it will be me, Jeremy

13    Fielding.  I'll be arguing on behalf of the defendants.

14         **THE COURT:**  All right.  Thank you, Mr. Fielding.

15         And who will be arguing on behalf of the plaintiff?

16         **MR. LINKIN:**  Your Honor, it will be myself, Robert

17    Linkin and Austin Tighe.  We'll be splitting up our argument

18    between the different two points raised in the defendant's

19    motion.

20         **THE COURT:**  All right.  I gather one will be the

21    issue of the preemption and the other will be the issue of the

22    sufficiency of the pleadings, is that -- am I assuming

23    correctly?

24         **MR. LINKIN:**  That's exactly right, Your Honor.

25         **THE COURT:**  All right.  Very well.  All right.  Now

1    since it's the defendant's motion, I think we'll start with

2    Mr. Fielding.

3            Ordinarily, I ask quite a few questions and tend to

4    interrupt probably more than I should.  That doesn't tend to work

5    as well on a Zoom setting.  So what I think I'll do is I will try

6    and give you, oh, about 15 minutes of time just to talk without

7    interrupting you.  At that point, I may start asking you

8    questions.  These are not necessarily hard time limits.

9            I have read the briefs.  Please don't feel like you

10   need to repeat all of the points in your briefs.  You're

11   certainly not going to waive any arguments that you made in your

12   brief because you don't repeat them today.  I think it's more

13   helpful to me if you distill your briefs and your arguments into

14   what's most important, if you will emphasize, clarify, that sort

15   of thing.

16           But with that preliminary, I think I'll let you begin,

17   Mr. Fielding.  So please go ahead.

18           **MR. FIELDING:**  Thank you, Your Honor.  I'm going to

19   share my screen.  I've got a PowerPoint presentation, if that's

20   okay.

21           **THE COURT:**  That's fine.

22           **MR. FIELDING:**  Can everyone see it?

23           **THE COURT:**  I can see it.

24           **MR. FIELDING:**  All right.  Thank you.

25           So, Your Honor, we ask you to dismiss the claims the

1     plaintiffs have filed today in their entirety and with prejudice

2     for two specific reasons.

3                First, because the RICO claims are barred by the PSLRA.

4                And second, because the plaintiffs have failed to plead

5     their claims with the required particularity, not only with

6     respect to the RICO claims themselves but also -- and especially

7     with respect to the fraud claims that form the predicate acts

8     under the RICO statute.

9                Now, Your Honor, there are -- the two reasons why you

10    should dismiss -- and by the way, these are both independent

11    reasons.  So obviously, if you agree with us that the first claim

12    is -- that the claims are barred by the PSLRA, that is an

13    independently fatal reason and you don't even need to even

14    continue on with the pleadings issues.  And the same is true

15    about the pleadings claims.  Those stand to rise on their own

16    independent merits.

17               But these two reasons why the claim needs to be

18    dismissed stem from two fatal defects in the plaintiffs'

19    underlying facts and their case.  And the first is that the

20    plaintiffs are trying to cram a nonRICO set of claims into a

21    round RICO-sized hole.  And the only way you can do that is by

22    doing great violence both to the claims and the thing that you're

23    pounding into.  And that's the reason why they struggle so much

24    to allege -- and their pleadings are so disjointed and the

25    enterprise is alleged in a lot of different alternative ways is

1    because of that.  And they have reasons they want to do it, they

2    obviously are motivated by the fact that RICO has, as the other

3    courts have recognized, an in terrorem effect because of the

4    availability of treble damages, but also, Your Honor, I think

5    they recognize they have significant and serious problems if they

6    have to bring these claims under the PSLRA.

7            And that, frankly, Your Honor, leads into the second

8    problem, kind of fatal defect in their case, and that is, their

9    fraud claims are incoherent on their face.  And here's what their

10   fraud claims are, and I think this is important because it

11   distinguishes this case especially from some of the other cases

12   that they site.

13           The essence of their fraud claim, they call it the

14   cornerstone of their case, is that defendants have created an

15   unlawful pyramid scheme by emphasizing new member recruitment

16   over the sale of products.  They say that's the telltale

17   characteristic, is that the comp structure emphasizes recruitment

18   over the sale of products.

19           But then, Your Honor, the evidence they cite, the only

20   evidence they cite to support this claim that this is a pyramid

21   scheme, is the comp structure itself.  In fact, in paragraph 27

22   of their complaint they say, "Just a 'cursory review' makes it

23   'abundantly clear recruiting is prioritized over the sale of the

24   product in the Young Living system to a fault.'"

25           Now, here's the problem, Your Honor:

1          The plaintiffs had full and 1,000 percent disclosure of

2     this compensation plan at the time they joined Young Living as

3     distributors.   It was disclosed to them, they acknowledged it,

4     they were aware of it.   And so this leads to the kind of

5     fundamental disconnect in their fraud claim.

6          To compare it to a kind of classic pyramid scheme,

7     Your Honor, like a Ponzi scheme, the Madoff scheme, this would

8     be -- their theory would be the equivalent as if Madoff brought

9     an associate in and says, "I'm going to tell you what I'm going

10    to do with your money, but I need you to help me go out and

11    recruit other people and I'm going to use those other people to

12    help pay you back."

13         Now, if that person turned around, and they might have

14    a variety of things they could say of Mr. Madoff, but they

15    certainly could not accuse him of fraud, and that's the

16    disconnect that lies at the heart of the problem.   So over and

17    over again, Your Honor, the question the plaintiffs are supposed

18    to answer, but they can't answer, so they continue to default to

19    pablum and conclusory statements, is what was the

20    misrepresentation or the promise or the omission that was

21    supposedly made to you that caused your harm?

22         And the problem is they say what it was, they say it

23    was the compensation plan, but they received that plan and they

24    had that plan.   I'll note, Your Honor, we vigorously dispute the

25    fact that our compensation plan is a pyramid scheme or that it

1   has any of the effects that they describe.  And the irony is,

2   Your Honor, so apparently do the plaintiffs, because with full

3   knowledge and disclosure of the very same plan, they said yes to

4   it.

5          And effectively what the plaintiffs are arguing is that

6   we conscripted someone into a participation in a fully disclosed

7   pyramid scheme.  That's a lot of things but it's not fraud, and

8   it falls apart on its face.  And that explains the problems they

9   have over and over in the case.

10         Now, let me address the two key points, Your Honor,

11  that I want to hit.

12         First, the RICO claims are barred by the PSLRA.

13  Everybody agrees the test here and everybody agrees that *Howey* is

14  the test and everybody agrees that it's the third prong of *Howey*

15  that matters here.  And the language from *Howey*, of course, is

16  whether the -- if it is a scheme, that's important because that's

17  one of the things that they allege, where a person invests money

18  and is led to expect profits from the efforts of the promoter or

19  a third party.

20         That "or a third party" is very important in the MLM,

21  the multilevel marketing, context like this particular case,

22  because, as you'll see in both the cases that come out, finding

23  this is a PSLRA kind of case.  And in the plaintiff's own

24  pleadings, that's what they allege.  They allege that the profits

25  and funding that go to the top flow from third parties; namely,

1   people in the downline underneath.

2           This is -- and in the *Howey* case, it's important to

3   note, the Court acknowledges that this is a flexible standard and

4   it's capable of adaptation to meet countless and variable

5   schemes.  So it's not just the kind of standard investment, you

6   know, Ponzi scheme, Bernie Madoff style, it's also any other

7   variable and countless scheme that meets that description.

8           What this means, Your Honor, as several courts have

9   recognized, including the Ninth Circuit Court of Appeals and the

10  DC Circuit Court of Appeals, is that pyramid schemes are on their

11  face covered by securities.  They are a securities contract.

12  This is the language from the *Webster* case.  They cite to a

13  previous case in the *Webster* case court.  The Ninth Circuit says,

14  "If Omnitrition Program is a pyramid scheme, investments in

15  the program supervisor positions are securities, just as a

16  de facto matter."

17          But the Court in *Webster* takes it a step further and

18  explains why.  And the Court says, "By the very structure of the

19  scheme, the participants' efforts are focused not on selling

20  products but on recruiting others to join the scheme."

21          This is an important observation by the Ninth Circuit

22  in the *Webster* case because it's the same argument the plaintiffs

23  make to try to escape from this.  They say the participants are

24  the ones that are focusing on this and that's what *Howey* doesn't

25  apply, but in fact, as the Ninth Circuit recognized, that's

1    exactly the kind of circumstances that would be, quote, enough to

2    bring the investments in the program within the definition of an

3    investment contract.

4            And, of course, it's important to note that the *Webster*

5    case was a multilevel marketing case.  That's what the party

6    being sued was in that case.

7            Now, the Ninth Circuit is right about this, Your Honor,

8    and it's because the way that a pyramid scheme works on its face,

9    when it's a pyramid scheme, is that the money flows from the

10   bottom to the top.  But what it means is that the people that are

11   recruiting aren't the ones that are actually generating the funds

12   that go to the top.  Yes, they have to do some effort to recruit,

13   but the only way that it turns into a profit is if people

14   underneath them actually contribute money to the pyramid.

15           And that's the key element that these cases all

16   recognize, that the plaintiffs seem to be missing, is it's not

17   the effort that goes into the recruiting that matters, it's the

18   source of the funds that flow up.  And without the funds flowing

19   from these third parties, who are not the plaintiff, there can be

20   no pyramid scheme.

21           Now, here's the thing, Your Honor, the plaintiffs agree

22   with this.  This is a quote from their complaint, paragraph 37.

23   "Those few at the top reap untold riches funded by all the lower

24   level members paying into the system."

25           Not the plaintiff.  The plaintiff can't get profits

1   because of the money she pays in.  It's the other people under

2   her, in her downline that she recruited, but mostly that the

3   people she recruited also recruited, that create the basis of the

4   profits that flow up through a pyramid scheme.

