Austin Tighe (*pro hac vice*)
atighe@nixlaw.com
**NIX PATTERSON, LLP**
3600 N Capital of Texas Highway
Suite B350
Austin, Texas 78746
Telephone: 512.328.5333

Robert E. Linkin (*pro hac vice*)
rlinkin@dwmrlaw.com
**MUNCK WILSON MANDALA, LLP**
807 Las Cimas Pkwy, Building II
Suite 300
Austin, Texas 78746
Telephone: 737.201.1616

Attorneys for Plaintiff

J. David Rowe (*pro hac vice*)
drowe@dbcllp.com
**DUBOIS, BRYANT & CAMPBELL, LLP**
303 Colorado Street, Suite 2300
Austin, Texas 78701
Telephone: 512.457.8000

Jason A. McNeill (9711)
mcneill@mvmlegal.com
Christopher M. Von Maack (10468)
vonmaack@mvmlegal.com
**MCNEILL | VON MAACK**
175 South Main Street, Suite 1050
Salt Lake City, Utah 84111
Telephone: 801.823.6464

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **JULIE O'SHAUGHNESSY, individually, and on behalf of all others similarly situated,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**YOUNG LIVING ESSENTIAL OILS, LC D/B/A YOUNG LIVING ESSENTIAL OILS,**<br><br>**Defendant.** | **SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><br><br><br><br>**Case No. 2:20-cv-00470-HCN-DBP**<br>**District Judge Howard C. Nielson, Jr.**<br>**Magistrate Judge Dustin B. Pead** |

Plaintiff Julie O'Shaughnessy ("Plaintiff" or "Julie"), individually, and on behalf of all those similarly situated, files her Second Amended Class Action Complaint against Defendant Young Living Essential Oils, LC d/b/a Young Living Essential Oils ("Young Living"). Plaintiff's Second Amended Class Action Complaint pleads federal securities claims brought pursuant to

Section 12(2) of the Securities Act of 1933, and Section 10b(5)(a) and (c) of the Securities Exchange Act of 1934.[1] Accordingly, Plaintiff alleges as follows:

# I.
## INTRODUCTION

1.      Julie, like the hundreds of thousands of putative class members she seeks to represent in this action, paid Young Living thousands of dollars to participate in Young Living's heavily marketed business opportunity.

2.      As it turns out, Young Living is part of an illegal pyramid scheme created under the guise of selling Young Living's own essential oils for quasi-medicinal purposes.  In truth, Young Living is nothing more than a piece of a cult-like organization falsely peddling the ever-elusive promise of financial success and an alternative lifestyle.

3.      The amounts paid by Julie and putative class members just like her to become Young Living Essential Rewards enrollees ("Members"), were induced by the false promises that "investment" in Young Living's pyramid scheme would bring about financial health (which Young Living calls "abundance") and even physical health.  Of course, the patently false promise of riches and alternative health remedies are simply the hook used by Defendant to grow Young Living's base of recruits, which is necessary to prop up the illegal pyramid scheme so that the Defendant, but not the Members, is rewarded with immense wealth.

4.      Defendant Young Living, and promoters of the pyramid scheme falsely represent to Young Living's Members that participation in Young Living—which necessarily requires regular monthly payments—will result in spiritual and material riches so long as they continue to

---

[1] Plaintiff's Second Amended Class Action Complaint no longer pleads claims against former Defendants Mary Young and Jared Turner.

solicit additional recruits to become Members of the Young Living family and pay their minimum monthly dues.

5.      But those promises are nothing more than a pipe dream for Young Living's millions of Members.  In reality, Defendant is operating an unlawful pyramid scheme—the cornerstone of which is Young Living's emphasis on new member recruitment over the sale of products.

6.      To wit, based on Young Living's own public disclosures, 94% of total Members earn an average of $1 per month in sales commissions, and more than half of those who joined in 2016 alone made no commissions at all.  Worse still, these same Members were nevertheless required to spend hundreds of dollars on Young Living products to remain active Members.  As such, the average *loss* per Member in 2016 was approximately $1,175, a key fact that Defendant not only failed to disclose, but affirmatively concealed from, prospective new Members.

7.      In short, Defendant has conducted business in an unlawful fashion and Plaintiff and the putative class seek to hold them accountable for such behavior.

8.      Accordingly, Plaintiff seeks on her own behalf and on behalf of the putative class to recover damages from Defendant pursuant to federal securities laws.

## II.
### PARTIES

9.      Plaintiff and putative class representative Julie O'Shaughnessy is a resident of Austin, Texas.  In 2015, Julie became a Young Living representative after being recruited by a friend at a party designed for that purpose.  Julie paid $100 to become a Young Living Member and has since expended thousands of dollars as part of her participation in the Young Living scheme, all of which is now lost.

10.     During the 2015 party attended by Julie, Julie paid $100 to join Young Living as a Member and also enrolled as a Young Living Essential Rewards Member by filling out a Young Living Essential Rewards Membership Application on-line, as well as receiving Young Living's Policies and Procedures, and Compensation Plan. Julie and putative class member's Young Living memberships have been declared to be securities and such securities are unregistered in Utah (or anywhere else). [2]  The Membership Application, Policies and Procedures, and Compensation Plan constitute the offering materials/prospectus delivered to investors and through which the security is sold.

11.     Defendant Young Living Essential Oils, LC is a Utah limited liability company with its principal offices and headquarters located in Lehi, Utah.  Young Living claims to "create abundance" for its Members.  In reality, Young Living creates abundance only for itself, by selling prospective Members on its fantastical and cult-like culture—all of which revolves around the self-authored mythology of its recently deceased founder, Gary Young, and his fraudulent peddling of essential oils as a medicinal remedy.  Young Living has been served with process by serving its registered agent, Corporation Service Company, 15 West South Temple, Suite 1701, Salt Lake City, UT 84101, and has appeared.