5          I mentioned that the Ninth Circuit reached this

6   conclusion, the DC Circuit Court of Appeals agrees with this.

7   This is the district court case, but it was affirmed by the DC

8   Circuit in an opinion.  The District Court case wrote, "The

9   capital fund bonus system is a pure pyramid scheme.  Independent

10  representatives earn income from the system solely through the

11  recruitment of new members."

12         And again, that's exactly the allegation word for word

13  that the plaintiffs are making in this case, which leads us to

14  the decision by a judge that is virtually anyway, if you consider

15  St. George virtually across the hall from you, who reached the

16  exact same conclusion on nearly indistinguishable set of facts in

17  the *Smith* versus *LifeVantage* court case.

18         And in this case, Judge Nuffer -- I mean if you look at

19  the claims, it's actually the same.  It's a multilevel marketing

20  company.  The allegation is it's a pyramid scheme.  They point to

21  the compensation plan and they say the compensation plan ties the

22  profits to recruiting.  And it's -- and that, they say that

23  directly tied to recruiting and forming a downline, that's what

24  creates the pyramid scheme.  That was the allegation there.

25         In agreeing that it was covered by the securities --

1    and I'll note, Your Honor, in their opposition brief, the

2    plaintiffs try to make it seem like, well, Judge Nuffer really

3    didn't look at this issue.  And that's a slight of hand.  It's

4    true that in that particular case, the defendants did not

5    claim -- did not have a RICO claim and there was no contest

6    there.  But Judge Nuffer still had to make a decision and a

7    determination at the motion to dismiss stage whether the

8    securities laws applied in the first place, and he did so.

9         And he wrote, "Courts, including the Tenth Circuit,

10   have broadly interpreted the *Howey* test so the word solely must

11   not be given an unduly restricted application," which is exactly

12   what the plaintiffs are trying to do.  "Therefore, when

13   investment in the plan, where profit comes, if not solely, at

14   least predominantly from the efforts of others; namely, the

15   downline members, it falls under the definition of a contract."

16        This is a case from last year, in December, from a

17   sister court of yours.  And it is squarely on point and compels

18   the same conclusion that the Ninth Circuit Court of Appeals did

19   and the DC Court of Appeals said.  And again, it's a recognition

20   that it's the money from the downline that's what powers the

21   scheme.

22        I can recruit until the cows come home, but if those

23   people under me, and in my downline that other people recruit,

24   choose not to buy, there is no money in the system.  And it's all

25   those efforts and all those decisions that have nothing to do

1    with me that matter.

2            Now, Your Honor, if you want additional cases, I've

3    focused on two, or three actually, because they are Circuit Court

4    cases of appeal.  Obviously, as you know, the plaintiffs have a

5    couple of cases they've cited that I think are distinguishable

6    for the reasons we outline in our brief.  Those are both district

7    court cases, but to the extent the Court wants to see in our

8    footnote, in our reply brief, we cite to several other cases

9    where courts have reached a similar conclusion, that a pyramid

10   scheme allegation is barred by the PSLRA, as the defendants argue

11   here.

12           Now, let me deal with the two arguments that plaintiffs

13   make in response to this.

14           The first argument that the plaintiff makes is they

15   say, "Oh, yeah, this DC Circuit Court of Appeals case, the

16   *LifeVantage* Court of Appeals case, the Ninth Circuit Court of

17   Appeals case, all those decisions rely on facts that are

18   different than ours."

19           That's just nonsense, Your Honor.  They're just wrong

20   about that, and all you have to do is compare it.  So what I've

21   done, this chart literally tracks the theories with each case,

22   *LifeVantage, International Loan Network,* which is the DC case,

23   and *Webster,* which is the Ninth Circuit case, and it compares

24   those allegations and theories to the ones that are alleged here.

25           In the *LifeVantage* case, the central allegation is that

1    *LifeVantage* is an illegal pyramid scheme.

2              In *International Loan Network*, the capital fund bonus

3    system is a pure pyramid scheme.

4              In *Webster, Omnitron's* MLM marketing program is a

5    pyramid scheme.

6              And here, defendants have created nothing more than an

7    unlawful pyramid scheme.

8              And that central theory, Your Honor, is buttressed with

9    almost identical allegations.  In *LifeVantage* they talk about how

10   the money in the plan is tied to recruiting and forming a

11   downline.

12             In the *International Loan Network* court, the plaintiffs

13   made the same allegation.  And in the *Webster* case, very same

14   allegation.

15             And then here, you can see what the plaintiffs have

16   alleged in paragraph 33.  "The system is designed for one

17   purpose, to recruit new members to grow the illegal pyramid."

18             Finally, in each one of those cases, the allegation,

19   just like here, is that the profits from that scheme come from

20   these lower level people down in the downline.  That was the

21   allegation in *LifeVantage.*  That was the allegation in

22   *International Loan Network.*  It was the allegation in Webster,

23   and it is the allegation here, in paragraph 57.

24             **THE COURT REPORTER:**  Counsel?

25             **MR. FIELDING:**  Yes.

1    **THE COURT REPORTER:**   This is Teena, the court

2   reporter.

3    **MR. FIELDING:**   Yes, ma'am.

4    **THE COURT REPORTER:**   I am not getting anybody's

5   attention somehow, but can you please slow down, just even a

6   little bit.

7    **MR. FIELDING:**   Yes, ma'am, I will.

8    **THE COURT REPORTER:**   Thank you so much.  And please

9   don't forget because you are so articulate and so well-spoken

10   but you are fast.

11    **MR. FIELDING:**   You're not the first court reporter

12   that's told me that, it probably won't surprise you to hear,

13   but I will -- I appreciate that.

14    **THE COURT REPORTER:**   That's a compliment.  There you

15   go.

16    **MR. FIELDING:**   So that's the first response.  When

17   they say that these cases are distinguishable, they're not.  In

18   fact, they're almost mirror images of each other.

19    The second response that the plaintiffs make to this

20   PSLRA bar claim is they say, "Look, what distinguishes these

21   other cases from our cases," they say, "is that here, the profits

22   were going to come from the victims themselves."  And they say,

23   "That makes all the difference in the world."

24    Here's the problem, Your Honor, that contradicts their

25   own pleadings.  That's not even what they allege.  What they

1    allege in their case -- this is in the section -- in the section

2    where they are discussing how the compensation plan that

3    everybody got that supposedly would have -- anybody looked at

4    would have known it was a pyramid scheme, how that structure

5    incentivizes people and makes it impossible for someone on their

6    own to ever recruit enough people to make money.

7              So here's what they say, "Members earn commissions only

8    from starter kits, not from other places, but only when they sell

9    to newly recruited Young Live [sic]members," which again that

10   person, third party has to make a decision to buy when they're

11   purchased --

12             **THE COURT:**  All right.  Counsel, again, you really do

13   need to slow down.

14                  **MR. FIELDING:**  Yes.

15             **THE COURT:**  There's no noticeable decrease in speed

16   since the reporter spoke up.

17                  **MR. FIELDING:**  All right.

18             When they're purchased by their downline members, or

19   when they're recruited by their downline members.

20             So again, you can see that they're talking about these

21   third parties that have to do this.  And then, one of the things

22   they point out is -- as an example of this goal that is so

23   unachievable, they say, "In order to get one of these high

24   rankings at the company, you have to meet an OGV of 1.5 million."

25   And they say that would take a downline of 15,000 members, which

1   they then say, "is impossible for me to do by myself."  And

2   that's the whole point, it has to come from the efforts of

3   others.

4         It's also that allegation that like the -- where they

5   say that this only comes from the efforts of the people

6   themselves, it directly contradicts, Your Honor, what they said

7   in their opposition at page 5.

8         In page 5 of their opposition they say, "Those profits

9   were to come from the efforts of punitive class members," such as

10  the plaintiffs.  Here's the thing, they can't point to the fact

11  that all of these plaintiff class members are paying.  They have

12  to look at this from the perspective of the individual plaintiff.

13  And what they're saying is, "The only way this individual

14  plaintiff is going to make a profit is if all of these other

15  class members pay into the system."

16        That is a classic example, as the Ninth Circuit, DC

17  Court of Appeals and Judge Nuffer have noted, of a pyramid scheme

18  allegation that the PSLRA preempts.

19        Last point that I would make on this, Your Honor, the

20  argument that they're making, that if the -- that the mere

21  participation of a class member in the scheme somehow makes a

22  difference, was explicitly rejected by the Ninth Circuit in the

23  *Webster* case.

24        In that case, like the plaintiffs here, the plaintiffs

25  argued that this, "success of a participant in its program

1    depends on the participant's own efforts and hard work."

2            Then the Court says, "We reject that kind of strict

3    interpretation."

4            And then they note, by the very structure of the

5    scheme, participants' efforts are focused on not selling products

6    but on recruiting others to join the scheme, this is enough.

7            The same thing is true in the DC Circuit case.  The

8    parties made -- the plaintiff made the same argument and the

9    Court rejected it.  And it said, "Without a doubt, to earn money

10   through the capital fund program, requires some every effort on

11   the part of the investor.  If each of them recruits one person,

12   who recruits one person, who recruits one person, an investor

13   will already have a five-level downline.

14           So they're noting, "All of this work happens underneath

15   me, including by people that I didn't even recruit."  And then

16   they adopt the approach of the Ninth and the Fifth Circuit and

17   conclude that it's an investment contract.

18           And then, of course, finally, this argument was

19   rejected by Judge Nuffer in the *LifeVantage* case.  He wrote that

20   that -- that courts -- he noted that courts do not give an unduly

21   restrictive application to the word solely, and then noted that

22   where the profit comes not solely, at least predominantly from

23   the efforts of others; namely, from the downline members, it

24   falls in their definition of an investment contract governed by

25   the securities loss.