### III.
#### ADDITIONAL NON-PARTIES

12.     Gary D. Young, who died in early 2018, was the founder of Young Living.

---

[2] Plaintiff brings this lawsuit as a securities claim in response to the Court's order dismissing her RICO claims and granting leave for Plaintiff to amend her petition to include securities claims only.  Plaintiff preserves her objection to the Court's ruling that her RICO claims are pre-empted by the PSLRA.

13.     Mr. Young's colorful 30 year history as the founder and CEO of Young Living included such memorable moments as: (a) being prosecuted for practicing medicine without a license on multiple occasions; (b) running a now shuttered "Young Living Research Clinic" in Springville, Utah, (subsequently replaced by a Young Living clinic in Ecuador) where he employed a quack physician convicted of manslaughter; and (c) allegations he nearly killed a patient through vitamin C infusions which caused renal failure.[3] His biography (authored by his wife—former Young Living CEO Mary Young) "D. Gary Young: The World Leader in Essential Oils," is a central piece of the Young Living cult's lore, which in turn is critical to the Defendants' schemes.[4]

14.     Young Living Foundation (the "Foundation") is a 501(c)(3) charitable foundation also created by Mr. Young. While the Foundation engages in charitable endeavors, it also serves to provide legitimacy to the pyramid scheme, as well as an entry point for the recruitment of members into the pyramid scheme across the globe.

---

[3] *See* Rachel Monroe, *How Essential Oils Became the Cure for Our Age of Anxiety*, THE NEW YORKER, October 9, 2018. Mr. Young was also the subject of an investigative report in which workers at his Tijuana based "medical clinic" represented to an undercover investigative reporter from the Los Angeles Times (who had provided the clinic with a blood sample) that he had "aggressive cancer and liver dysfunction" which required immediate, expensive therapy at the clinic. When the clinic workers were confronted with the fact the blood sample was provided by a healthy tabby cat named "Boomer," they responded the cat likely had leukemia. According to Ms. Moore's article, Boomer is alive and well, despite Young Living's gloomy diagnosis.

[4] According to Mr. Young's biography, while working as a logger in the State of Washington, Mr. Young was struck by a falling tree, which resulted in a fractured skull, ruptured spinal cord, and nineteen broken bones. After being told he would never walk again, Mr. Young claimed to have healed himself through a 252-day dietary regimen of nothing but water and lemon juice. By comparison, the medicinal qualities and potential for financial rewards ascribed to essential oils by Young Living are not nearly as believable.

## IV.
### JURISDICTION & VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. 1332(d)(2).

16.     Venue is proper in this District, and this Court has personal jurisdiction over the Defendant pursuant to 28 U.S.C. § 1391(b) as the Defendant is a citizen of, resident of, is found within, have agents within, are doing business in, and/or transact their affairs in this District, and the activities of the Defendant which give rise to the claims for relief occurred in this district. Moreover, the venue agreement contained in the Membership Agreement between Plaintiff and Defendant was previously determined by the United States District Court for the Western District of Texas (where this action was first filed) to be a mandatory venue selection clause, such that venue for this action exists only in this judicial district.[5]

## V.
### FACTS

#### HOW THE YOUNG LIVING PYRAMID SCHEME WORKS

17.     Young Living manufactures and sells "essential oils" via a complicated MLM operation, which is actually an illegal MLM pyramid scheme operated by Defendant. The complex and intentionally hard-to-understand multi-layer compensation/participation structure of the Young Living pyramid is a hallmark of illegal MLM pyramid schemes.

18.     While many consider every MLM company to be inherently fraudulent, the Federal Trade Commission has outlined some guidelines it considers critical to distinguishing an illegal pyramid scheme from a "legitimate" MLM.  For example, a legal MLM program must structure

---

[5] *See* Dkt. No. 74.

its compensation so that the members are paid primarily based on sales of goods and/or services to those outside the plan.  By contrast, an illegal pyramid scheme overwhelmingly rewards its participants for recruitment of new members rather than product sales made to persons outside the pyramid structure.

19.     Here, the Defendant is operating an illegal pyramid scheme, in no small part because the financial success of any Young Living Member is overwhelmingly dependent on the recruitment of new people into the Young Living sales force—*i.e.,* the defining characteristic of an illegal pyramid scheme versus a legitimate MLM company.  Specifically, Defendant peddles the fleeting promise of financial rewards—what they call "abundance"—through the unrelenting recruitment of new Members.  The pyramid's very structure ensures that every new Member will almost certainly lose large sums of money, chasing the elusive promise of "abundance" by trying to recruit additional new Members from an ever-shrinking pool of available candidates.

20.     And the Members' losses are compounded by the pyramid's structure, which requires Young Living's Members to continuously purchase (and as a result, hold) an ever-growing inventory of unused product, in direct violation of the 70/30 rule established in the FTC's 1979 *Amway* ruling.[6]

### (1)     The Pyramid Scheme Encourages Member Recruitment over Retail Sales

21.     In order to join Young Living, new Members must first purchase a "starter kit" from an existing Member and enter into a Member Agreement which also incorporates Young Living's Policies and Procedures and Compensation Plan.  A basic starter kit consists of an order of a single, 5 ml bottle of "stress away" essential oil, samples of other various oils, an atomizer,

---

[6] *See In the Matter of Amway Corporation*, 93 F.T.C. 618, 679–80 (1979).

sample business cards, "Essential Oils Magazine," "Essential Edge News," and miscellaneous other "resources" for new Members.  The cost of a starter kit ranges from $100 (for a basic kit) up to $260 for "premium" kits.  The vast majority of new Members opt for the premium kits, largely because the recruiters are actively encouraged by Young Living to push the premium kits over the starter kits.