1          So for these reasons, Your Honor, we would ask you to

2     dismiss all of the claims asserted by the plaintiffs in this

3     case, because each and every one of them is barred under the

4     PSLRA.  And we would ask you to do it with prejudice, obviously,

5     because this is not a problem that can be cured with pleading.

6     And in any event, they've already had two chances to do it.

7          Let me -- yes.

8          **THE COURT:**  All right.  Mr. Fielding, before you move

9     on, let me ask you just a couple of questions related to this

10    theory before we get into your next set of arguments.

11         **MR. FIELDING:**  Yes, Your Honor.

12         **THE COURT:**  So is your argument -- did I understand

13    you correctly, that a fully disclosed pyramid scheme is not

14    unlawful?  Is that what you were saying at the very beginning?

15         **MR. FIELDING:**  What I'm saying is that the plaintiffs

16    have to articulate -- plaintiffs have to articulate a

17    representation or a -- a misrepresentation or a false promise

18    that was made.

19         And my point, Judge, is it's hard for me to conceive of

20    how they could do that if their allegation is that the

21    obviousness of the pyramid scheme was evident on the face of the

22    commission plan that they were handed.

23         Now, Judge, I don't know, I can't answer the question

24    with respect to some other set of hypothetical facts.  It only

25    underscores why, as we'll get to in a moment, it's so vital that

1    they plead those facts.  If that, in fact, is their theory, they

2    need to identify that and explain why or how they were still

3    misled.  They don't do that.  And I think it will be very

4    difficult for them to do that.  I think it will be impossible,

5    but they haven't even tried.

6           And I offer that explanation, Your Honor, so you

7    understand, A, why they haven't done it.  This is not some mere

8    technical defect where -- in other words, it's not that they

9    can't or they won't or they haven't pleaded them, it's that they

10   can't possibly do so in any way that I can see that makes any

11   logical sense.

12           **THE COURT:**  All right.  So I mean, you -- you're

13   disclaiming the desire -- you know, you're disclaiming the

14   ability to speak to different hypotheticals.  Of course, you

15   offered the hypothetical of the Madoff scheme at the beginning,

16   where, you know, he calls his associate into the office and

17   says, "This is what we're going to do:  You pay me X amount of

18   dollars.  You know, if you go out and recruit someone to pay

19   you, each person you recruit, have them pay you this amount of

20   money and you have to pay me this portion, and then tell them

21   they can do the same."

22           I mean -- and he had it all elaborately laid out, but

23   no products were changing hands, just -- you know, just money.

24   You know, each level pays in a certain amount of money, which is

25   divvied up among the people higher up.  Would that be completely

1    lawful and not actionable by anyone?

2         **MR. FIELDING:**  Well, it may be actionable by other

3    people under the scheme that didn't have it disclosed.  It may

4    be actionable by the FTC.  It may be illegal for a variety of

5    reasons.  But as to that person, in order for them to claim

6    they were defrauded, the elements of fraud is, you have to tell

7    me something that's not true, or you have to withhold something

8    material from me.

9         And if everything was disclosed, here's the irony,

10   Your Honor, what the plaintiffs effectively are saying is, "We

11   were active and knowing participants."  And here's why that

12   matters:  Because our view is, the compensation plan says nothing

13   like that.  And the fact that these plaintiffs looked at this

14   plan and they reached the same conclusion we think that any fair

15   fact finder will reach; namely, that it isn't a pyramid scheme,

16   is itself compelling evidence against the plaintiff's theory.

17        The point is that's not even a pleaded theory, other

18   than in terms of misrepresentations or promises.  That is what

19   the plaintiffs claim happened here.  But where their claims fall

20   down and their allegations fall apart is where we ask them,

21   "Okay, tell me, what were you told that wasn't true?"

22        And the only thing they can say is, "You sold me a

23   pyramid scheme and you're on the hook," but that's not the

24   question.  The question is, is how were you led with incorrect or

25   false information?  That's what fraud is.  And that's the --

```
 1              THE COURT:  All right.  I understand your argument on

 2    that.

 3              MR. FIELDING:  Okay.

 4              THE COURT:  All right.  On this -- I guess it's your

 5    position that regardless of the details, anything that

 6    qualifies as a pyramid scheme is, per se, a security.  Is that

 7    fair?

 8              MR. FIELDING:  I don't know that the Court has to go

 9    that far.  I think there's certainly support for that in the

10    Webster case and in the DC Circuit Court of Appeals case.  But

11    I think that what is clear, Your Honor, is that on these facts,

12    which are in all material respects the same as in the

13    LifeVantage case, in the DC Court of Appeals, the Webster case,

14    and in the International Loan Network case, on those facts, the

15    Court can't reach any other conclusion other than there is a

16    pyramid scheme here, or that is to say that this particular

17    kind of a pyramid scheme is a security.

18              I don't think you need to get to the broader question,

19    though I think there's plenty of authority to support that

20    proposition, Your Honor, if the Court chooses to accept it.

21              THE COURT:  Okay.  And just in terms of alleged

22    pyramid schemes that are in the form of kind of an MLM business

23    model, like Young Living -- it looks like Webster, the Ninth

24    Circuit case, clearly was some kind of an MLM.

25              MR. FIELDING:  It was.
```

1        **THE COURT:**  Is that correct?

2        **MR. FIELDING:**  It was.

3        **THE COURT:**  Yeah, and it looks as though Judge

4  Nuffer's case was also some kind of an MLM.

5        **MR. FIELDING:**  Yes, it was.

6        **THE COURT:**  In the DC Circuit, it's a little harder

7  to tell.  Maybe it's kind of an MLM, but it seems like, if it

8  was, it didn't seem like they were selling a product as opposed

9  to some kind of an investment.  It's hard to tell from the

10  facts, but it doesn't look like the same kind of an MLM as the

11  ones at issue in the other two cases.  Am I misunderstanding

12  that?

13        **MR. FIELDING:**  No, I think -- I think what is clear

14  is that the Court -- the DC Circuit Court and then the Ninth

15  Circuit never characterized it as an MLM, like they did in the

16  Ninth Circuit case and Judge Nuffer did.

17        I will note, though, Your Honor, that it shares all the

18  characteristics of the MLM, and I'm quoting from case, "Namely,

19  that the downline members from whose fees the plaintiff expects

20  to derive most of his wealth."

21        So there's a reference to downline members, and that is

22  where I think the commonalities, the material commonalities

23  between this case and the other case, and our case come into

24  play.

25        I'll also note for the Court, in Footnote 6, where

1   there's a list of other cases, where the Courts have reached

2   similar conclusions, there's one other case involving an MLM.

3   The *SEC versus CKB168 Holdings* case, that also explicitly, the

4   Court says, involved a multilevel marketing company.

5             **THE COURT:**  Which one was that again?

6             **MR. FIELDING:**  I'm sorry?

7             **THE COURT:**  Could you repeat that.

8             **MR. FIELDING:**  Yeah, that's *SEC versus CKB168*

9   *Holdings, Limited.*  And the cite is at paragraph -- or at

10  Footnote 6 in our reply brief.  It is an Eastern District of

11  New York case from 2016.

12            **THE COURT:**  All right.  Thank you.  I appreciate

13  that.

14            All right.  I think those are the primary questions I

15  have now.  Why don't you proceed with your second argument.

16            **MR. FIELDING:**  Yes, Your Honor.

17            So let me deal then with our second argument, which is

18  the plaintiffs have failed to plead their claims with the

19  required particularity.

20            Now, here's what's important, is the plaintiffs have

21  obviously any kinds of things that -- they can make any choice

22  they want about the kind of predicate act that they claim is the

23  basis of their RICO claim, but the one they've selected, the only

24  one they've pleaded, is fraud.  And that's clear on the face of

25  their complaint, that the RICO case is premised upon an intent to

1    defraud, deceive, mislead or fraudulently induce.

2              Now, here's why that matters.  Why that matters, of

3    course, is because that dictates the pleading standard that they

4    have.  And then because they've alleged a fraud claim, it -- as

5    the Court knows, it's a heightened standard.  It requires -- Rule

6    9(b) requires that it be pled with particularity.

7              In the Tenth Circuit, in the Schwartz case, but it

8    could have been -- there's dozens of cases that say same thing,

9    it identifies at a minimum what this requires.  And what this

10   requires is that the plaintiff must plead the time, the place,

11   the contents of the false representation, that is to say what was

12   it, why was it false, the identity of the party that made it, and

13   the consequences of it.

14             So they've got to link any particular false statement

15   to -- like causally to the harm that they're seeking in the case.

16   That's standard they have do with respect to each defendant and

17   with respect to each claimed fraud or misrepresentation.

18             And so again, you see across the bottom, you'll see

19   this again, if you're a plaintiff and you can't check every

20   single one of these boxes with respect to your fraud claims, then

21   you failed your burden under the Rule 9(b).

22             Now, importantly, that duty not only applies to

23   affirmative representations, but it also applies to omissions.

24   And the defendant has to identify, with respect to any claimed

25   omission, who should have told him, when they should have told

1   him, what they should have told him, why that information was

2   material and the consequences of the failure to do so.

3        Finally, the case law is clear -- this is the *George*

4   case from the Tenth Circuit in 2016, makes clear that this

5   obligation doesn't somehow go away when the predicate -- when

6   you're using fraud as a predicate for RICO.  The Court makes

7   clear that because -- the Tenth Circuit made clear that because

8   Federal Rule 9(b) requires a plaintiff to plead mail and wire

9   fraud with particularity, the RICO plaintiffs must set forth the

10  time, place, contents of the false representation, the identity

11  statements, consequences, same checklist.