22.     Once a new Member enrolls, Young Living pays a cash bonus to the "up line" Member who recruited the new "down line" Member to incent its existing Members to recruit as many new down line Members as possible.[7]

23.     The payment of the cash enrollment bonus, however, is not the only manner in which Members are actively and repeatedly encouraged to focus their efforts on the recruitment of new Members.

24.     Even a cursory review of Young Living's compensation structure makes abundantly clear recruiting is prioritized over the sale of product in the Young Living system—to a fault.[8]

25.     As Members attempt to move through the Young Living compensation system, their only opportunity to earn enough income to cover the cost of Membership is by recruiting new Members and then encouraging their down line Members to also recruit aggressively.  And this undoubtedly is by design.

---

[7] When Julie joined in 2015, the cash bonus was $50.  Today it is $25.

[8] A true and correct copy of the Young Living Compensation Plan was attached as Exhibit A to the Original Complaint.  *See* Dkt. 1 at 38.  That document is incorporated herein by reference.

26.     To move up the pyramid and to be eligible to receive commissions, Young Living Members must enroll in the Essential Rewards ("ER") program and maintain their active enrollment in ER by purchasing a minimum amount of Young Living products on a monthly basis, which is referred to as personal volume or "PV."

27.     Young Living gives each product a PV value, where each point is roughly equivalent to each dollar of goods purchased.  So, a $10 product would typically have a PV value of 10.  The minimum PV value to maintain active enrollment in ER is 50, but to earn commissions on a downline, the minimum PV increases to 100.  In Julie's case—before she discovered Defendants were operating an illegal pyramid scheme—she purchased at least $100 of Young Living product each month in order to maintain her eligibility to earn commissions.

28.     The products that comprise a Member's PV are purchased at a 24% discount and, at least theoretically, can be resold by each Member, who could retain any difference between the discount and the retail price for which they might sell the product.  But there is no real incentive or profit associated with a Member trying to become a reseller of oils as opposed to becoming a recruiter of more down line members for two important reasons.  First, there's no real opportunity for a Member to profit from becoming a reseller of oils at a mark-up because anyone can buy the oils at the discounted "wholesale" price directly from Young Living.  Second, Members do not earn any commissions on the PV they purchase from Young Living.  Instead, Members earn commissions only from (a) starter kits sold to newly recruited Young Living Members, and (b) the Organizational Group Volume, or OGV, purchased by their down-line Members either recruited personally by them, or recruited by their down-line Members.  Importantly, no Member may earn a commission except through new member recruitment.

29.     And even more shocking is that Young Living doesn't even pay earned commissions to most of those lucky few who are able to amass a down line that purchases the minimum level of OGV each month.  To the contrary, if a Member's earned commission is less than $25 in a single month, Young Living will not pay that commission to the Member.  Instead, Young Living issues a credit, which can be used by the Member only to buy more product.  So, if a Member's OGV isn't large enough each month to trigger a commission check, her only option is to recruit even more Members in hopes of driving up her OGV.

30.     This is not a system designed to sell product to those outside the pyramid.  Rather, the entire system is designed for one purpose:  to recruit new Members to grow the illegal pyramid.

31.     To support the pyramid's need to bring in new blood, Young Living presents its Members with a dizzying array of bonuses and other compensation benefits earned solely through the recruitment of additional Members.  And those benefits all come with membership titles meant to falsely convey to new Members the promise of wealth—such as "Gold," "Platinum," and potentially, the elusive title of "Royal Crown Diamond."

32.     The problem is, these higher tiers are virtually unattainable.  In order to move up the pyramid and share in the abundance of promised riches, a Member's required minimum OGV increases dramatically.  For example, in order to earn the relatively low rank of "Star," a new Member must have an OGV of 500, and the Member's minimum PV of 100 doesn't count towards the 500 OGV.  In other words, a Member is required to recruit new Members to move up the pyramid and earn commissions.  And because Members are not rewarded for additional PV purchased personally, the only conceivable way for a Member to move up in rank is by achieving the near impossible—*i.e.,* the creation of a down line consisting of *thousands* of recruits.

33.     Consider, for example, Young Living's highest rank of "Royal Crown Diamond." The required OGV is a staggering 1,500,000.  In order to meet an OGV of 1,500,000, a Member would need a down line of more than 15,000 members each purchasing the minimum PV.  And because attrition and failure to order minimum PV is not uncommon, it is likely a Member would actually need a down-line consisting of many multiples of that number.  Thus, it is not surprising that an infinitesimally small number of Members have ever actually achieved any meaningful success.  Indeed, while Young Living brazenly touts the achievement of becoming a "Royal Crown Diamond" as within the grasp of all of its Members, a mere 46 have achieved this goal.  Young Living claims it has 3,000,000 active Members but does not report on the number of former Members.  Thus, only .0015% of active Members have made it to the top of the pyramid, and the percentage of all Members is very likely much, much smaller.  On information and belief, Young Living intentionally conceals the number of former Members from new recruits so they will not know how truly impossible it is to achieve "abundance" by joining the illegal pyramid.

34.     Thus, the overwhelming majority of Young Living Members lose money by paying far more into the scheme than they receive, while those few at the top reap untold riches, funded by all of the lower-level Members paying into the system.  This is the very definition of an illegal pyramid scheme.

**(2)     <u>Young Living Encourages Its Members to Violate the 70/30 "Amway" Rule</u>**

35.     Beyond Young Living's overwhelming dependence on recruitment income, Young Living's status as an unlawful pyramid scheme is further evidenced by its brazen violation of the so-called 70/30 rule.  In the Federal Trade Commission's seminal 1979 *Amway* ruling, it concluded that Amway did not operate as a pyramid scheme, in part, because Amway required its

representatives to submit proof of resale demonstrating no more than 30% of purchased product was for personal use or storage before permitting its representatives to purchase additional product—thus the term "70/30."