12        Last point that's important to note here, Your Honor,

13  and that is courts have also held that so-called lumpy pleading,

14  I don't know if that's a word but it makes sense to me, lumping a

15  bunch of defendants together and saying the defendants did this

16  or said this or made this representation doesn't work.  You have

17  to plead specific facts with respect to each defendant and you

18  have to do it not just for fraud, but as you can see here in the

19  *Walker* case, Your Honor, you have to do it for RICO.  And

20  that's -- that's important and significant, separate and apart

21  from the fraud claim.

22        The Schwartz case itself is instructive.  In that case,

23  the Court found that the plaintiffs had adequately pleaded.  And

24  if you look, they identified why, the time, the place, the

25  contents, describes them with particularity and even quotes them,

specifically alleged the facts the statements misrepresented or

failed to disclose.

These are all the things that every plaintiff has to do

and they're things that the plaintiff here utterly and completely

failed to do.

Now, this requirement, Your Honor, that you plead --

**THE COURT:**  Let's see, Mr. Fielding, this is -- how

many slides do you have on this?  I mean this is an awful lot

of detail on the Rule 9(b).

**MR. FIELDING:**  Yeah.

**THE COURT:**  I'm certainly familiar with 9(b).

**MR. FIELDING:**  Fair enough, Your Honor.  I'll jump

ahead here.

The key, though, is the purpose of this and this is --

this is I think important for RICO, Your Honor, is that

everybody's entitled to an individualized analysis.  It has to be

on an individual basis.

Okay.  So here's what I want to do now, Your Honor, if

you look in this case, what I've done is I -- because I went back

and read their pleading, and I see in their response they say,

"We've done all this."  And I've literally identified each one of

the situations where they -- they made some kind of claim about a

misrepresentation.  So we can look and see, did they plead these

particular things?  Right?

So here they are and I've listed -- there's -- the

1  paragraphs are across the bottom, but you can see that every one

2  of these, Your Honor, is a generic claim that doesn't say time,

3  place, content, identity or consequence.  Promises of riches,

4  falsely represent spiritual and material riches, vast promises of

5  financial awards.  That's a lumped pleading.

6          The defendants' operations.  The members are

7  financially induced by defendants to recruit new representatives

8  through materially false representations.  Which representations?

9  By whom?  When?  How did you rely upon them?  How did those cause

10 you damage?  None of that is identified.

11         The reason, Your Honor, that's really important,

12 obviously, is because if they had identified those things --

13         THE COURT:  All right.  You're going to need to slow

14 down just a little bit.

15         MR. FIELDING:  Yes.

16         The reason, Your Honor, that that's important is

17 because if they had identified these specific things, then this

18 would be part of the Court's gatekeeping function at a motion to

19 dismiss, to determine if these alleged misrepresentations

20 actually were misrepresentations.  But we -- but the plaintiffs

21 have prevented us from doing that because they haven't identified

22 what they are, which creates a double problem for us.  And it's a

23 reason why the rule exists in the first place.

24         Here are three more paragraphs.  This is paragraph 50,

25 51A and 51E.  All the defendants participate in illegal fraud

1    through their statements and actions, do not identify any

2    statements by any individual defendant anywhere, or any action

3    that constitutes fraud, other than these generic and conclusory

4    assertions.

5              In paragraph 51A, "Young, Turner and the other members

6    of the RICO conspiracy agreed to use false and fraudulent

7    pretenses through materially misleading statements."

8              **THE COURT:**  All right.  All right.  Counsel, I

9    understand your 9(b) argument.  Why don't you move to any other

10   pleading defects you want to address.  I know you have other

11   things about the failure to properly allege an enterprise --

12             **MR. FIELDING:**  Yes, yes, Your Honor.

13             **THE COURT:**  Whether there's -- you know, whether the

14   enterprise is distinct from the person, also whether or not the

15   enterprise is distinct from the predicate acts.  Why don't you

16   move on to those.

17             **MR. FIELDING:**  Of course.  Of course, Your Honor.

18             And, of course, our position on this is because they

19   haven't provided the answers to all of these questions, you have

20   to dismiss all of their claims because it's the predicate for all

21   their claims.

22             Let me deal with some pleading defects, Your Honor,

23   with respect to individual counts.  And I'm going to focus on

24   just a couple here, Your Honor.  I know we make other claims in

25   our briefing.  And again, I think these are the ones that would

1    benefit most from me pointing out and providing some additional

2    information with.  And to the extent the Court has questions

3    about anything that I don't mention, I'm happy to answer those

4    questions.

5         THE COURT:  Well, let me -- how about I help you

6    frame this.

7         I think you make some fair points on the enterprise

8    versus person.  But what about theory that the two individual

9    defendants are the persons and Young Living itself is enterprise.

10   What's wrong with the pleading there?

11        MR. FIELDING:  Yeah.  I will tell you that I think

12   that's the closest call in the case.  The case law is, frankly,

13   muddy on this issue.  We've cited some cases that we think

14   stand for the proposition that support our position on that.  I

15   know that the plaintiffs have cited some cases that seem to

16   come out the other way, and I think there's just some messiness

17   here about that.  I think that, on balance, the authorities

18   favor us, but I agree that that's a close question, Your Honor.

19        THE COURT:  All right.  And I don't think you need to

20   belabor your arguments, beyond what you did on the brief, on

21   the other theories of the person versus enterprise.  The

22   foundation is the enterprise or the combination of the two

23   individual defendants is the enterprise, and then each

24   individual is one of the persons.  I think you make your points

25   in brief and I understand your arguments there.

1        **MR. FIELDING:**  One hundred percent agree, Your Honor,

2    and I'm not going to address those for that very reason.

3        **THE COURT:**  Okay.  Also on this -- on the enterprise

4    versus the predicate act or the series of predicate acts, I

5    guess my question here -- and I don't know if this is fairly in

6    the pleadings or not, but certainly, Young Living, as an

7    enterprise, does do things other than the alleged predicate

8    acts, doesn't it?  I mean if I were to accept that Young Living

9    is an enterprise, I mean among other things, it makes these

10   products.  I mean it makes essential oils, doesn't it?

11        **MR. FIELDING:**  It does.  It does.  It makes --

12        **THE COURT:**  Okay.  So it does do something other than

13   these alleged fraudulent misrepresentations of abundance or --

14   you know, I mean leaving aside the 9(b) issue.

15        **MR. FIELDING:**  Well, yes, except that what they

16   claim, Your Honor, is that the whole purpose of this is not to

17   actually sell product, it's just to engage in a pyramid scheme

18   to collect funds.  So that is the only tension there,

19   Your Honor, is between their allegations and that.

20        I think the broader problem here, Your Honor, with

21   respect to this enterprise issue, has to do with Count III.  And

22   it's the fact -- it's where they're trying to use the foundation

23   as the enterprise.  And here's where they run into an enormous, I

24   think, pleading deficiency.

25        So remember, their allegation is that the Young Living

1    Foundation -- this is the basis for the claim against Young

2    Living as a defendant.  They say the Young Living Foundation

3    constitutes an enterprise and they allege that it's because Young

4    Living used the Young Living Foundation through a pattern of

5    racketeering.  And here, Your Honor, here's the key question that

6    they have to answer in their pleading, how did this happen?

7    Right?

8              THE COURT:  All right.  Mr. Fielding, I understand

9    your argument very well on that.  I think -- I think probably

10   the most viable claim that plaintiffs have alleged here is --

11   and again, I'm not suggesting -- I mean I don't mean to suggest

12   a firm view on the other claims, but I think the one that

13   you -- that your answers probably make -- appear to be the

14   closest question is just, you know, the individual defendants

15   is the persons and Young Living is the enterprise.

16             MR. FIELDING:  Yes.  Yes.  I agree with that,

17   Your Honor.  And I think -- I think, again -- I've got on the

18   screen here the sole allegations they've made about the

19   foundation.  I think you're right.  I think it's a pleading

20   defect issue.  It's not even an identify, you know, whether

21   they can be these two things at once.  It's just a very simple,

22   they've just failed to identify how this foundation was

23   supposedly used for racketeering.  These are literally the only

24   time foundation is discussed.  So I think you have no choice

25   but to dismiss Count III.

1      And then, on the conspiracy side, I think they have

2   pleading defects there that are unrelated to this issue we've

3   been discussing about the, you know, relatedness.  And that has

4   to do with the fact that they just have these conclusory

5   allegations that there's an agreement.  We cite to cases from

6   several courts that say you can't just say they agreed, you have

7   to have a factual basis.

8      And then here are the paragraphs in their complaint

9   that talk about the conspiracy.  And if you look, it's just these

10  general averments to mail fraud and wire fraud.  And I'll note,

11  Your Honor, if you look at paragraph 62A, where they say, "The

12  acts of mail and wire fraud is described in paragraphs 75 to

13  101," what's fascinating is when you look at paragraphs 75 to

14  101, as the plaintiffs concede in their brief, none of those

15  things say anything about fraud being committed.

16     And the plaintiffs say, "We don't have to" -- you know,

17  and they're right.  If they had other evidence of fraud, if they

18  had other specific evidence linking the individual defendants to

19  fraudulent acts that they made, when they made them, et cetera,

20  but they don't have that.

21     THE COURT:  All right.  Mr. Fielding, I do want to

22  clarify what you've just said.

23     I mean you agree with plaintiffs, I gather, that the

24  use of the mails and the use of the wires themselves don't have

25  to contain specific misrepresentations if they're in furtherance

1   of a fraudulent scheme, but your argument is, is it even

2   accepting that plaintiffs haven't alleged with particularity any

3   misrepresentations that are part of the scheme; namely, because,

4   you know, you're saying either it's -- it's just too vague, you

5   know, just these kind of unspecified promises of abundance and

6   said things along that nature.

7          And so, you know, even if the misrepresentations don't

8   have to be in the use of the wires or the mails themselves, they

9   have to be somewhere.  Is that a fair characterization of your

10  position?