36.     The 70/30 rule is designed to prevent an MLM from encouraging its Members to continuously order new product for sale (sometimes referred to as "inventory loading") in order to be eligible to earn commission.  Here, Young Living's compensation system actually requires its Members to inventory-load product.  If a Member fails to meet her minimum monthly PV, she is not eligible to earn any commissions on her down line's OGV no matter how large that OGV may be.

37.     Young Living is well aware of the 70/30 rule.  Its policies and guidelines even say that no more than 30% of ordered PV can be stored prior to purchasing additional inventory.  But this is mere lip-service.  Young Living does absolutely nothing to enforce this policy and is well-aware that it is routinely violated.  It has no method of compliance in place, and it requires no proof that its Members are actually selling their PV.  Any Member can order as much PV as she wants, whenever she wants.  Indeed, the monthly minimum PV required to earn commissions intentionally encourages Members to buy product each and every month regardless of how many bottles of essential oils are being amassed in closets and garages by Members.

38.     And, unlike MLMs that sell physically large products, which impedes inventory loading, the opposite is true of Young Living's products.  Young Living's oils are contained in small, easily stored vials, which actually facilitate inventory loading.  Most vials contain only 5 ML to 15 ML and each one can sell for $20+.  At that size and price, a single closet shelf would be enough space for a failing Young Living Member to store literally thousands of dollars in unsold

product, hoping against hope that her down line OGV will grow large enough to trigger a meager commission.

        **(3)**    **Young Living Is In Fact an Illegal Pyramid Scheme**

    39.    By any measure, the Defendants are unequivocally operating a pyramid scheme.

    40.    Numerous government agencies, legal opinions and experts have all recognized that MLM companies like Young Living, which emphasize member recruitment over product sales, earn the majority of their revenue from member recruitment, and make no effort to enforce the "70/30" rule, are in fact illegal pyramid schemes.[9]

    41.    Indeed, in 2015 the FTC sued Arizona based Vemma Nutrition Company in the District Court of Arizona for running an illegal pyramid scheme utilizing the exact pay structure and model utilized by Young Living.[10]

    42.    In December 2016 Vemma admitted it was running an illegal pyramid scheme and agreed to a judgment which included $238 million in monetary damages, as well as an injunction which prohibits Vemma from, *inter alia*, engaging in the very same acts which the Defendants are engaging in here.[11]

---

[9] *See e.g.*, *Stull v. YTB Intern., Inc.*, CIV. 10-600-GPM, 2011 WL 4476419, at *5 (S.D. Ill. Sept. 26, 2011) (unpublished) (noting fact travel based pyramid scheme's revenues were largely derived from new recruits supported allegation it was a pyramid scheme).

[10] *See FTC v. Vemma Nutrition Co.,* et al., 15 CV 01578–PHX (D. Ariz.) (ECF No. 1).

[11] *See* FTC Release "Vemma Agrees to Ban on Pyramid Scheme Practices to Settle FTC Charges." https://www.ftc.gov/news-events/press-releases/2016/12/vemma-agrees-ban-pyramid-scheme-practices-settle-ftc-charges (Dec. 15, 2016). More recently, Dallas-based Advocare, in the face of the FTC's allegations it was also running an illegal pyramid scheme, agreed to a $150 million fine levied by the FTC and to completely change its business model such that members no longer recruit at all, and instead only sell Advocare products directly. *See* FTC Release "FTC Settlement Ends Advocate's Alleged Pyramid Scheme and Bans Defendants from Multi-Level Marketing" https://www.ftc.gov/news-events/blogs/business-blog/2019/10/ftc-settlement-ends-advocares-alleged-pyramid-scheme-bans (Oct. 2, 2019).

43.     Specifically (and just like Vemma), the overwhelming majority of representatives will not even recoup the money they paid to Young Living to become a Member and be part of Young Living's sales force.

44.     Conversely (and just like Vemma), Young Living's enormous revenue is largely staked in the money it receives from its own representatives to be part of the sales force, and the products its sales force are required to purchase to remain an active Essential Rewards enrollee.

45.     Federal courts have recognized that the operation of a pyramid scheme such as Young Living constitutes fraud.  Pyramid schemes make money for those at the top of the pyramid and victimize those at the bottom who cannot find recruits.  Accordingly, pyramid schemes by their design and implementation are inherently fraudulent.  The Defendant's operations are also a pyramid scheme because they are based on false promises of vast financial rewards, which are impossible to achieve for new Members who enter at the bottom of the pyramid and who have no realistic chance of moving up the ladder.

46.     Ultimately, the Members are financially induced by Defendant to recruit new representatives to join the sales force through materially false representations and/or omissions about the Young Living pyramid scheme.  By emphasizing recruitment over product sales, Young Living crosses the threshold from legitimate MLM into an illegal pyramid scheme.

47.     The rewards Members can achieve in this case are dependent on virtually endless recruitment into the scheme in which people are exploited and have virtually no chance to get a return on their "investment," let alone achieve the high financial gains Defendant induced these representatives to believe they would achieve.  The Defendants participates in the illegal fraud

through its statements, omissions, and actions in furtherance of Young Living's operations as an illegal pyramid scheme.