11         **MR. FIELDING:**  It is, Your Honor.  And to me, the

12  most telling example of where the plaintiff's claims are

13  lacking is in their opposition brief at page 25.  This is where

14  they say -- first they say, "The heightened pleadings standard

15  doesn't apply," and that's just wrong for all the reasons we

16  cite in our brief, and all the cases that I've just showed you

17  already about that pleading standard in Rule 9 and RICO cases.

18         But they say this, they say, "We've done it anyway."

19  And they say, "It's been adequately alleged through materially

20  misleading statements of fact, important facts about Young

21  Living."  And then helpfully, they tell us and the Court, "Look

22  at these paragraphs.  You'll see where we've met our heightened

23  pleading burden, the what, when, who, where, how."

24         Here's the three paragraphs.  This is paragraph 51A.

25  "They agreed to use false and fraudulent pretenses through

1    materially misleading statements of fact and nondisclosure."

2         62A is just -- it's verbatim the same thing.

3         73A, they reference the mail.  In their opposition,

4    they say, "It doesn't have to contain any information."  And look

5    what they say in that, Your Honor, each and every use of the mail

6    had the specific intent to defraud by means of false or

7    fraudulent representations, promises [sic] or promises.

8         So the problem they have is they've told us the three

9    paragraphs we can look at.  And then when you look at the three

10   paragraphs, you get more conclusory statements and you certainly

11   get none of the who, what, when, where, how, why that Rule 9 and

12   the rules around RICO pleading require.

13        So that's the two reasons why we think the Court should

14   grant that and we think, Your Honor, you should do it with

15   prejudice as to all claims, even with respect to the pleading

16   difficulty.  I guess I would say especially with respect to the

17   pleading deficiencies, with respect to RICO and the fraud.

18        And that has to do with two things.  Number one,

19   they've already had two bites at the apple.  A motion to dismiss

20   was filed previously, raised the PSLRA issue, raised these

21   pleading defects.  They filed a new motion to dismiss.  They've

22   already had the two bites, and the motion to dismiss practice

23   can't be a roulette wheel that they get to keep spinning until

24   they get -- until they land on black.

25        And secondly, and maybe more importantly, Your Honor,

1   it would be futile.  And the reason that it would be futile to

2   allow them to amend is because of the problem that I identified

3   before, their theory of the case.  Namely, you told me what I was

4   about to do and gave me a comp plan that told me how to do it and

5   then that -- I relied on that.  I don't see how you create a

6   fraud claim around that.

7              So those are the two reasons why we would ask the

8   Court, when you -- if you grant and when we think you should

9   grant these motions to dismiss all these claims, that you do so

10  with prejudice.

11             **THE COURT:**  All right.  Thank you very much.

12             **MR. FIELDING:**  Thank you, Your Honor.

13             **THE COURT:**  Let's turn to the plaintiffs and give

14  them a chance to respond.  And I believe we were going to have

15  Mr. Linkin and Mr. Tighe -- first of all, let's see if we can

16  stop sharing your screen.

17             **MR. FIELDING:**  Yes, I'm doing that, Your Honor.

18             There we go.

19             **THE COURT:**  Very good.  Thank you.

20             Now, remind me on the plaintiff's side, Mr. Linkin,

21  Mr. Tighe, which one of you is going to address the preemption

22  argument?

23             **MR. LINKIN:**  Good afternoon, Your Honor.  I'm Robert

24  Linkin, I'll be handling the PSLRA argument.  Mr. Tighe, from

25  Nix Patterson, will be handling the RICO directed arguments.

1    **THE COURT:**  All right.  Why don't you go ahead then.

2    I'd like to start with that.  And I'm using it as preemption

3    for shorthand, but you understand what I mean.

4    **MR. LINKIN:**  Absolutely, Your Honor.

5    **THE COURT:**  All right.  Please go ahead.

6    **MR. LINKIN:**  Thank you, Your Honor, for the

7    opportunity to present our arguments in opposition to the

8    defendant's 12(b)(6) motion.  I won't take an enormous amount

9    of time with the preemption argument.

10    As an initial matter, Judge, we recognize that the

11    Court may follow the holding reached by Judge Nuffer in the

12    *LifeVantage* decision, and find that a Young Living essential

13    rewards membership is, in fact, a security.

14    And as we noted in Footnote 2 of our response, should

15    the Court reach that decision, we would simply request the right

16    to amend our complaint to plead securities claims on behalf of

17    the plaintiff and the punitive class.  Specifically, we would

18    bring claims related to 12(1) and 12(2) of the 33 Act, 10(b)(5)

19    claims under the 34 Act, if necessary, and any state securities

20    violations that might also be raised.

21    And to that, let me just say one thing in response to

22    Mr. Fielding's remark that any type of amendment would be futile.

23    Again, we don't think the Court has to find that our

24    claims are preempted by the PSLRA, but again, in the event that

25    the Court were to follow that *LifeVantage* decision, the defenses

1    raised by the defendants in *LifeVantage* who, not coincidentally,

2    are represented by at least some of the counsel who represent the

3    defendant here, those defenses did not work on the 12(b)(6)

4    motion, at least to the larger part of their securities claims,

5    and those claims have gotten past a motion to dismiss.  So the

6    futility standard would hardly be met under those circumstances.

7             But, again, Your Honor, we don't think you have to get

8    there.

9             Certainly, we acknowledge that there are cases

10   throughout the judiciary that do find that the PSLRA bars RICO

11   claims with regard to pyramid schemes, but there are cases in

12   other circuits and in District Courts across the country that

13   have held that's not case, that RICO claims are appropriate in

14   allegations of a pyramid scheme.

15            For example, *the AdvoCare* case, which was decided in

16   2019, here in the Fifth Circuit where we're located, and that was

17   in the Northern District of Texas, and the *ViSalus* case.  And

18   each of those cases held that under *Howey*, and *Howey*'s

19   three-prong test, that these interests in a pyramid scheme are

20   not investment contracts.  We all know what *the Howey* test is,

21   part one of three-part test is that it's an investment of money;

22   part two, in a common enterprise; and then part three, from which

23   the profits are expected to come solely from the efforts of

24   others.

25            And we also understand that here in the Tenth Circuit,

1    the *Crowley* decision expanded the term "solely" to really mean

2    primarily.  But whether you plead solely or --

3           **THE COURT:**  Counsel, just a moment.  I just want to

4    make sure, on the cases -- and I'll let you finish your thought

5    in just a moment.  I apologize for interrupting.  But on those

6    cases, the two you primarily mentioned, I want you to repeat

7    them just so I have them down.

8           Could you do that?

9           **MR. LINKIN:**  I'm happy to do that, Your Honor.  And

10   if I'm going too fast, I hope either you or the court reporter

11   will let me know.

12          **THE COURT:**  You're fine.

13          **MR. LINKIN:**  The first is *Ranieri v. AdvoCare*,

14   Northern District of Texas.  And both parties have cited that

15   case for different reasons.

16          **THE COURT:**  Right.  No.  I just -- somehow the

17   pronunciation didn't register, but yes, when you repeated it, I

18   know which one you're talking about.

19          And the second one was?

20          **MR. LINKIN:**  And the second was *Kerrigan v. ViSalus,*

21   Your Honor.

22          **THE COURT:**  Okay.  I'm familiar with that.  For some

23   reason when you said them I didn't catch the names, but, yes, I

24   know those case.  And both of those did involve MLM situations;

25   correct?

1        **MR. LINKIN:**  Yes, Your Honor, that is correct.

2        So whether you use the term "solely" or primarily,

3   we're here on a 12(b)(6) motion to dismiss so we're talking about

4   pleading.  We're not talking about a full record.  And on a

5   12(b)(6) standard, we have certainly pled more than enough

6   factual information that relates to the efforts that our

7   plaintiff, Ms. O'Shaughnessy, and that punitive class members

8   have to exert in order to expect to profit from this pyramid

9   scheme.

10        We talked about in paragraph 8 of the complaint that

11   members make money through their own efforts.  And what are those

12   efforts?  It's a never ending cycle of recruiting that is

13   attendant to a pyramid scheme such as this one.  It isn't that

14   you just hope for money to flow up from others, you have to

15   continue -- you have to continue to recruit and you have to

16   continue to encourage your recruits to recruit.  That is the

17   effort.  This is not similar to an investment in a security,

18   where you lay your money down, you know you're investing with

19   other investors, or the common scheme, and then you hope to reap

20   profits from the managers, the managers of the scheme or the

21   enterprise.  This is different from that.

22        We pleaded in further detail those efforts in

23   paragraphs 22, 27, 34, 35, and we believe we've pleaded enough

24   factual detail here to make clear that even under the *Crowley's*

25   relaxed standard, the primary standard used here in the Tenth

1   Circuit, that we've pled enough to remove this claim from the
2   purview of the PSLRA's bar.
3           Now, with regard to some of the cases cited by
4   Mr. Fielding, Your Honor, for example, mentioned the *CKB Holdings*
5   case, *CKB168 Holdings, Limited*, which is the Eastern District of
6   New York decision.  In that case, yes, it was a pyramid scheme,
7   and, yes, the Eastern District did find that the interest in *CKB*
8   were a security, but in *CKB*, the participants in the scheme
9   actually also received a security interest, an actual security,
10  what was, I believe, promised to them as a preferred stock in
11  *CKB*.  So that's a different fact that we don't have here.
12          And in *Omnitron*, which Mr. Fielding remarked on, yes,
13  the Court did find that *Omnitron* scheme was a security.  What's
14  difference in that case?  In that case, while there was
15  recruiting, the members actually never did the act of recruiting.
16  They would invite people to a meeting and then the managers would
17  actually hold that meeting and do the actual recruiting.  That's
18  the factual distinction there, distinct from what we've pled in
19  our case.
20          So again, Your Honor, I don't want to belabor what is
21  already in our brief, which we believe sets forth why we are
22  not -- our claims are not barred by the PSLRA, do not limit the
23  PSLRA preemption.  But, again, in the event this Court does
24  determine that, we've never had an opportunity to plead
25  securities claims.  In fact, prior to being in this Court, we

1    were transferred from the Western District of Texas.  We were in

2    the Fifth Circuit because of *AdvoCare*.  Because of the law in the

3    Fifth Circuit, we pled this as a RICO claim.  So if the Court

4    were to decide that the Tenth Circuit requires PSLRA preemption,

5    we believe we should be afforded the opportunity to replead on

6    that basis.