THE STRUCTURE OF THE YOUNG LIVING PYRAMID SCHEME

48.     The members of the Young Living Pyramid Scheme is structured in the following manner, and the Defendant and others have the following roles:

a.      Gary Young created Young Living Essential Oils, LC and the Young Living Foundation (the "Foundation") as legitimate fronts behind which he created, operated, and grew the illegal pyramid.   For their legal faces, Young Living manufactures, promotes, and sells essential oils, while the Foundation is Young Living's charitable arm that gives Young Living a patina of legitimacy and entry into otherwise difficult to penetrate markets around the world. Behind the scenes, however, Gary Young used Young Living and the Foundation to operate the illegal pyramid scheme described herein.   Mary Young helped her husband promote and operate the illegal pyramid scheme and later took over operations of the unlawful pyramid scheme after her husband died.

b.      Young Living manufactures, bottles and sells essential oils. Young Living also serves to (i) provide the pyramid scheme with the means to implement and promote a compensation plan that drives recruitment rather than sales of the products produced by Young Living, and (ii) operate an administrative structure that, among other things, creates and supports the marketing of the pyramid scheme.   Through these efforts, Young Living grows the pyramid scheme through encouraging new recruitment by unsuspecting Members.

c.      The Foundation is a 501(c)(3) charitable organization that participates in charitable endeavors, it also serves to provide the pyramid scheme with a patina of legitimacy, and

thus helps to introduce the pyramid scheme to unsuspecting potential Members across the globe. Notably, nearly all pyramid schemes involve the creation of a foundation for this very purpose.

        d.     Individuals associated with the Defendant each performed a role that was essential to its operation and continued success of the Pyramid Scheme.  Mary Young is a co-founder along with Gary Young, and as of the date this suit was originally filed, acted as the Chief Executive Officer of Young.  Since 2012, Jared Turner has served as the Chief Sales Officer, the Chief Sales and Marketing Officer, the Chief Operating Officer, and as of the date this suit was originally filed, was the President and COO of Young Living.

        e.     The success of Defendant's pyramid scheme would not be achieved but for the agreed, active, willing participation of these individuals and the Foundation.  For example, Mary Young wrote and created the fictional biography of Gary Young, through which the scheme's fraudulent promises of spiritual and financial "abundance" were developed and promoted.  Later, Young took over operation and management of the pyramid scheme, and she and Turner agreed to perpetuate the scheme.

        f.     The success of the pyramid scheme made it possible for the Defendant and these individuals to enjoy substantial illegal financial benefits through the fraudulent payment of enormous sums by Young Living Members to be part of the Young Living pyramid scheme.

    49.     Under the direct supervision of Young, Turner and others, and with their knowledge and approval, Young Living promotes the pyramid scheme using emails, electronic newsletters, Facebook, and videos posted to hosting sites like YouTube and Vimeo.  These promotional materials are inherently fraudulent because they promote an illegal pyramid, which itself is inherently fraudulent.  These promotional materials are also specifically fraudulent because they

make false promises to the effect that prospective new Members may earn riches if they will join and participate in the pyramid scheme. These promotional materials are also specifically fraudulent because they fail to disclose the material fact that prospective new Members will almost certainly never be able to earn more in commissions than they will pay to Young Living.

### PLAINTIFF'S EXPERIENCE CONFIRMS YOUNG LIVING IS A PYRAMID SCHEME

50.     In 2015, Julie joined Young Living as a Member after attending a Young Living party hosted by a close friend, who was herself a member of the Young Living pyramid scheme and using Young Living designed promotional materials to recruit prospective new Members. Julie was initially interested in the quasi-medicinal claims associated with Young Living's oils, and was also persuaded the operation of a Young Living distributorship might at least cover the cost of paying approximately $100 for a "starter kit" and the right to resell Young Living products as a Member.

51.     Julie joined Young Living by electronically signing the Young Living Member Agreement, which by its terms included the Young Living Policies and Procedures, and Young Living Compensation Plan, each of which were also provided to Julie.[12]

52.     Thereafter, Julie began making monthly payments to Young Living in order to satisfy her PV requirement, and to ensure she could receive both the potential commissions of her "down line" as well as the 24% wholesale discount on the product she was purchasing.

53.     Of course, like the overwhelming majority of Members, Julie found recruitment and sale of products difficult, if not impossible. Indeed, since joining Young Living, Julie has only been able to recruit a handful of new Members as her "down-line," which makes her chances

---

[12] *See* Dkt. 7-2 ¶¶ 9–10.

of even breaking even as a Young Living Member impossible.  But even with little success in recruiting down line members, Julie dutifully purchased her minimum 100 PV every month so she wouldn't lose the chance to earn a commission from her down line's OGV.  Julie bought product month after month whether she needed it or not (she didn't), and whether she had any hope of re-selling it to someone else (she couldn't) without Young Living ever questioning whether she was re-selling at least 70% of her purchases.

54.    By the time Julie realized she had been victimized by Young Living, she had purchased more than $4,700 worth of product, but "earned" a commission of only $385 from her down line.[13]  She estimates she has accumulated about 2-3 years' worth of product if she were to try to use it all herself, including at least one unopened bottle from her initial purchase way back in 2015.  Because the vials are so small, Julie had no clue how much inventory she had been loading in an effort to chase the elusive promise of down line commissions.

55.    Julie's experience is hardly an aberration.  The income statistics for Young Living confirm the fact that only an infinitesimal number of Members <u>ever</u> manage to make a profit.  For example, the Young Living 2015 U.S. Income Disclosure Statement (the year Julie joined Young Living) states the average annual income for all Members in 2015 was $30, or approximately 1/3 the cost of joining and far less than the $100 monthly minimum payment required to maintain status as a commission-eligible Essential Rewards Member.[14]

---

[13] Young Living never actually paid any commissions to Julie because she never earned more than $25 in any single month.  Instead, the earned commissions simply accrued to Julie's account.

[14] And remember, these "Member" statistics don't include former Members, whose net income would be less than $0.

56.     According to the 2016 Young Living Disclosure Statement, the average annual income for all Members fell to $25, or approximately a 1/4 of the cost of joining the Young Living scheme.[15]

57.     Young Living's disclosure statements are, however, far from true disclosures.  In fact, they are intentionally misleading and false because they omit material facts, such as the number of total members (as opposed to only current members), the true likelihood that any new Member will actually earn any commissions, and the relatively small number of new prospects that have not already considered but refused to participate in Young Living's pyramid scheme. These false and misleading disclosures were published 24 hours a day for 7 days a week, year after year on Young Living's website under the direction and supervision of Young and Turner and with their tacit approval.