7              **THE COURT:**  All right.  No, I --

8              **MR. LINKIN:**  Do you have any questions, Your Honor?

9              **THE COURT:**  Okay.  Thank you, Counsel.  And I guess

10   let's talk about particularly your request for the opportunity

11   to amend.

12             Of course, you've not moved for leave to amend so far

13   in this court.  Correct?

14             **MR. LINKIN:**  We have not, Your Honor, not in your

15   court.

16             **THE COURT:**  Right.  I know that many district judges

17   are quite lenient with motions to dismiss and dismissing with

18   leave to amend.  I tend to be a little stricter there.  I tend

19   to say that a request in a brief or argument for the

20   opportunity for leave to amend is something very different from

21   actually filing a motion for leave to amend, where I can

22   actually see, you know, the proposed amendments and know and be

23   able to evaluate whether, in fact, they would solve the legal

24   issues or defects that I see.

25             I think -- the Federal Rules of Civil Procedure, in the

1    2008 amendments, they were amended to make it so that a motion to

2    dismiss, as well as an answer, starts the deadline for being able

3    to amend as a right.  And one of the reasons for that, if you

4    read the commentary, was to kind of eliminate the practice of

5    plaintiffs of waiting to see -- of kind of taking a mulligan, of

6    just standing on their allegations and saying, you know, if we

7    survive the motions to dismiss, great; but if we don't, you know,

8    we'll get a free shot, a chance to amend.

9         So I'm actually not a big fan of dismissing with leave

10   to amend where plaintiff is on notice of the potential defects in

11   the complaint and doesn't seek to amend.

12        So I guess what I would advise you is, you know, if you

13   think you have viable claims under the Security Act, I mean

14   you're on notice of the defendant's argument here, I would

15   suggest that you seek leave to amend pretty promptly.  And I

16   can't promise I'm going to grant a leave to amend, but I think

17   I'd -- you know, if you want me to consider that possibility, I

18   would suggest that you seek leave to amend before I rule on the

19   motion to dismiss.  So that's just my suggestion there.

20        Any questions about that?

21        **MR. LINKIN:**  No, Your Honor, I completely understand.

22        And, again, we don't believe the Court should find that

23   our RICO claims are barred by the PSLRA.  We didn't believe that

24   before, we don't believe it now.

25        **THE COURT:**  Right.  No, you're welcome --

1      **MR. LINKIN:** But -- I'm sorry, Your Honor, please.

2      **THE COURT:** No, you're welcome to take your chances

3 on that.  You know, if you're confident enough of that that you

4 want to stand on that, that's fine, but I just don't give

5 mulligans very often.  Let's just put it that way.

6      **MR. LINKIN:** Certainly, Your Honor, and we understand

7 that and we will -- should we decide to amend, we will follow

8 the process the Court has highlighted for us here today.

9      And, again, I would simply -- this would not, from our

10 view, be taking a mulligan.  It would simply be pleading in a

11 manner that might be more appropriate in the Tenth Circuit as

12 opposed to the Fifth Circuit, where we pled the live pleading

13 that's in front of Your Honor.

14      **THE COURT:** Right.  And by taking a mulligan, what I

15 mean is where the plaintiff waits to see what the outcome of

16 the motion to dismiss is before they then try and seek leave to

17 amend.

18      **MR. LINKIN:** I perfectly understand that, Your Honor.

19      **THE COURT:** I mean I understand your point.  I mean

20 your point is that, you know, if I -- you know, the

21 authority -- there's some split in your authority.  There's

22 some uncertainty in the case law here, but there's certainly

23 substantial support for defendants' position, there's some

24 support for your position.  As you said, there are some things

25 about some of these cases that are distinguishable from your

1    case, in terms of the way in which recruitment takes place.

2         Certainly, the language "solely" doesn't seem to mean

3    solely and courts have disagreed, though, about how far you can

4    get away from solely.  So I mean there's clearly room for

5    disagreement there.  And I think your point is, is that even if I

6    agreed with defendants that the RICO claims don't survive and any

7    claim should be brought under the Securities Act, the PSLRA, you

8    think that you would have valid claims there that you could

9    assert.  So I understand your position.

10        All right.  And I don't think I have further questions.

11   Honestly, I just -- I've read some of these cases, but you've

12   both presented -- I think you've both presented the cases that

13   are most helpful to you.  You've both discussed why cases that go

14   the other way, I should either just ignore them or I should

15   distinguish them.  So I think I'm pretty clear on both parties'

16   positions on this issue.

17        **MR. LINKIN:**  Thank you, Your Honor.  Then I'll turn

18   it over to Mr. Tighe.

19        **THE COURT:**  All right.  Thank you very much.

20        Mr. Tighe, please go ahead and address the other

21   arguments, the arguments that, even assuming the RICO claims can

22   go forward, that they haven't been pled with sufficient clarity.

23   And, you know, addressing both the Rule 9 issue and also just the

24   issues of whether you've properly alleged persons and enterprise

25   and the predicate acts that are not overlapping.

```
 1              MR. TIGHE:  Thank you, Your Honor.  May it please the

 2    Court, Austin Tighe for Plaintiff Julie O'Shaughnessy.

 3              I'm going to do two things going forward, Your Honor.

 4    Number one, I'm going to focus on the briefs and not the

 5    PowerPoint.

 6              As I sat there and watched the PowerPoint, it occurred

 7    to me that the PowerPoint was really about standards of proof,

 8    not standards of pleading.  And neither argument of counsel,

 9    whether it's in the form of oral argument or PowerPoints, this is

10    really on the briefs.  And Your Honor is quite familiar with the

11    briefs, so I'm going to focus my argument there.  I'm going to

12    further tailor it.

13              I noted when Your Honor asked specific questions to

14    opposing counsel about specific issues, and I have cut my

15    argument voluntarily, tried to read those cues, by about half,

16    and I'm going to try to address those in the order in which they

17    were raised.  I think that would make more sense, Your Honor,

18    when I introduce the first argument, which is the requirement for

19    a distinction between enterprises and persons.

20              But first a bit of an overview as to where I see this.

21              So of the four arguments that the defendants are making

22    for dismissing the case on RICO grounds at the pleadings stage,

23    two of the four fail outright, because the Supreme Court has said

24    that pleading requirements that Young Living is trying to impose

25    on us, on those two of the four, simply aren't required.  I'll
```

1    address those directly and I'll make short thrift.

2         The other two arguments fail because of the 25 pages of

3    detailed, specific factual allegations, including allegations of

4    intent, I'll answer the question hanging out there, where are the

5    allegations of intent?

6         But those fail because of the 25 pages of factual

7    allegations in the pleading and they fail because of the law of

8    this circuit.  So let's take argument No. 1.  That is the

9    argument that the enterprises we allege are not sufficiently

10   distinct from the persons involved.

11        I will stand on our briefing as to Count III.  Unless

12   Your Honor has any questions, I will stand on our briefing as to

13   what they refer to as theory A of Count I, and instead, focus on

14   what Your Honor asked about, which is Count I, what they refer to

15   as theory B.  That's where Young and Turner, chief executives,

16   are named persons and the entity, Young Living, LC, is the

17   enterprise.

18        I would cite Your Honor to the Tenth Circuit's decision

19   in AD-X International, it's a Tenth Circuit 2004 opinion cited

20   and discussed in our brief, along with Supreme Court precedent on

21   page 13 of our brief, where the Tenth Circuit has held that, "In

22   cases like this, where the enterprise is a formal legal entity,"

23   and it's indisputable that Young Living, LC, is a formal legal

24   entity, then, "RICO requirements are most easily satisfied."

25        Continuing on in argument one, there's a more

1    fundamental problem they have with this argument in trying to

2    knock us out on enterprise versus persons.  The Tenth Circuit has

3    held in the *Hogan* case that Rule 9(b) doesn't apply to pleading

4    enterprises and fact.  It applies to pleading mail and wire fraud

5    predicate acts.

6            Now, in their briefing, Young Living argued that I

7    inserted the word "only."  It's not "only" because I inserted it,

8    it's "only" because there are no cases that hold otherwise.  To

9    be clear, Rule 9(b) does not apply to pleading an enterprise in

10   fact, so that should make short thrift of the 9(b) argument as

11   to, Your Honor, theory B of Count I, Young and Turner as persons,

12   Young Living, LC, as the enterprise.

13           As to a question Your Honor asked about whether or not

14   Young Living does anything else other than operate what we allege

15   to be a pyramid scheme, it does, and as Your Honor knows, that's

16   relevant under the *Boyle* case from the U.S. Supreme Court.  I'd

17   like to make two very brief points about the *Boyle* case.

18           So in *Boyle*, what is required for adequate pleading is

19   we must plead a common purpose, common relationships and

20   longevity.  That's the *Boyle* test for whether or not we've

21   adequately pled a RICO claim.

22           At paragraph 117 of the complaint, we plead in Sections

23   A, B and C, each one of those.  In fact, Your Honor, as to

24   longevity, 117C, we actually use the word "longevity."  We talk

25   about this has been going on since at least 2012.  So we meet

1   that aspect of the *Boyle* test.

2          What's the other aspect of the *Boyle* test?  The

3   enterprise must exist for some reason other than what we've

4   alleged as illegal conduct.