58.     Some or all of the communications described herein have appeared and continue to appear on Young Living's website since the date of their original posting.

59.     O'Shaughnessy and other class members justifiably relied on Young Living's fraudulent representations and omissions made pursuant to the above-described scheme in that, among other things, Young Living fraudulently and deceptively induced O'Shaughnessy and other class members to pay and lose hundreds (and in some cases thousands) of dollars to become Young

---

[15] In 2018, Young Living (likely to obscure the fact they had been operating an illegal pyramid scheme) created a two-tiered membership system that distinguishes between "preferred customers" and "business builders."  Preferred customers now pay for the right to receive discounts on Young Living products but do not recruit other Members or sell products.  Business builders continue to recruit new members and sell products in the hope of one day earning enough money to cover the enormous costs of being a Member. As discussed *infra*, this action concerns the pyramid scheme operated by Defendant prior to 2018 and does not involve Young Living's transition to this new, two-tiered system—which is nothing more than an effort to obscure the unlawful business model by skewing the statistics in its income reporting statements.  Indeed, it only serves to underscore the fact that the Enterprise is operating as a pyramid scheme.

Living Members, as set forth with more particularity above, and such conduct was the "but for" and proximate cause of those losses.

INTERSTATE COMMERCE

60.     Defendant has engaged in activities that affect interstate commerce.

61.     Defendant has transmitted, caused to be transmitted, or invited others to transmit materials, by mail or private or commercial carriers, for the purpose of executing their scheme or artifice with intent to defraud.  By way of example, on May 16, 2015, Young Living shipped an order of essential oils to Julie using a private courier involved in interstate transport.  The shipment of oil was in response to an order placed by Julie as part of her monthly effort to earn enough PV to qualify for commissions on her down line sales.  When Defendant Young Living shipped essential oils to Julie, Defendant knew, but failed to disclose that Julie could not hope to resell such oils or profit from such practice, and/or that the sale of Young Living's oils through the Defendant's use of the private interstate courier was in furtherance of the illegal pyramid scheme.

62.     Further, on May 16, 2015, Young Living sent to Julie a monthly newsletter entitled "The Essential Edge" using a private interstate courier.  The newsletter is published by Defendant and includes promotional/marketing materials designed to promote the illegal pyramid scheme. Among other items in the newsletter, there was a profile of a "Diamond" level Member who claimed that Young Living provided "financial freedom" to her and her husband, and an advertisement for the 2015 International Grand Convention, "Light the Fire," to be held in Dallas, Texas in August of 2015.  When Defendant sent the May 16th Monthly Newsletter promoting the purported financial freedom Julie could achieve as a Member, Defendant misrepresented or failed to disclose to Julie that she would only lose money from her participation in Young Living, and

that Defendant was operating an illegal pyramid scheme. Moreover, Defendant's use of the private interstate courier to disseminate the newsletter was in furtherance of their illegal pyramid scheme.

63.    Moreover, Defendant has transmitted, caused to be transmitted, and invited others to transmit, by means of wire in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing their scheme or artifice with intent to defraud.  By way of example, On October 14, 2015, sitting in Texas, Julie logged onto to the Young Living website that is hosted on servers in New York.  As part of her monthly requirement to purchase product, Julie placed an electronic order for Young Living products and paid for the order electronically using account credits and credit card.  The order was placed, and payment was made in the amount of $126.82 via the use of interstate wires.  This transaction, like every other Julie transacted with Young Living, was induced on the false promise that Julie could make a profit on her purchases, which false promise was made repeatedly by Young Living.  In fact, when Defendant Young Living took Julie's payment on this date and provided to her the oils Julie was required to purchase, Young Living knew, but failed to disclose at the direction of Young and Turner, that Julie could not hope to make a return on her "investment" because (i) there is no market to re-sell the oils at a profit, and (ii) no matter how hard she might work, she would not be able to recruit enough downline members to earn enough commissions to return a profit to her.

64.    And on October 21, 2015, Young Living sent a mass marketing email from customerservice@youngliving.com to Julie and thousands of other Members throughout the United States using interstate wires.  This email contained imbedded hyperlinks to web-hosted articles promoting the illegal pyramid scheme, including a list of live cult-like events during which fever-pitched-speakers attempt to motivate the faithful into recruiting more and more members.

The imbedded hyper-links pointed back to Young Living's New York hosted website. Defendant's use of interstate wires was in furtherance of their illegal pyramid scheme. When the Defendant undertook to communicate regarding the web-hosted articles, it misrepresented to Julie or omitted to disclose that such communications were for the purposes of promoting a pyramid scheme which would lead only to losses for Julie, and profits only for those at the top of the pyramid scheme

## VI.
### CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this suit as a class action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

66.     The Class is defined as follows:

**All United States residents who joined Young Living as Essential Rewards members.  The following are excluded from this class:  Defendant and its officers, directors, counsel, and subsidiaries, along with immediate family members of individual Defendants.**

67.     The putative Class easily meets Rule 23(a)'s numerosity requirement.  Indeed, the class is believed to number well over one hundred thousand members.

68.     Plaintiff's claims are typical of the claims of the class in that each became a Young Living Member because each was unsuspectingly induced to join the pyramid scheme.

69.     This case presents questions of law or fact common to class members that predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

70.     The questions of law and/or fact common to the class include, but are not limited to:

      a.     Whether Defendant was operating an unlawful pyramid scheme;

      b.     Whether the sale of an interest in Defendant's unlawful pyramid scheme constitutes the sale of a security;

      c.     Whether Defendant engaged in acts of securities fraud when operating the unlawful pyramid scheme;

      d.     Whether Defendant engaged in acts of securities fraud by omitting to inform Members they were joining a pyramid scheme,

      e.     Whether Defendant engaged in acts of securities fraud by omitting material facts relating to the offering materials/prospectus provided to Members when they paid to join Young Living;

      f.     Whether Defendant is liable to the class as a result of their participation in the Young Living pyramid scheme; and

      g.     Whether the Class has sustained damages, and if so, what is the measure of damages.