5          Your Honor raised the example of, do they make the

6   oils?  I will give you one other brief example.  You or I could

7   go on to the Young Living website right now and buy an essential

8   oil without becoming another brick in the pyramid.

9          Final point on argument one, we agree that a RICO

10  allegation must indicate how the defendants used the enterprise

11  to facilitate the fraud, and we've done that.  For Count I, which

12  I've been focused on, paragraphs 59 and 62 are just two of the

13  examples.

14         Now we're going to get to the first of the two

15  arguments that I mentioned the Supreme Court has said that the

16  pleading requirement does not apply.  So the second argument,

17  Young Living argues that the case must be dismissed because

18  there's no distinction between the enterprise and between the

19  predicate acts.  There is no such pleading requirement.  I'll go

20  back to *Boyle*.

21         **THE COURT:**  All right.  Mr. Tighe, before you move

22  on, does your complaint -- I guess your complaint does allege

23  that people can just buy oils, or maybe that was in your brief.

24  You talked about that.  And I think you talked about that as

25  being a reason why the members can't make money selling the

1   oils, is because anyone who wants them can just buy them at the

2   same price the distributors can.

3           Is that in your pleading or was that in your brief?

4   And if it is in the pleadings, where in the pleadings?

5           **MR. TIGHE:**  I am going to ask one of my co-counsel to

6   see if they can find that in the pleading.  I don't recall if

7   we made that specific argument, Your Honor, in the complaint.

8   I know we made arguments in the complaint about the average

9   annual income being $25 and people lose money because it costs

10  four times that to sign up.  I don't specifically remember if

11  we made the allegation that they could simply buy the oils

12  without joining.

13          My reference to that in this argument, Your Honor, is

14  to simply make sure that I comport with the *Boyle* requirement

15  that that be a fact.  And in this instance, I would submit to you

16  that it is.

17          **THE COURT:**  Right.  But, Counsel, I think the concern

18  is that the *Boyle* requirements need to be met in your pleading

19  and not just your argument.  So I guess I'm wondering where --

20  does your pleading allege these other things that Young Living

21  does, that it makes the oils, that it sells the oils directly

22  to nondistributors?  Is any of that in the pleadings?

23          **MR. TIGHE:**  It is, sir, thanks to Mr. Linkin.

24  Paragraph 31, I guess the third sentence in, Your Honor,

25  "There's no real opportunity for a member to profit from

1    becoming a reseller of oils at a markup," which is the -- which

2    is being a Young Living member, "because anyone can buy the

3    oils at the discounted wholesale price directly from Young

4    Living."

5            And that's -- just on the fly, that's paragraph 31.  I

6    won't represent to you that it appears elsewhere, but I will

7    represent to you that I just read from paragraph 31.

8            THE COURT:  Right.  And is there something in the

9    complaint that says as well that Young Living makes these oils?

10   Maybe your co-counsel can help you with that as well.

11           MR. TIGHE:  I think so, Your Honor.  I think when

12   we're giving the history of Mr. Young, the late Mr. Young, and

13   how Young Living came to be, my recollection is we talk about

14   the creation, the mixture and the production of these essential

15   oils, but they're looking for that at this point.

16           THE COURT:  All right.  Well, why don't you tell me

17   when they find it, but you can just move on with your arguments

18   so we aren't just waiting.

19           MR. TIGHE:  Thank you, sir.

20           Argument No. 2, they argued that the case must be

21   dismissed because there's no distinction between the enterprises

22   and the predicate acts.

23           Under *Boyle*, and this is my third cite to *Boyle*, and I

24   believe my last, the Supreme Court has ruled that there does not

25   need to be a distinction made between the enterprises and the

1    predicate acts.  Even if there was a requirement, Judge, under

2    the *Warner* case out of the Seventh Circuit, if one of the

3    alternative enterprises has a separate legal existence, I will

4    return to the point where there's no question that Young Living,

5    LC, has a separate legal existence.  It had to file papers to

6    become Young Living, LC.

7            In that case, they are distinct from the predicate

8    acts.  In some, they don't need to be and we need not plead that,

9    but we have alleged that and that would work under *Warner.*

10           There's lots in the third argument, Judge, and much of

11   it has to do with mail and wire fraud predicates.  And Your Honor

12   mentioned, during opposing counsel's argument, specific questions

13   and issues regarding mail and wire predicate, and I'm sure

14   Your Honor will ask me questions if you have any about those

15   specifics.  But I'm going to skip ahead in argument three as to

16   the intent to defraud, because much of what we heard from

17   opposing counsel was there's no intention to defraud.

18           The 25 pages I'm making reference to are all intent to

19   defraud.  The fraudulent misrepresentation is you can make an

20   abundance, we've all heard word the "abundance".  He used

21   abundance, Your Honor used abundance.  So you can make an

22   abundance of money, you can make a lot of money.  What we've

23   alleged is that the average income per year is roughly $25, which

24   is a quarter of what it costs to join, and the majority of

25   members lose money.  That makes representations regarding how

1    this can create an abundance fraudulent misrepresentation.

2            Opposing counsel said we don't cite any omissions.  I'm

3    suggesting, Your Honor, that the entire range of those 25 pages

4    is a fraudulent omission.  What's the omission?  The omission is,

5    is that this is a pyramid scheme where you only make money by

6    building your downline.  All of those communications, Your Honor,

7    over those 25 pages is about, come to these meetings and learn

8    how you can be part of a family that will grow your revenue, that

9    will grow your life, and will offer these great opportunities.

10           Specifically, we allege in paragraphs 22 to 36 an

11   intention to defraud through recruitment.  In paragraph 37, we

12   allege the overwhelming majority of members lose money by paying

13   more than they receive, and enriching those up the pyramid,

14   including those running the pyramid, Young and Turner.

15           Okay.  If that fact, as alleged, and it must be at this

16   point, is taken as true, so let's do what we do in 12(b)(6), that

17   is taken as true, how do they -- how is that tied to the acts of

18   an intent to defraud?

19           It's by getting those e-mails and mails out to

20   encourage people to join and to buy into something that is not

21   going to be enriching, that is not going to be money making.  We

22   described the false promises of financial awards in paragraph 48,

23   paragraphs 51, 62 and 73.  We say that Young and Turner, through

24   their use of false pretenses to deceive, by using material

25   misleading statements of fact regarding what Young Living really

1    is and is not.  The complaint by defendants is that doesn't have

2    a who, what, when, where, why and how.

3            Well, it certainly has a what, it certainly has a how,

4    it certainly has a why, but if the argument is we don't say who

5    said it, who took it to the mailbox and dropped it in the

6    mailbox, well, guilty, we don't, because we don't know.  But what

7    we do know is that the entire intent of Young Living is fraud,

8    the entire intent.  So every single -- every single paragraph of

9    those 25 pages is an intent to defraud.

10           The final argument is argument No. 4 and that regards

11   Count II.  Counsel for Young Living discussed this in his

12   argument, said that Count II, the conspiracy count, Your Honor,

13   should be dismissed because we didn't plead an agreement to

14   commit the predicate acts.  Much like argument two, the Supreme

15   Court has said there is no such requirement to do so.  All that

16   is necessary to maintain Count II, and this is the *Salinas* case

17   on page 25 of our response brief, is an agreement to the overall

18   conspiracy.

19           The overall conspiracy agreed to by Young and Turner is

20   to run a pyramid scheme.  And, again, the allegations of how to

21   do so and what was done are set forth in the 25 pages throughout

22   the complaint.

23           Your Honor, I tried to limit my argument somewhat based

24   on some of the issues that you raised during opposing counsel's

25   presentation, but I'm certainly happy to elaborate or answer any

1    questions for that.

2              **THE COURT:**  All right.  Thank you.  I appreciate

3    that.  One thing I would like to ask about is the 9(b) issue.

4    And your opposing counsel, Mr. Fielding, he put great emphasis

5    in his argument, and I think it's fair to say that this wasn't

6    a new issue in argument, it's in the briefs as well, on the

7    requirement that you allege with particularity the

8    misrepresentations.

9              And opposing counsel agrees with you, that you don't

10   have to allege that the specific instances of use of the wires or

11   mails contain these misrepresentations, but he's arguing

12   somewhere in your complaint, you have to allege specifically what

13   was said that was false, who said it, when they said it.  And I

14   gather part of your argument may be that you just don't agree

15   with that, but if that's true, if opposing counsel is correct,

16   where do you allege with particularity that someone said

17   something false specifically?

18             **MR. TIGHE:**  Yes, Your Honor, thank you.

19             So for example, when we talk about the mail and wire

20   fraud, which, again, that doesn't need to be the mechanism,

21   right, of the -- the fraud does not need to be contained within

22   the wire and the mail, and we all agree to that.  But in this

23   case, it was, because when you -- and, again, this is throughout

24   all of the paragraphs throughout those 25 pages.

25             When you invite people through wire and mail to join an

1    organization with the promise that they can make a lot of money,

2    and you know that that is a false statement, that covers both the

3    false aspect of the representation and it covers intent to

4    defraud.

5              As to the who, we argue that in all of those

6    paragraphs, with the exception of, I think, maybe 11 or 12

7    paragraphs where we specifically identify Ms. Young and

8    Mr. Turner, we use the phrase "Young Living."  It's one of the

9    arguments they made against us for group leading, but in many of

10   those paragraphs we make the argument that Young Living is the

11   one who was making these fraudulent representations.  Come to

12   this annual meeting, join this organization, you can make a lot

13   of money, knowing that that's false and intending to have people

14   rely upon that.

15             When we use Young Living in that phrase, it

16   obviously -- a corporation only acts through its individuals.  So

17   obviously inherent in that is at least Young and Turner, and

18   perhaps others at Young Living, perhaps someone was assigned the

19   job of recruiting for the annual meeting, which they get together

20   and have a pep rally, where they try to sign up a bunch of people

21   as they go out the door.  I don't know if that's Turner and

22   Young.  I don't know who that is as an individual.  I do know

23   that it's Young Living.