71.     Plaintiff will fairly and adequately represent the interests of the Class because Plaintiff's claims are typical of those of the Class and Plaintiff's interests are fully aligned with those of the Class.  Plaintiff has retained attorneys that are experienced and skilled in complex class action litigation.

72.     Class action treatment is superior to any other method of proceeding for the fair and efficient adjudication of the controversy alleged herein because class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum

simultaneously, efficiently, and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

73.     Defendant has acted on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole. If Plaintiff proves Defendant operates a pyramid scheme the Court should enjoin Defendant from operating that pyramid scheme in the future.

74.     The questions of law and/or fact that are common to the Class predominate over any questions affecting only individual class members.

75.     Finally, a class action under Rule 23(b)(3) is superior because:

        a.     No class member has an interest in individually controlling the prosecution of his/her/its separate action.  No class member can be expected to incur the cost of attorneys' fees and costs to recover the amounts spent by each to join Young Living and operate as a Member of Young Living.  While such amounts are significant to each Member, they are not enough to justify the costs of litigation individually, and no one would choose to do so on that basis;

        b.     There is no other pending litigation over these issues;

        c.     It is manifestly desirable to concentrate the litigation of the class' claims in Texas and this district; and

        d.     The Court will encounter no difficulties in managing this case as a class action.

**VII.**
**CAUSES OF ACTION**

**COUNT I**

**VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5, THEREUNDER**

76.     Plaintiff realleges and restates paragraphs 1–75, as if fully set forth herein, and further states:

77.     The offer and sale of Young Living Essential Reward Membership interests, such as that purchased by Plaintiff and putative class members, is in connection with and constitutes the sale of a security.  The writings, offering materials/prospectus (as described herein) and other written materials comprise the prospectus for Young Living Essential Reward Membership interests.

78.     Defendant has engaged in activities that affect interstate and foreign commerce. The pyramid scheme has operated in the United States, Canada, and numerous countries across the Globe, and is based in the United States. Federal securities laws regulate Defendant's acts and this Court has jurisdiction to apply Section 10(b)(5) with respect to all activities upon which this action and claim is based.

**Section 10(b)(5), Subsections (a) and (c) Scheme Liability**

79.     The Securities Exchange Act of 1934, Section 10(b)(5) subsections (a) and (c), makes it illegal to "employ a device, scheme, or artifice to defraud" and "to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." Defendant Young Living is liable under subsections (a) and (c) as follows:

80.     Defendant Young Living employed a plan, scheme, and course of business to operate as a product-based pyramid scheme. The scheme had as its defined target, unsophisticated investors like Plaintiff and class members. The scheme went beyond misrepresentations and omissions (both of which have also been described herein). Indeed, it was designed to act and operate as an illegal pyramid scheme masquerading as a product-based multi-level marketing system, and in fact operated in this manner. The scheme depended on a fiction that acted as a fraud or deceit on Plaintiff and class members—that Essential Rewards members were engaging in an activity that was legal, whereby they would sell a product to a base of customers and in turn be compensated for such sales. In fact, Defendant Young Living knew the Plan they required each Essential Rewards Member to enter into through the offering materials/prospectus described herein, in practice required Essential Rewards Members to pay for the right to receive rewards which were unrelated to the sale of products to retail customers, and instead only paid for Essential Rewards Members to recruit others into the pyramid scheme.

81.     The product sales which do occur, are almost entirely to other Essential Rewards Members (either in the form of the "starter packs" or as part of PV and OGV). Defendant Young Living enticed Essential Rewards Members to join with false promises of financial and spiritual rewards. In the meantime, Defendant Young Living failed to disclose the true earnings Plaintiff and class members were likely to receive (essentially none) and that the Young Living business opportunity which they had paid to receive operated as a pyramid scheme, as defined by numerous courts and the Federal Trade Commission. The facts which lead to the inescapable conclusion Young Living operates a pyramid scheme are repeated and realleged here, and as such, Defendant Young

Living's pyramid scheme is inherently fraudulent under federal law, which thus imposes Section 10b, subsection (a) and (c) scheme liability on the Defendants.[16]

## Proximate Cause and Reliance

82.     The losses suffered by Plaintiff and the Class were foreseeable and a direct result of Defendant Young Living's establishment, operation, promotion, and expansion of the pyramid scheme, because the harm the operation of the pyramid scheme imposes on the innocent participants in the pyramid scheme (*i.e.,* Essential Rewards Members) is the foreseeable consequence of the structure of this, and all pyramid schemes.

83.     Specifically, the operation of this pyramid scheme depends upon expansion through the continual and unrelenting recruitment of other innocent participants into the pyramid scheme who do not know the only way they could hope to mitigate their losses from their participation in the pyramid scheme is to recruit even more additional innocent participants into the pyramid scheme.

84.     In reality, this pyramid scheme (like every other pyramid scheme) emphasized recruitment over the sale of a product, and depended on the fact that money losers (such as Plaintiff and class members) ultimately are paying money to the small group of winners at the top of the pyramid scheme (here Royal Crown Diamonds). The participants in the pyramid scheme were induced to purchase their business opportunity without knowledge that there was no way to profit without victimizing others (which even still, rarely if ever led to "profits"). The promotional and recruiting materials authored by Defendant Young Living and described herein, were produced with

---

[16] *See e.g., Kerrigan v. Visalus, Inc.*, 2016 WL 892804, at *16 (unpublished) (holding that allegations that Defendant operated an illegal pyramid scheme satisfies theory of "scheme liability" under Section10b, subsection (a) and (c)); *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445–46 (E.D.N.Y. 2016) (same).

the intent Plaintiff and class members would join another's "downline" and therefore contribute funds into the scheme. Thus, the acts described herein are a proximate cause of Plaintiff and class member's damages.