24             So I would represent to you, Your Honor, that we have

25   sufficiently alleged that by alleging that it is Young Living,

1   which is the corporation and the corporation's act through their

2   executives and principals.

3           THE COURT:  All right.  Thank you very much,

4   Mr. Tighe.

5           All right.  Mr. Fielding, I'll give you a few minutes

6   if you feel like you need to respond to any of the specific

7   arguments that -- actually, that either of your two opposing

8   counsel have made.

9           MR. FIELDING:  Yes, Your Honor.  I actually have only

10  two things I want to cover really quickly, if I may.

11          THE COURT:  All right.

12          MR. FIELDING:  First, Your Honor, let me address --

13  opposing counsel said two out of the three claims fail

14  outright.  I want to be clear about this.  I mean, Count I, we

15  talked about that, I get that.  I get why he says that.  I've

16  already conceded, I think that's the closest call, even though

17  we believe the weight of the authority supports us.  But on the

18  conspiracy claims, Your Honor, where he says that it's contrary

19  to Supreme Court law, what he's ignoring is -- what opposing

20  counsel is ignoring is the Tenth Circuit law that talks about

21  just because -- well, it specifically references the fact

22  that -- I apologize, Your Honor, let me turn this off.

23          That specifically references the fact that you have

24  to -- you can't just say that there was an agreement, but you

25  have to specifically plead facts to support that agreement.  And

1    we cite to those cases in our brief and they don't have a

2    response to that at all, other than to say that -- like it's

3    true, that you have to agree, but you have to have some facts to

4    support that agreement.

5           Let me deal with the other thing, and I think this is

6    probably the most significant of all of it, Your Honor.  And that

7    is, I heard him say now that what they're -- when was that, when

8    he was asked, "What is the claimed fraud, like where do you

9    identify?"

10          And his answer was, "Well, we told them" -- "they were

11   told that it would be abundant," is what he said.

12          Now, here's the problem -- a couple of problems with

13   that.  First of all, as the Court already noted, there is no --

14   as the Court already noted, there's no who, time, place, content,

15   identity or consequences associated with that particular

16   statement.  He just says it's abundant.  And in fact, in their

17   pleading they say, you know, that "lured by the promises of

18   abundance," is what they say.  But there's no one that's

19   identified when the statement was made, who it was made, what the

20   specific contents were.  Like is it just, you'll have an abundant

21   life?  The identity of the person making it.  And here's what's

22   worse, Your Honor, it's directly contrary to their own pleading.

23   So the class representative, in paragraph 56, identifies how she

24   says she became a member.  And this is a quote from paragraph 56.

25          "Julie O'Shaughnessy was also persuaded by the

 1   operation of a Young Living distributorship, might at least cover
 2   cost of paying approximately $100 for the starter kit."  Okay?
 3           Two things that stand out here.  Thing number one, "was
 4   also persuaded," passive voice.  Who persuaded her?  How did they
 5   persuade her?  When did they persuade her?  Where?  What did they
 6   say?  Why was it false?  We don't know.  We just get passive
 7   voice, like we do through everything, either that or conclusory
 8   statements.
 9           Secondly, Your Honor, note that the thing that she said
10   lured her in was not the promise of abundance or riches, but she
11   could at least cover the costs.  She was -- according to their
12   petition with their class rep, the class rep says, "I just
13   thought I would break even."
14           So this notion that like what they've pleaded is this
15   case, now they could have -- I suppose they could have pleaded
16   some case that says, "Here's a specific promise that was made,
17   here's when it was made, here's who made it."
18           And by the way, what's interesting, Your Honor, if you
19   look at a lot of the cases, the *Ranieri* case is a great example,
20   the Court ends up dismissing that case, but the Court notes that
21   like at least in that case, the plaintiffs actually identified
22   specific statements from specific people and why the content was
23   false.  They don't do any of that here.
24           And I think that's significant and important because,
25   again, what it demonstrates is they just utterly and completely

1    failed under their duty.

2            They also said that -- I heard him say that all through

3    the 25 pages are -- it's full of these, you know, specific

4    statements about who, what, when, where, how, et cetera.  Again,

5    here's just -- here's some, we've looked at others, Your Honor,

6    we cite to them in the brief.

7            Here's what the 25 pages consist of:  The defendant's

8    group pleading, they use false pretenses, no identification what

9    they are, et cetera, et cetera.  So when they say that there's

10   this abundance and things like that, it doesn't square with what

11   their pleadings say.  It directly contradicts the allegations the

12   class representative made, and none of this can cure the

13   underlying problem here, which is we still don't know what is the

14   lie that they were told or were told or were supposed to be told,

15   plaintiffs aren't saying.

16           **THE COURT:**  All right.

17           **MR. FIELDING:**  And for that reason, you have to

18   dismiss.

19           **THE COURT:**  All right.  Thank you, Mr. Fielding.

20           All right.  Again, let's get the PowerPoint down.  All

21   right.  Thank you.

22           Now, either -- let's see.  Either of the counsel for

23   plaintiffs who were speaking, Mr. Linkin and Mr. Tighe, do either

24   of you have any final words that you feel like you just have to

25   say in response to Mr. Fielding's most recent -- what

1  Mr. Fielding just said?

2          **MR. TIGHE:**  I do, Your Honor, only not in response to

3  what he said, but in response to the two questions you asked,

4  that I now have the answer to.

5          **THE COURT:**  Okay.  Please.

6          **MR. TIGHE:**  Thank you, Your Honor.

7          We did not specifically plead, having reviewed in the

8  complaint, that Young Living actually manufactured the oils.

9  What we say in paragraphs 20, 31, 41, and 50, is we refer to them

10  as Young Living oils.  But really most importantly, I think, is

11  paragraph 29, we refer to them as Young Living products.  But the

12  word "manufactured" does not appear, Your Honor, direct answer.

13          **THE COURT:**  Thank you.

14          **MR. TIGHE:**  The second one has to do with this intent

15  to defraud issue.  I think opposing counsel is trying to

16  shoehorn a fraud standard, a securities fraud standard, into a

17  RICO analysis.  I was overcomplicating this.  It's more simple.

18          A pyramid is by definition fraudulent.  It will fail.

19  It's definitionally fraudulent.  When we say pyramid scheme, it's

20  definitionally fraudulent.  New members will not make money, and

21  we satisfy 9(b) by alleging that this is a pyramid scheme.  By

22  doing so, we pled a fraudulent vehicle and all the facts in those

23  25 pages support that.

24          Thank you, Your Honor.

25          **THE COURT:**  All right.  And let me just ask you a

1    question.  Your opposing counsel flirted with the proposition,

2    and didn't quite embrace it, that, you know, even a pure

3    pyramid scheme might not be fraudulent or actionable by an

4    individual investor if it was fully disclosed.

5             Do you disagree with that?  Do you think just by

6    definition, a pyramid scheme, even if fully disclosed, is

7    actionable, is fraud?

8             **MR. TIGHE:**  I do disagree for this reason:  It

9    wouldn't be a pyramid scheme if it was fully disclosed.  I'm

10   not trying to cut around circular.  It wouldn't exist if full

11   disclosure was made as to the facts that we've alleged.

12            **THE COURT:**  All right.  Understood.

13            **MR. FIELDING:**  Your Honor, if I may real quickly, he

14   raised a point about -- that he hadn't made before, that the

15   mere fact that they're inherently fraudulent itself saves them.

16   I'll just note that the *Ranieri* case specifically rejects that,

17   the case that they liked from the PSLRA.

18            Let me read from the *Ranieri* case at page 917.

19            "Plaintiffs contend that in the Fifth Circuit, pyramid

20   schemes are inherently fraudulent, thus they argue allegations

21   that the individual defendant supervised the scheme suffice to

22   show scienter or intent."

23            The Court then says, "Plaintiffs spend several pages

24   detailing how the individual defendants defended *AdvoCare* for

25   pyramid scheme allegations, but provide no facts or circumstances

1    from which the Court can infer that they knew or showed reckless

2    disregard for the truth of those assertions."

3            And in fact, what the Court did in the *Ranieri* case,

4    the Court dismissed the RICO claims, precisely because this

5    argument that you just heard opposing counsel make right now,

6    that, well, it's a pyramid scheme and all I have to do is allege

7    that they were involved in it, the Court noted that's not how it

8    works.  You have to identify what they did, how they did it and

9    that they knew about it.

10           **THE COURT:**  All right.  Thank you.  I understand your

11   arguments.

12           Thank you.  It's been kind of a lengthy hearing but

13   it's been very helpful.  I appreciate all of the arguments that

14   you've made.  Before we adjourn, are there any other matters that

15   the Court needs to take under consideration at this time?

16           For the defendant, anything?

17           **MR. FIELDING:**  Nothing from us, Your Honor.

18           **THE COURT:**  All right.  How about the plaintiffs?

19   Anything we need to address at this time?

20           **MR. LINKIN:**  Nothing from plaintiffs, Your Honor,

21   thank you.

22           **THE COURT:**  Very well.  Thank you.  And court is

23   adjourned.

24                   (Concluded at 2:38 p.m.)

25                      CERTIFICATE OF COURT REPORTER

67

```
1

2          This is to certify that the proceedings in the

3   foregoing matter were reported by me in stenotype and

4   thereafter transcribed into written form;

5          That said proceedings were taken at the time and

6   place herein named;

7          I further certify that I am not of kin or otherwise

8   associated with any of the parties of said cause of action and

9   that I am not interested in the event thereof.

10          In witness whereof I have subscribed my name this

11   17th day of March 2021.

12

13   _____

14   Teena Green, RPR, CSR, CRR, CBC

15

16

17

18

19

20

21

22

23

24

25
```