85.     Importantly, individual reliance by Plaintiff and class members is not a requirement to scheme liability under Section 10(b)(5), subsections (a) and (c). Regardless, and alternatively, Plaintiff and class members also rely upon the presumption of reliance established in *Affiliated Ute, CGC Holding, Co., LLC v. Broad and Cassel*, 773 F.3d 1076 (10th Cir. 2014).

86.     Specifically, generalized class-wide proof demonstrates reliance on Defendant Young Living's scheme to defraud such as to support the inference of reliance applicable to the entire Class. Such proof includes the requirement that Plaintiff and each class member was required to sign an essentially identical agreement and enter into unilaterally imposed terms contained in the offering materials/prospectus, thus exposing Plaintiff and class members to the same misrepresentations and omissions about the pyramid scheme—including that the Plaintiff and class members investment in the Defendant's pyramid scheme was legal.

## Scienter

87.     Defendant Young Living's actions, (through its operators and managers such as Young and Turner) as set forth herein were made with such mental state to manipulate, deceive, or defraud, or with such recklessness, as to constitute *scienter*, which is imputed to Defendant Young Living. Defendant had a motive to operate and benefit from the operation from the pyramid scheme, and opportunity to conceal the fact it was operating a pyramid scheme. Proof of *scienter* is demonstrated or inferred from the following:

a.      The operation of a pyramid scheme which, according to published reports, generated billions of dollars in revenue each year during the class period, almost none of which is based upon the sale of its products to ordinary retail customers;

b.      Engaging in plainly illegal actions related to the operation of a pyramid scheme as alleged herein; and

c.      The understanding by Defendant that it was operating an illegal pyramid scheme, which is demonstrated by its design and implementation of the Young Living Compensation Plan.

88.      Plaintiff and class members suffered damages as a result of the above-described actions of Defendant. Specifically, Plaintiff and class members suffered the amounts they paid to purchase their interest in the pyramid scheme.

**COUNT II**
**VIOLATION OF 15 U.S.C. §77*l*(a)(2)**

89.      Plaintiff realleges and restates paragraphs 1–88, as if fully set forth herein, and further states:

90.      The Securities Act of 1933, Section 12(2) provides strict liability if: (1) the seller of a security used interstate commerce or the mails, (2) to offer or to sell a security to the purchaser, (3) by means of a prospectus or oral communication, (4) that misstates or omits a material fact, (5) of which the purchaser did not have knowledge.

91.      A prospectus as defined by the United States Supreme Court, is a "document soliciting the public to acquire securities."[17]  The interest in Defendant's pyramid scheme involved

---

[17] *See Gufstason v. Alloyd Co.*, 513 U.S. 561, 569 (1995).

the use of a prospectus, as that term is defined in the Securities Act of 1933.[18]  Here, Plaintiff and the class members received the same, or substantially same offering materials/prospectus transmitted through interstate commerce and the mails.

92.    The offering materials/prospectus, which were transmitted to Julie and the class members via Young Living's website, contained the following omissions:

a.    Nothing in the offering materials/prospectus or any associated information on Defendant's website or affiliated websites containing the offering materials/prospectus disclosed that Defendant was operating a pyramid scheme or that Plaintiff and class members would be purchasing an interest in a pyramid scheme. Instead, the offering materials/prospectus claimed to be operating a legal MLM company.

b.    Nothing in the offering materials/prospectus or any associated information on Defendant's website or affiliated websites containing the offering materials/prospectus disclosed that the majority of participants in Defendant's pyramid scheme would lose money unless they operated their business opportunity in the pyramid scheme as such.  Instead, Defendant implied or stated that participants in the pyramid scheme could profit by selling products to retail customers.  Such misrepresentation or omission was false because Plaintiff and class members could not profit from the retail sale of Defendant Young Living's essential oils because any non-participant could purchase Defendant Young Living's essential oils at the same discount such essential oils were sold to participants.

---

[18] Section 10(a)(10) of the Securities Act of 1933 defines "prospectus" as "any prospectus, notice, circular, advertisement, letter, or communication, written or by radio, or television, which offers security for sale of confirms the sale of any security."

93.     Plaintiff and class members suffered damages as a result of Defendant Young Living's actions described above because they lost money through the purchase of their interest in the pyramid scheme.

94.     Plaintiff and class members are entitled to damages in the form of recission.

## VIII.
### JURY DEMAND

95.     Plaintiff and putative class demand a trial by jury.

## IX.
### PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the putative class pray for judgment against Defendants as follows:

a.      An order certifying the putative class and appointing the undersigned class counsel;

b.      A judgment against Defendant;

c.      Damages in the amount of the financial losses incurred by Plaintiff and class members as a result of Defendant Young Living's conduct and as a result of Defendant Young Living's violation of the Securities Exchange Act of 1934, and specifically, Section 10(b), subsections (a) and (c);

d.      Recessionary damages in favor of Plaintiff and class members as a result of Defendant Young Living's conduct and as a result of Defendant Young Living's violation of 15 U.S.C. §77*l*(a)(2);

e.      Temporary and permanent injunctive relief enjoining Defendant from further unfair, unlawful, fraudulent, and/or deceptive acts, including but not limited to supporting the pyramid scheme; and

f.      For such other damages, relief, and pre- and post-judgment interest as the Court may deem just and proper.

DATED this 2nd day of July, 2021.

**MUNCK WILSON MANDALA, LLP**

*/s/ Robert E. Linkin*
Robert E. Linkin
*Attorneys for Plaintiff Julie O'Shaughnessy*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served on July 2, 2021 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

By: _/s/ Hannah Harrington- Dunn_
Hannah Harrington-Dunn