IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

_____
                               )
Julie O'Shaughnessy,           )
                               )
     Plaintiff,                )
                               )   Case No. 2:20-cv-00470-HCN-DBP
vs.                            )
                               )
Young Living Essential         )
Oils, LC, et al.,              )
                               )
     Defendants.               )
_____)

**MOTION HEARING AND ORAL RULINGS VIA ZOOM BEFORE THE**

**HONORABLE HOWARD C. NIELSON, JR.**

Thursday, June 24, 2021

Time:  3:00 p.m. to 4:24 p.m.

Reported by Teena Green, RPR, CRR, CBC

     United States Courthouse
     351 South West Temple, 7.430
     Salt Lake City, Utah   84101
     (801) 910-4092
     teena_green@utd.uscourts.gov

1                        **APPEARANCES**

2    FOR THE PLAINTIFF:

3    CHRISTOPHER M. VON MAACK, ESQ.
     MCNEILL VON MAACK
4    175 South Main Street, Suite 1050
     Salt Lake City, Utah    84111
5    (801) 823-6464
     vonmaack@mvmlegal.com
6
     ROBERT E. LINKIN, ESQ.
7    MUNCK WILSON MANDALA LLP
     2801 Via Fortuna Drive Suite 630
8    Austin, Texas    78746
     (737) 201-1616
9    rlinkin@munckwilson.com

10   AUSTIN PATRICK TIGHE, ESQ.
     NIX PATTERSON
11   3600 North Capital of Texas, Highway B350
     Austin, Texas    78746
12   (512) 328-5333
     atighe@nixlaw.com
13
     J. DAVID ROWE, ESQ.
14   DUBOIS BRYANT & CAMPBELL LLP
     303 Colorado Street, Suite 2300
15   Austin, Texas    78701
     (512) 457-8000
16   drowe@dbcllp.com

17   FOR THE DEFENDANT YOUNG LIVING ESSENTIAL OILS:

18   JEREMY A. FIELDING, ESQ.
     KIRKLAND & ELLIS LLP
19   1601 Elm Street
     Dallas, Texas    75201
20   (214) 972-1754
     jeremy.fielding@kirkland.com

21

22

23

24

25

1          **APPEARANCES CONTINUED**

2     JAMES GRANT JONES, ESQ.
      KIRKLAND & ELLIS LLP
3     609 Main Street
      Houston, Texas    77002
4     (713) 836-3347
      grant.jones@kirkland.com
5
      OLIVIA ARDEN ADENDORFF, ESQ.
6     RACHAEL A. REZABEK, ESQ.
      KIRKLAND & ELLIS LLP
7     1601 Elm Street Suite 2700
      Dallas, Texas    75201
8     (214) 972-1674
      rachael.rezabek@kirkland.com
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    June 24, 2021                                    3:00 p.m.

2                    **P R O C E E D I N G S**

3            **THE COURT:**  Good afternoon we're here for a video

4    hearing on Docket No. 131, Plaintiff's motion to amend in

5    *O'Shaughnessy versus Young Living Essential Oils, LC, et al.*,

6    and that's Case No. 2:20-cv-470.  We will begin with

7    appearances of counsel for the record.

8            Let's start with counsel for plaintiffs.

9            **MR. LINKIN:**  Good afternoon, Your Honor.  Robert

10   Linkin from Munck Wilson Mandala, here on behalf of Julie

11   O'Shaughnessy, the plaintiff.  With me I have Austin Tighe from

12   Nix Patterson.  I also have my co-counsel, David Rowe from

13   Dubois, Bryant & Campbell, and also on the Zoom is Chris

14   Von Maack from McNeill Von Maack.

15           **THE COURT:**  All right.  Very good.  Thank you,

16   Mr. Linkin.  All of you are welcome.

17           Now let's have appearances from counsel for the

18   defendants.

19           **MR. FIELDING:**  Yes, Your Honor, it's Jeremy Fielding

20   of Kirkland & Ellis.  I am joined by my colleagues, Rachel

21   Rezabek, Olivia Adendorff and Grant Jones.  We also have a

22   summer associate, Holly Stewart, who wanted to see the sausage

23   get made, Your Honor, so she's also listening in.  I'm also

24   joined by in-house counsel from Young Living, Mr. Brent Bishop,

25   April Medley, and let's see -- maybe it's just those two.  And

1  we also are joined by Bryan Johansen, who is also representing

2  Young Living in this matter.

3          **THE COURT:**  All right.  Thank you, Mr. Fielding.

4          And welcome, all of you.

5          I think we'll begin with argument.  I'd like to focus

6  just on -- well, I'd like you to address both the issue of

7  timeliness and also of futility, in particular, if the claim --

8  if I were to allow the amended complaint, whether it would

9  nevertheless be subject to dismissal.

10         So I will start -- it's the plaintiff's motion for

11  leave to amend.  Mr. Linkin, will you be arguing that or will

12  one of your colleagues be doing that?

13         **MR. LINKIN:**  I'll be arguing, Your Honor.

14         **THE COURT:**  All right.  I'm going to give you

15  about -- oh, about 10 or 15 minutes, and I may give you more

16  time than that, but why don't you count on about that much.

17  And with that, you can start.

18         **MR. LINKIN:**  Thank you, Your Honor.  I appreciate you

19  giving us the time today, and I'll try to speak slowly.  I know

20  we both sort of went a little fast last time and we'll try to

21  make it easier for the court reporter this time.

22         **THE COURT:**  Thank you.

23         **MR. LINKIN:**  As we all know, the general standard for

24  a motion for leave to amend is stated in *Foman v. Davis*, the

25  seminal Supreme Court case, and that is that leave to amend

1　shall be freely given when justice so requires.  That's 40

2　years of law.

3　　　　　With regard to the status of these proceedings and

4　contrary to defendants' argument regarding whether or not they

5　would be prejudiced by some undue delay, that's just not the

6　case, given the status of the proceedings right now.  Very

7　little discovery has taken place.  I think the defendants have

8　served some very preliminary discovery on the plaintiff.

9　That's the only discovery that's occurred in the case.  We

10　don't even have a scheduling order in place.

11　　　　　In fact, the only hearing that's occurred in this

12　case was the one that occurred in this court on March 17th.  So

13　we are very much, despite how long the case has been pending,

14　at the beginnings of this case, the infancy of this case.  So

15　it's hard for us to understand how there could be prejudice to

16　the defendants.

17　　　　　Now, as to delay, the argument that somehow the

18　plaintiffs have been dilatory or we've delayed this case

19　frankly falls a little flat, we believe.  The record of this

20　case is pretty clear that the defendants have taken advantage

21　of -- and we're not saying it wasn't their right to, that isn't

22　our argument, but they've taken advantage of virtually every

23　possible procedural hurdle to keep this case at the state where

24　it is right now.  It's exactly the sort of procedural efforts

25　that the Tenth Circuit referred to in *Minter v. Prime Equipment*

1    when it remarked that Rule 15(a) is to provide litigants the

2    maximum opportunity for each claim to be decided on its merits

3    rather than on procedural niceties, but defendants have really

4    focused on procedural niceties.

5           And because we're new to this district, let me just

6    lay out a few of the things that have gone on here.

7           We filed our complaint in April of 2019.  Two months

8    later, these defendants filed a motion to compel arbitration.

9           While the motion to compel arbitration was pending,

10   defendant -- and to be fair, not these lawyers, but lawyers who

11   are still of record in this case, outright refused to even meet

12   and confer with us and, instead, filed a motion to excuse them

13   from the meet and conferral process for purposes of agreeing on

14   a scheduling order.

15          When the magistrate judge issued her report and

16   recommendation denying the motion to compel arbitration,

17   defendants, as was their right, of course, filed objections to

18   the magistrate's R and R, and that briefing took another month.

19   When the Court overruled defendants' objections a month later,

20   they again, as was their right, appealed, filed an

21   interlocutory appeal to the Fifth Circuit.  That was another

22   six months of our time.

23          While the interlocutory appeal was pending, they

24   sought a stay of the case, which they got, because the appeal

25   was expedited.  And then finally, when the appeal was over,

1    when the Fifth Circuit had affirmed the denial of their motion

2    to compel, they sought transfer to this district.  Again, their

3    right, but all of those events took up at least 14 months in

4    the life of this case.  That wasn't plaintiff's doing.  We had

5    to get over those procedural humps just to get to where we are

6    now.

7           That's really different from the cases that

8    defendants cite to as support for the proposition that we've

9    somehow delayed or been dilatory in this case.

10          For example, the defendants cite to *Estate of Riecke*,

11   which is a District of Utah case from 2017.  In that case there

12   was a scheduling order in place and, in fact, the deadline in

13   the scheduling order providing for the filing of an amended

14   complaint, that deadline had already passed four months before.

15          The defendants had already filed an answer; there's

16   no answer here.  They filed a counterclaim; there's certainly

17   not that here.  And discovery was essentially complete.  That's

18   entirely different from the situation we find ourselves in

19   here.

20          They cite to *McKnight v. Kimberly* Clark, that's a

21   Tenth Circuit case.  There the plaintiff sought to amend his

22   complaint five months after the discovery cutoff.  We don't

23   even have a discovery cutoff because we don't have a scheduling

24   order.  And most of the key individuals, the witnesses in that

25   case, the Tenth Circuit remarked, would have to be deposed

1   again if the complaint was amended.  Not close to our situation

2   here.

3         *Evans v. McDonald Corp.*, which they cite to, another

4   Tenth Circuit case where the Tenth Circuit noted that the

5   plaintiff's new theory that she sought to bring was presented

6   two weeks before trial and in response to a motion for summary

7   judgment.  That's obviously not where we stand.

8         And finally, they also cite to *First City Bank versus*

9   *Air Capitol Aircraft Sales*.  And there the denial to amend was

10   the defendant's request to amend their answer on the eve of

11   trial.  None of those -- none of those are close to the

12   procedural posture of where we are here, which is regrettably

13   at the beginning of this case.

14         And nobody wants to be farther down the road at this

15   point than the plaintiffs.  Nothing -- nothing could be truer.

16   But this is where we are, Your Honor, and it's not our doing.

17         In fact, just to close this loop, Your Honor, I

18   looked at the docket this morning and, at this point, we are at

19   Docket entry 144 without an order on a motion to dismiss and

20   without a scheduling order.  All of that is the result of one

21   procedural effort after another to slow down this case.

22         But all that procedural maneuvering has ensured one

23   thing, and that is that the defendants couldn't possibly suffer

24   any prejudice from us amending our complaint because they've

25   done everything they can to keep us frozen in place at the

1    beginning of this case.

2            Now, where have we been, the plaintiffs?  We've

3    previously amended one time, Your Honor, one time as of right

4    in the Western District of Texas.  We did that in response to a

5    previously filed motion to dismiss because, admittedly, we

6    believed we needed to clean up the RICO claims we had filed.

7    We believe we did that, but we had not been repeatedly casting

8    about trying to fix pleading errors.  This is our one and only

9    request for leave to amend in this case.  It's the first time

10   we're making it.  And why are we making it?

11           Well, Your Honor will recall at the last hearing on

12   March 17th, we told Your Honor, and we still believe, that our

13   claims properly lie as RICO claims.  We don't believe that the

14   plaintiff in the punitive class members' interest in Young

15   Living pyramid scheme are securities that would be subject to

16   PSLRA preemption.  We just don't believe that's the case.

17           And that view that we have is supported in the Fifth

18   Circuit where this case originated, the most recent case is

19   *Ranieri*, in the Northern District of Texas.  That's the

20   *AdvoCare* case where the District Court stated that at least at

21   that point in the proceedings, the Court could not find that

22   interests in a pyramid scheme were subject to the PSLRA.

23           And by the way, that's actually not different from

24   Fifth Circuit law out of *Koscot* or *Piambino.*  I know defendants

25   say it is, but it's not, because those two cases merely stand

1  for the proposition that whether or not a pyramid scheme is a

2  security is an intensely fact-specific inquiry.

3          In fact, the *Piambino* case, the holding of that case

4  specifically, and I'm quoting here, is that "summary judgment

5  declaring that the distributorships," there the interest in the

6  pyramid scheme "to be securities was improvidently granted."

7  They found that summary judgment on that issue in favor of

8  finding it was a security was improperly granted.  And that's

9  at 610 F.2d 1309.

10          So to go back to this issue, though, the Court will

11  also recall that during the March 17th hearing, we felt

12  required to acknowledge to the Court that the *Smith v.*

13  *LifeVantage* decision that was issued in the same district in

14  Judge Nuffer's court in December of 2019, might understandably

15  lead Your Honor to hold differently and find that our plaintiff

16  and punitive class members' participation in the pyramid scheme

17  did qualify as securities and then would be preempted by the

18  PSLRA.

19          In fact, that was the reason why, in our briefing on

20  the motion to dismiss, we informed the Court that should the

21  Court find that we are subject to preemption, we would seek

22  leave to amend to add securities claims, specifically 10(b)

23  claims and 12(2) claims under the Securities Act.  But during

24  the hearing, Your Honor made clear that it was Your Honor's

25  stated preference and practice, different from the Western

District of Texas where we had previously been, and other
courts as well, that we seek leave to amend immediately rather
than wait for the Court's ruling on the pending motion to
dismiss.  And we took your instruction seriously and we wanted
to be sure that we proceeded in a manner that accorded with
Your Honor's preference.

And if we misread the Court's intention with those
instructions, we certainly apologize for that, but we don't
believe that we did.  We certainly don't believe that the Court
told us they would just, as a matter of fact, grant the motion,
but that if we wanted to seek leave, we needed to do so
immediately, and so we did that.

And we have now sought leave to amend to add two
alternative securities claims.  One is a 12(2) claim and the
other is a 10(b) claim.  But we also want to be clear here with
regard to these claims, Your Honor.  We're not trying to have
it both ways.  We recognize that ultimately our RICO claims,
our securities claims, cannot live together forever in this
case.  We will have to, at some point, make a decision as to
which claim we have.

But right now is not that time because, as I
referenced earlier, whether or not a pyramid scheme interest is
a security is a fact-intensive inquiry.  We're not even into
discovery yet, so there's no way that we could make that
determination now.  That goes to whether or not we have timely

1  sought leave to amend.  And I hope Your Honor understands why

2  we did things in the way we did them.

3       As to their futility arguments, I'll address the RICO

4  amendments first and then I'll focus on the securities claims

5  as well.

6       So we amended certain of our RICO claims in response

7  to questions Your Honor raised during the March 17th hearing.

8  For example, you might recall that Your Honor asked whether or

9  not Defendant Young Living actually manufactured the essential

10  oils that are the product used to promote the pyramid scheme as

11  we've alleged.  We took that to be a question regarding whether

12  or not we had appropriately pleaded enterprise person

13  distinction.

14       So after we carefully listened to that question at

15  that hearing, we amended paragraph 21 and 67(b) to include

16  allegations regarding Defendant Young Living Oil's role in

17  manufacturing the oils.  So we have alleged that they

18  manufacture them.

19       We further amended paragraphs 52(a), 52(b) and 52(c)

20  to better explain the role each defendant, person or entity

21  plays in the enterprise such that we could be certain that

22  Your Honor would clearly see that we had pled the enterprise

23  person distinction.

24       And then we also clarified the manner and role each

25  defendant, including the individuals, played in the enterprise

1  and, in particular, the predicate acts we have pled.  So we

2  revised our paragraphs 80 to 106, and we did that to be sure

3  that we had pled the specific acts the individual defendants

4  had played, the role they had played in the predicate acts.

5       To be honest, we didn't really think that was

6  necessary, we think that the defendants' arguments as to that

7  issue run in the face of the law, but in order to avoid

8  unnecessary briefing on that issue with the motion to dismiss

9  that I'm certain will be forthcoming, we amended to try to keep

10 that out of the briefing.

11      Now, with regard to the security claims that we've

12 pled, we believe that we have appropriately pled them with the

13 requisite specificity.  As I mentioned, Count IV is brought

14 pursuant to Section 10(b) of the '34 Act, Count V, pursuant to

15 Section 12(2) of the '33 Act, and we've brought them for the

16 first time in this case.  Your Honor obviously knows that.

17      When drafting these claims, Your Honor, one, be

18 clear, we frankly pled them as we could to the claims in *Smith*

19 *v. LifeVantage*, because we were frankly cognizant of the fact

20 that these claims on similar facts had already been sustained

21 by Judge Nuffer in *LifeVantage*.

22      We also were aware of the claims which Judge Nuffer

23 held didn't pass muster in LifeVantage, and we did not plead

24 those.  We did not want to waste the Court's time on a fool's

25 errand briefing claims we knew we couldn't support.  We only

1  brought the ones we believed we could support.

2  And it's for that reason that, as to the 10(b) claim,

3  we've only brought a scheme liability claim.  10(b) permits us

4  to allege a securities fraud claim based on the defendants'

5  operation of a pyramid scheme which is inherently fraudulent.

6  And we've more than aptly done so here, we believe.

7  For example, paragraphs 25 through 51 in the proposed

8  amended complaint provides specific allegations as to why the

9  defendant is operating an illegal pyramid scheme.  And those

10  allegations, by the way, also support our 12(2) claim, which is

11  a strict liability claim, based upon the sale of the security

12  by means of an offering document.

13  So we've alleged in paragraphs 10, 143, 158 and 159

14  that the Member agreement, the compensation plan, and the

15  policies and procedures that each member receives are the

16  offering documents, and that those offering documents omit to

17  state or misstate the material fact that the defendants are

18  operating a pyramid scheme and that the overwhelming majority

19  of the members cannot make money, in fact, will lose money.

20  Those are the same claims brought in LifeVantage which Judge

21  Nuffer found to be sufficient, and it's our belief that this

22  court should as well.

23  As for defendants' claims that our security claims

24  are futile, their argument that we could never bring these

25  securities claims, honestly, they're arguing about the

1  securities claims they wish we had alleged as opposed to the

2  securities claims we actually included in our proposed

3  amendment.

4          They complain that we haven't pleaded misstatements

5  or omissions with particularity and, therefore, our amended

6  complaint is futile.  But, again, Your Honor, 10(b)(5) scheme

7  liability isn't based upon misstatements of material fact,

8  isn't based on omissions, and it doesn't have to be.  That's

9  exactly what Judge Nuffer held when he said "Plaintiffs'

10  complaint alleges that defendants' MLM was a pyramid scheme,

11  and those allegations, taken as true, state a claim that is

12  facially plausible."  That's LifeVantage at 1285.  It couldn't

13  be clearer.

14          As to the level of specificity defendants imply we

15  were required to provide, that's just not supported by the law,

16  but regardless, we provide plenty of specificity with regard to

17  how the defendants operate an illegal pyramid scheme, and

18  that's at paragraphs 2 through 51.

19          So honestly, the truth of the matter is that the

20  defendants' complaint isn't so much that we don't provide

21  specific enough allegations.  What they really are asking us to

22  provide is information that no plaintiff could ever be in

23  possession of at the pleadings stage.  That's information we

24  could only acquire through discovery.  That's the point of

25  discovery.  There's more than enough here to support our

allegations.  They are specific enough, and so we believe that the securities claims stand as they're pleaded.

Finally, Your Honor, as to their statute of limitations argument, there isn't much of an argument about that in their brief, but I will say the following.

First of all, our alternatively pled securities claims clearly relate back to the original RICO claims brought by Plaintiff.  It's the same common core facts.  If they're operating a pyramid scheme, as we've alleged, and we believe they are, those allegations, if they're born out by the facts, support either claim.

It's the exact same common core facts.  They're brought against the exact same defendants.  We haven't added any defendants.  It's exactly the type of claims which Rule 15 specifically provides relate back to an original pleading.

And as to whether or not the plaintiff filed them on a timely basis, she did.  She filed them -- as soon as she discovered she'd been sold a business opportunity in a pyramid scheme, she filed this lawsuit on her own behalf, on behalf of others.  She didn't wait a year, she didn't wait two years, which are the relevant limitations periods following discovery of fraud for a 10(b)(5) or a 12(2) claim, she did it immediately.

And regardless of that, statute of limitation argument is again another inherently factual inquiry that is

1    not appropriate for a determination at this stage.

2         So, Your Honor, we believe that we've filed this

3    motion for leave to amend appropriately.  There was no undue

4    delay.  The defendants are certainly not prejudiced here.  I

5    think they'd be hard pressed to make that argument and there is

6    nothing even remotely futile about the claims we have pled.

7    I'm happy to answer any questions Your Honor has with regard to

8    any of these arguments.

9         **THE COURT:**  No, thank you, I think you've covered

10   that very well.  I think I'll now give the opposing party a

11   chance to speak.

12        Mr. Fielding, will that be you or will one of your

13   colleagues --

14        **MR. FIELDING:**  I'll be up, Your Honor.  And may I

15   share my screen, please?

16        **THE COURT:**  You may, yes.

17        **MR. FIELDING:**  Thank you.

18        Can everyone see that?

19        **THE COURT:**  I can see that just fine.  Thank you.

20        **MR. FIELDING:**  Okay.  So Your Honor, we --

21   ironically, the two things that you said you wanted us to

22   address are the two things we figured you'd want us to focus

23   on, and they happen to be the two reasons why the Court should

24   deny this motion for leave to amend.

25        The first is, the motion is untimely under

1    well-settled law; and the second is that the amendment would be

2    futile, which, of course, compounds the first problem because

3    we're going to have to do this all over again, which is where

4    so much of the prejudice for this comes from.

5            With regards to the first issue, the motion being

6    untimely, here's the plaintiff's biggest opponent.  It's

7    reality.  It's the fact of what really happened.  The reality

8    is that the plaintiff here made a strategic decision not to

9    amend their claims for almost two years to assert a PSLRA

10   security claim over and over and over again, despite numerous

11   opportunities to do so.  And they stuck to the strategic

12   decision until the very bitter end of the hearing when it

13   became apparent to them that this was no longer tenable.

14           And it's clear why they did it.  It's because

15   opposing counsel's all but admitted they like their RICO claims

16   more.  They get punitive damages, there isn't the heightened

17   standard for the PSLRA for scienter and other requirements.

18   And, of course, if they pleaded alternate theories, it puts

19   their RICO claims in the spotlight.

20           So they had a clear plan here and it's one that

21   Your Honor had alluded to in the hearing.  That is, they wanted

22   to step up to the tee box and they looked ahead and they

23   thought, can I drive it all the way to the green with my

24   driver?  Maybe, maybe not, but what I'll do is I'll give it a

25   shot.  And then if I can't get it all the way to the green with

1    the driver, well, then I'll just fall back and hopefully the

2    judge will give me a mulligan and let me lay up and it won't

3    count against me.

4          Now, what changed?  Beautiful, isn't that, Judge?  It

5    makes us want to be there instead of somewhere else.  But what

6    changed?  Well, what changed is, they got to the hearing, they

7    saw this shot halfway through the air and they didn't like

8    where it was headed so they immediately pivoted.

9          And they've admitted this, they've admitted that what

10   prompted them to file this is not all the other pretend reasons

11   that they then told you and that fill up their brief.  The

12   reason why they amended their claim is because they saw the

13   shot was going in a place they didn't want it to go.

14         This is what you told them in the hearing, "I would

15   advise you...if you're on notice of a defendant's argument

16   here," and as I'll show you in a moment, Your Honor, they've

17   been on notice of this for almost two years "...I would suggest

18   that you seek leave to amend pretty promptly.  And I can't

19   promise I'm going to grant leave to amend, but I think, I'd --

20   you know, if you want me to consider that possibility...that's

21   my suggestion."

22         When a federal court makes a suggestion, if you're a

23   party that is smart and clever, you follow that suggestion,

24   which is exactly what they did.  All of this stuff about being

25   our fault or they didn't have a claim to plead, none of that

has -- it's all pretend, it's all made up.

The real reason is because they saw their tee shot was heading in a place they didn't want it to go. Now, why is this a problem for them? Well, because under well settled law, this liberalized pleading rule that they're talking about doesn't give them the ability to do what they want to do, which is wait until the last minute, see where that tee shot is headed, then rerefine their theories after we've all gone through a long and complicated process of moving for a motion to dismiss.

And, Your Honor, you also, in the same section in your -- you warned them about this. This was right before you told them that they should file for -- your suggestion they should file for leave. You said correctly that the Federal Rules of Civil Procedure were amended to make it so that a motion to dismiss starts the deadline for being able to amend as a matter of right. "And one of the reasons for that, if you read the commentary, was to kind of eliminate the practice of plaintiffs waiting to see -- of kind of taking a mulligan, of just standing on their allegations and saying, you know, if we survive the motion to dismiss, great; but if we don't, you know, we'll get a free shot, a chance to amend."

And you can see, Your Honor, they're not just asking you to add some brand new securities claims. They want one more bite at the RICO apple. They've already amended once as a

matter of right, and now they're asking to amend those again after seeing all of our motion to dismiss briefing and after hearing Your Honor's questions.  And you heard them admit that that's exactly why they want to amend the way they do.

And you concluded this by saying, "I'm not a big fan of dismissing with leave to amend where..." they're on notice. That's clearly the case here, and that's why you should not give them the mulligan they want.

Now, what are they trying to do to get around this because they know the truth, the reality of what happened is a problem?  Well, they have to create a new reality and they have to come up with new theories or claims as to why they actually waited two years to file their claims and they're different from the reasons that everybody on this Zoom call knows are the reasons that they did.  Every one of those reasons is inaccurate and untrue and inconsistent with the record.

But the second problem, Your Honor, and this relates to the first one, and this is the other reason why you should deny their motion, and that is that their amendment is futile. And the reason it's futile is for the reasons that we talked about in the last hearing.  And that is, it is premised upon an incoherent theory.

You heard them argue it again in connection with the securities motion.  He says in the offering documents it included this compensation plan, but if you look at their

1    pleadings, what they say is, and it's the scheme liability

2    claim that they've talked about, they say the scheme was to

3    create a pyramid scheme.

4          But then they also say that the way to figure out

5    what the scheme is is even a "cursory review of the

6    compensation structure." Well, these were in the offering

7    documents that they were talking about. There's no dispute

8    that the plaintiff received those.

9          So it raises the question, if the plaintiff knew

10   that -- had this compensation information and even a cursory

11   review would lead to the conclusion it was a pyramid scheme,

12   what misrepresentation was made to her? And more importantly,

13   for purposes of the securities role, what's the scienter? If

14   the plaintiff couldn't figure out there was anything wrong with

15   this plan, what possible allegations do they have to support

16   the claim that Young Living and the individual defendants were.

17         And as you'll see, this is where their complaint

18   falls apart. They simply have no allegations to support either

19   one of those because of that flaw at the heart.

20         Let me walk briefly, really quickly, Your Honor,

21   through this first issue, the motion is untimely. I just want

22   to show you, remind you of first the legal standard. We've

23   looked at this evidence case out of the Tenth Circuit and

24   talked about the principle here, which Your Honor has

25   enunciated as well. The Tenth Circuit is very clear, it's well

 1    settled that untimeliness alone is a sufficient reason to deny

 2    leave to amend.

 3            Here's a good example.  This is the *First City Bank*

 4    case from 1987 where the Court upheld the broad discretion of a

 5    trial court like you to deny leave.  And it was because the

 6    plaintiff was aware of all the information on which his

 7    purported amended complaint was based prior to filing the

 8    original complaint and they offered no explanation for the

 9    undue delay.  That's absolutely true here.  And, of course, the

10    explanation that I wanted to see where my ball was headed is

11    not an explanation that courts accept for this purpose.

12            I also want to note, Your Honor, prejudice -- unlike

13    the argument you just heard counsel make, prejudice need not be

14    shown in the Tenth Circuit.  That is well settled law as well.

15            Now, there is prejudice here.  And the most

16    substantial form of prejudice, of course, is the prejudice that

17    comes from having to do all this all over again.  I heard

18    counsel say that he's on -- we're on Docket Entry No. 144, and

19    implied that that is somehow our fault.

20            I'll note that we were victorious on the motion that

21    brought the case here, in the face of their resistance.  But

22    more importantly, what granting the motion would do is just

23    mean that that docket entry is going to have even more entries

24    and it's going to take even more time.  And that, of course, is

25    the thing that we don't want to have happen here for lots of

1    reasons.  And it's inconsistent, as you noted, with what the

2    rules require.

3          So what do the plaintiffs have to do?  What is

4    their -- their choice in the face of this case law and this

5    record is, right, they're stuck with that and they have to

6    pivot.  And what is that record?  Well, in 2019 is when the

7    plaintiff filed the complaint in the Western District of Texas.

8    We filed a motion to dismiss in December of 2019.

9          And in that motion to dismiss, we pointed out that

10   both under the Tenth Circuit and the Fifth Circuit and in

11   controlling case law in the *Koscot* case, that a pyramid

12   distribution system is securities.  They were absolutely

13   unequivocally on notice that this was an issue in the case that

14   we were going to argue PSLRA preemption predicated on a Fifth

15   Circuit case.

16         So then they had a question.  They were on notice.

17   They have to decide, are we going to amend or are we going to

18   double down?  Well, they chose to amend, but not in a way that

19   would plead in a securities theory.  Instead, they chose to

20   double down.

21         And what's instructive, Your Honor, is instead of

22   arguing the claims -- asserting securities claims, what they

23   did was they found this *Ranieri* case, which was from a

24   different district, it wasn't binding, and they pleaded the

25   case away from *Koscot* and toward *Ranieri*.

1          And it's actually striking, if you look, they
2     literally went through *Ranieri* and when *Ranieri* said that these
3     people were independent contractors, they put that in.  When it
4     said "significant personal effort," they stuck that in their
5     amended complaint.

6          So they clearly understood what was going on and they
7     were clearly in their mind making a strategic decision, I don't
8     want to do the securities claim, I want to stick with my RICO
9     claims.  I'm hoping for my mulligan.

10         Now, they filed that in January.  We filed the
11    response, once again, reminding them, hey, there's still this
12    issue in the case.  Then in June, the case is transferred to
13    Utah.  Why is that significant?  Well, one of the pretend
14    excuses they make is they say, we wouldn't ethically have the
15    ability to amend our case and bring a securities claim because
16    the cases wouldn't support it in the Fifth Circuit.  They're
17    wrong about that.

18         But more importantly, in June, that all goes away
19    because the case is now in Utah.  And apparently this is
20    something they'd considered and thought about, and if they
21    didn't know that, in July, we filed a third motion to dismiss
22    and says, hey, we're still here, this is still a problem, PSLRA
23    exemption still applies.

24         They have another choice.  Do they amend?  Do they
25    seek leave to amend?  Or do they make this strategic decision

1    to double down and hope for a mulligan?  They chose to double

2    down.  They filed a motion in opposition to the motion to

3    dismiss.

4            Now, we know, Your Honor, that they at least

5    considered the possibility that they were going to lose this

6    motion, because in their motion to dismiss, they had this

7    footnote.  And they said, "In the unlikely event the Court

8    agrees with the defendants' assertion that the membership is a

9    security, Plaintiff respectfully requests leave to amend the

10   complaint to include the claims."  But then, of course, they

11   didn't attach the claims and didn't do it.  And effectively

12   what they're saying, in the unlikely event that my tee shot

13   ends up in the gulch, then I would really like the opportunity

14   to swing one more time.  It's a naked request for a mulligan.

15   That's exactly what it is.

16           Then the court sets a hearing on January 20, 2021,

17   for March of that year.  And they, again, have that same

18   opportunity.  This is serious.  The Court's not going to deny

19   this thing on the papers.  Are we going to amend or are we

20   going to double down?

21           Here's where it gets crazy.  They actually considered

22   amending.  They called us and reached out to us on the phone

23   and they said, "You know what, we've decided to amend the

24   claim."

25           And I asked them, "To do what?"

1          And they said, "We're going to bring a securities

2     claim."  And they said, "Would you oppose?"

3          I said, "Well, we'd have to see a draft of it,

4     obviously."

5          Two days later, three days later, they called us back

6     and said, you know what, never mind, we're not going to do

7     that, we're going to double down, we're going to go for our

8     mulligan thing.  Right?  And here's the e-mail they sent.

9          "We've decided against amending our complaint at this

10    time.  We will see you at the hearing on your motion to

11    dismiss."

12         I don't see how they can argue in the face of this

13    that somehow they didn't have some notice or idea that what

14    they were doing was seeking this redo.

15         Then, of course, 11 days later, the Court hears the

16    motion to dismiss, you provide them with the warnings that you

17    told them, you told them about the mulligans and you don't

18    think it's a good idea or a good plan.  You advised them to

19    refile or to file a motion for leave, and then that's --

20         **THE COURT:**  I'm going to ask you to slow down just a

21    little bit.  I think the reporter is struggling.

22         **MR. FIELDING:**  Yes, I'll do that, Judge.

23         **THE COURT:**  Thank you.

24         **MR. FIELDING:**  So they filed -- excuse me.  Nine days

25    later, after your suggestion, is when they filed their motion

1    for leave to amend.

2          This case is very similar -- I'd point the Court to

3    the *Fisher* case, very similar kind of situation.  About a year

4    after filing the complaint, sought leave to file a third

5    amended complaint.  That's what this is, a third amended

6    complaint.  Well, I guess it's a second amended complaint, but

7    it's more than two years later.  The District Court determined

8    the facts and the law supporting the proposed state law claim

9    were known to her at the time she filed her initial complaint.

10   The same thing is true here.

11         So where does that lead to?  Right?  Well, it leads

12   to they have to make up some pretend excuses.  And I just want

13   to address -- there's three.  I want to address them briefly.

14         The first claim they make in their brief is, we

15   didn't have a good faith basis to assert a securities claim

16   before March of 2021.

17         That's preposterous, Your Honor.  The *Koscot* case

18   from the Fifth Circuit is very clear what it says.  We raised

19   this issue with them before, the argument that *Ranieri* somehow

20   overcomes Koscot.  You just heard him argue that what they did

21   in the *Ranieri* case in their amendment was they actually argued

22   it closer to *Ranieri*, and that's what their intent was to do.

23   So they clearly understood and made a --

24         **THE COURT:**  Again, slow down.

25         **MR. FIELDING:**  -- deliberate decision.  And then, of

1    course, after the case was transferred to the District of Utah,

2    and this is where the argument gets really problematic, they

3    wait seven more months before they file -- seek leave.

4          So if the idea was, well, we just didn't know that we

5    were going to be in the Tenth Circuit, well, they did in June,

6    and they had numerous opportunities, but they didn't take

7    advantage of them until you warned them.

8          The second argument they make, second pretend excuse

9    was they say the delay was caused by Young Living's dilatory

10   tactics.  And you heard them say, well, it was our motion to

11   compel arbitration and our motion to transfer venue and all

12   those things.  But again, Your Honor, at any point in time in

13   this entire two-year period where this case was pending,

14   including when we were fighting about arbitration and

15   fighting -- they could have sought leave to amend, and they

16   didn't do it.  All this noise about motions to compel

17   arbitration and other things are just distractions that have

18   nothing to do with that strategic decision they made.

19         The last argument they make in their brief,

20   Your Honor, is we sought leave to amend in August of 2020, and

21   they point to that footnote that I showed you before where they

22   basically say, if for some reason my tee shot's no good, then I

23   want the chance to do it again.

24         The problem, Your Honor, as you noted, and this is --

25   I haven't shown you this before, but this is from the

transcript.  You told them -- because this came up.  They said -- well, you'd asked them, "Have you asked for leave to amend?"

And they said, "Well, we did in the footnote."

And you said, "I tend to say that a request in a brief or argument for the opportunity for leave to amend is something very different from actually filing a motion for leave to amend, where I can actually see, you know, the proposed amendments and know and be able to evaluate whether, in fact, they would solve the legal issues or defects that I see."

And, of course, that's the problem here, is that we've already gone through and spent all the time and energy and money briefing and arguing this motion to dismiss, we're going to have to do it all over again if the Court grants this motion.

So the basic equation here, Your Honor, is the delay, plus their strategic decisions, plus the prejudice that comes, leaves the Court with no excuse but to deny it.  But I'd note that any one of those things standing alone, delay or strategic decision making on their part or prejudice, all of them are sufficient basis for the Court to grant the motion in to the Tenth Circuit, all of them are true here.

Lastly, let me deal with this "futility of the amendment" thing.  And I told you that all of this stems from

1     the incoherence of their argument that this really affects the

2     securities claims, especially in light of how they did

3     characterize those documents, the offering documents. The very

4     offering documents they claim the plaintiffs received are the

5     ones they claim a cursory review would show would demonstrate

6     it's a pyramid scheme. This affects their RICO claims. So the

7     case law -- and I don't want to -- the Court's obviously aware

8     of that from things that you have to plead under Rule 9 to be

9     sufficient for fraud, the time, the place, the content, the

10    identity and the consequences. They don't do that. They still

11    don't do that. Their allegations are still conclusory and

12    generic.

13         Here's just one example in their pleading. There are

14    literally tens of thousands, if not more, examples of

15    specifically fraudulent statements made by Young Living at the

16    direction of Young and Turner. We'll take just one where they

17    identify who made it, when they made it, and why it was untrue

18    and how the plaintiff relied on it. But they don't give us any

19    and they say plaintiff cannot identify each with particularity.

20         Again, it goes back to the fact that supposedly the

21    thing that lured her to do this, the offering documents, are

22    the very thing that contained the disclosure of the

23    information. What makes the fraud claims even more

24    problematic, as Your Honor knows, is under the PSLRA there is a

25    heightened requirement. Not only do you have to identify the

1  five things you would ordinarily have to do for fraud, but you

2  also have to specifically allege facts demonstrating scienter

3  and the reason why the statements or omissions were misleading.

4       Now, that's really significant here and it's where

5  this complaint falls apart for them, because they have all

6  these allegations about how this is supposedly a pyramid scheme

7  under the scheme liability claim, but they don't identify how

8  or why Young Living or any of the individual defendants would

9  know that.  And that's a real problem when they've alleged

10  their own client received the same information and never once

11  presumed it until several years later but, again, don't provide

12  any explanation at all about that.

13       Now, I thought it was interesting to hear counsel say

14  that they styled -- they pleaded their case or characterized

15  their pleadings in comparison to the *LifeVantage* case.

16  Your Honor, I think that that is damning to them.  Because when

17  you compare the specificity and the detail of the allegations

18  in the *LifeVantage* case to those in this case, you see how a

19  well pleaded case looks and a poorly pleaded one.

20       Let me just give you a few quick examples.  This is

21  our case in the complaint at 148 in the section to support

22  their securities claim.  "Defendant Young Living enticed

23  essential reward members to join with false promises of

24  financial and spiritual rewards."

25       Who?  Which defendants?  When?  How?  Which rewards?

1    How much?  What was the promise?

2            They don't tell us that.  They just say this, this is

3    what it is, a conclusory nonspecific statement.  That's our

4    case.

5            Here's LifeVantage.  "To boost its entrance in the

6    new MLM...*LifeVantage* purchased a number of top promoters in

7    the multilevel marketing industry and entered into side

8    distribution agreements with the distributors."

9            And if you read the complaint, Your Honor, you'll see

10   that these folks went on to go out and recruit other

11   individuals.  Then there's a specific allegation about what the

12   promised rewards were.  Monthly average income for side

13   hustlers is $11,000 to $110,000, which in LifeVantage they go

14   on to say that was untrue, and then provide facts that show not

15   just the defendant, the corporate defendant, but the individual

16   defendants knew that as well.

17          **THE COURT:**  All right.  Again, again -- again, you're

18   going too fast.  I think when you're reading these slides you

19   speed up.  Again, you need to slow down.

20          **MR. FIELDING:**  I will.  I apologize.

21          So that's a good example of just how they've failed

22   to plead the kind of specific things in a way that they did in

23   *LifeVantage.*  But as I said, maybe the most compelling example

24   is with respect to scienter.  So what's on the screen in front

25   of you, Your Honor, this is the grand total of the scienter

allegations that the plaintiffs make in their amended
complaint. There's three paragraphs. And what's interesting
is, every one of them relate to the scheme liability thing and
all relate back to the scope and structure of the compensation
plan. A does, B does, and C says, "which is demonstrated by
its design and implementation of the plan."

Now, what they don't say is, anywhere, why any of
these defendants, including Young Living, would know that this
compensation plan was a pyramid scheme. Now, compare that to
the allegations in *LifeVantage*. If you look at *LifeVantage,*
and I have a copy of the petition here, I mean, Your Honor,
starting on page -- starting in the section that deals with
scienter, so it's on page 99, the LifeVantage petition,
paragraph 259, at scienter there were five pages of specific
allegations about scienter, about why both the company and the
individual defendants knew that the allegations -- that the
pyramid -- that the so-called structure was a pyramid scheme.
And they include things like, for instance, Your Honor,
"*LifeVantage* knew and acknowledged that the marketing industry
is subject to regulation. Its management took steps to
masquerade the effect of the plan in SEC filings and from their
distributors."

It goes on to talk about how the management
understood it was an illegal scheme, because he's a high-
ranking member, that one of the managers was, the individual

1  defendants, of the direct selling association.  It talks about

2  how they both were operating former MLMs that had been sued and

3  that the same compensation things that they had been sued for

4  and found to be problematic in their prior jobs they'd done and

5  they implemented them again.

6        It talks about how they hired these distributors to

7  fake it.  And the Court says a strong inference that you can

8  draw from that is that, if you had to hire fake distributors,

9  there must have been something illegal about it.  It also

10  talked about how this is a big deal for the court, in

11  *LifeVantage*, that *LifeVantage* was unprofitable before it

12  adopted this MLM scheme and that that's another piece of

13  evidence.

14        It goes on and on for page after page.  And these are

15  just, again, some of the examples of it.  And it's not just at

16  the corporate level, Your Honor, but it's also with respect to

17  each one of the individual defendants.  Prior CEO Brown had

18  personal knowledge of the FDA regulations.  Where's that

19  allegation anywhere about the individual defendants and why or

20  how these individual defendants would know about this or

21  supposedly discover that this compensation plan was problematic

22  when the plaintiff herself didn't do this?

23        Jensen, another one of the individual defendant's,

24  specific allegations about scienter with respect to them.  And

25  if you look at the Court's conclusions in *LifeVantage,* the

1    Court underscored that.  So we talked about the scheme

2    liability case.  And then it says, if you look at the

3    highlighted, "plaintiffs allege defendants structured their

4    purported MLM as a pyramid scheme," but they didn't just stop

5    there.  And that's all the plaintiffs here have done.  They

6    just said, "You operated a pyramid scheme and you knew about

7    it," period.

8           But the Court says, as part of the scheme they

9    recruited distributors, paid for the right to receive

10   compensation that was dependent upon the recruitment of

11   additional participants in the scheme rather than on legitimate

12   retail sales.  Not an allegation that's present here or for

13   anything even close to that.

14          They hired professional marketers to pose success

15   stories to convince them they could attain great financial

16   rewards that were highly likely.

17          Then there was a whole segment of the case,

18   Your Honor, that dealt with lies that were supposedly told

19   about improper health claims that had to do with the

20   supplements that were being sold.  None of those are present in

21   this case, none of those allegations.  The bottom line here is

22   that when you compare those to the sparse three-paragraph,

23   three-sentence set of scienter allegations in this case, the

24   contrast between what was alleged in *LifeVantage* and what was

25   alleged here is stark, compelling and damning.

1     And I agree, *LifeVantage* is a great example of the

2     kind of allegations you have to plead to support a securities

3     claim, and they haven't done it. And *LifeVantage* is the best

4     way.

5     Let me address one last point, and that is the

6     statute of limitations. And I don't mean to cram it at the

7     end, because this is a big deal, too, Your Honor, but it

8     effectively is related to the same problem. Their allegation

9     is -- in the securities claim, is that she received these

10    offering documents which included this compensation plan.

11    We've already seen that they claim a cursory review

12    of that plan would show that this was a pyramid scheme. This

13    would mean that she was on notice and needed to file those

14    claims within two years of receiving those offering documents

15    that disclose that fact. She would have had to file by 2017.

16    Instead, the plaintiff waited until 2019 to file.

17    Now, in their reply, they don't address this.

18    Instead they say, none of this matters because all of our

19    claims relate back to the claims that we filed in December of

20    2019. But relate back is not going to save you when -- relate

21    back is only going to get you back to March -- or April of

22    2019. But in order for these claims to not be barred by

23    limitations, the claims that they admit were apparent on the

24    face of the documents that plaintiff received, this case would

25    have had to have been brought in 2017. It's one more

1   independent reason why these securities fraud claims are futile

2   on their face.

3         So for all those reasons, Your Honor, we would ask

4   the Court to deny their motion for leave.

5         **THE COURT:**  All right.  Thank you, Counsel.

6         Why don't you take down the screen sharing.

7         **MR. FIELDING:**  I will do that.

8         All right.  There we go.

9         **THE COURT:**  Thank you.

10        Now, Mr. Linkin, do you want to respond to any of

11  that?

12        I think you're on mute still.

13        **MR. LINKIN:**  There we go.  Thank you, Your Honor,

14  just very briefly.  I don't want to take up too much more of

15  your time.  I don't have a dizzying array of slides to show

16  you.  What I have is common sense.

17        How do we allege scienter in the securities claim?

18  How did the defendants know they were operating a pyramid

19  scheme?  Because they designed the pyramid scheme they are now

20  operating.  What could be more self-evidence than that?

21        The idea that we've somehow failed to plead scienter

22  is beyond me, Your Honor.

23        In terms of the last-minute filing of our complaint,

24  what last minute?  This is not any of the cases they cite to

25  where you're on the eve of trial, you're long past a deadline

1    contained in a scheduling order.  It's none of those things.

2    It's -- yes, temporally speaking, the case was filed in 2019,

3    but for the reasons I made clear earlier, Your Honor, we're at

4    the beginning of this case.  There isn't even a scheduling

5    order.  There's no prejudice to them.

6         And, yes, the Tenth Circuit does say that undue delay

7    is a reason for denying leave to amend, but the undue piece is

8    prejudice.  It's just prejudice by another ward.  And there is

9    no prejudice to these defendants, zero prejudice that they

10   would suffer by us amending this complaint.

11        Thank you, Your Honor.  We really do appreciate the

12   time.

13        **THE COURT**:  Thank you.  I appreciate the arguments

14   from both sides.  I will now rule on the Motion to Amend as

15   well as on the defendants' Motion to Dismiss, which was

16   Docket No. 98.

17        We are still on the record, and the transcript of the

18   ruling will serve as my opinion.  That is, although my

19   courtroom deputy will enter a minute order stating the

20   disposition of the motions, there will not be a written

21   opinion.

22        Pursuant to Federal Rule of Civil Procedure 15, the

23   Plaintiff "may amend its pleadings with...the court's leave,"

24   and "the court should freely give leave when justice so

25   requires."  I'm quoting there from, of course, from

1    Rule 15(a)(2).

2         "Refusing leave to amend is generally only justified

3    upon a showing of undue delay, undue prejudice to the opposing

4    party, bad faith or dilatory motive, failure to cure

5    deficiencies by amendments previously allowed, or futility of

6    amendment."  I'm quoting there from *Bylin versus Billings*, 568

7    F.3d 1224 at page 1229 from the Tenth Circuit in 2009.

8         Here Defendants argue that the motion for leave to

9    amend is untimely and that granting the leave to file amended

10   claims would be futile.

11        As for the first argument that the motion to amend

12   was untimely, I'll address that first.

13        No doubt Plaintiff could, and probably should, have

14   sought leave to file an amended complaint earlier.  Indeed, it

15   probably would have made sense for Plaintiff to seek leave to

16   assert PSLRA claims as soon as Defendants raised the preemption

17   issue in their motion to dismiss.

18        The standard governing leave to amend is quite

19   liberal, however.

20        In addition, this case spent much of its life in a

21   different district court, quite possibly with different

22   procedural practices, in a different circuit with different

23   precedent governing both the standard for denying leave to

24   amend and the specific preemption issue raised by Defendants.

25        In addition, I have not yet ruled on the motion to

1  dismiss and many judges routinely allow plaintiffs to amend

2  their claims even after granting motions to dismiss.

3          For all of these reasons, I will not deny the motion

4  for leave to amend on the ground that it is untimely.

5          The defendants also argue that granting Plaintiff's

6  motion for leave to amend would be futile.

7          With regard to Plaintiff's proposed amendment of her

8  RICO claims, Defendants argue that the amendment would be

9  futile because Plaintiff's RICO claims are preempted by the

10 PSLRA.  This is the same argument Defendants made in their

11 motion to dismiss.

12         "A proposed amendment is futile if the complaint, as

13 amended, would be subject to dismissal."  I am quoting there

14 from *Anderson versus Suiters*, 499 F.3d 1228 at page 1238, from

15 the Tenth Circuit in 2007.

16         So the same legal standard applies to both

17 Defendants' motion to dismiss and its argument that the

18 Plaintiff's proposed amendment of its RICO claims would be

19 futile.

20         Because Defendants' motion to dismiss and its

21 argument that leave to amend the RICO claims should be denied

22 as futile rely on the same arguments and are governed by the

23 same legal standards, I will consider them together.

24         The PSLRA amended Section 1964(c) of RICO to provide

25 that "no person may rely upon any conduct that would have been

actionable as fraud in the purchase or sale of securities to establish a violation of RICO." And I'm quoting with a slight alteration just to say "RICO" from Public Law at number 104-67, Section 107, which is 109 Statutes at Large, 737 at page 758.

Plaintiff's RICO claims are therefore preempted by the PSLRA if her investment in Young Living constitutes a "security".

The Supreme Court has held that the test for determining whether an investment constitutes a security is "whether the scheme involves an investment of money and a common enterprise with profits to come solely from the efforts of others." I'm quoting there from *SEC versus W.J. Howey Company*, 328 U.S. 293 at page 301, from 1946, of course.

The parties do not contest here that in this case according to the allegations there was "an investment of money in a common enterprise." The question is thus whether the promise or anticipated profits are to come "solely from the efforts of others."

This is a close question.

The Supreme Court has made clear that the word "solely" should not be understood strictly. Rather, it should be understood to "embody a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." I'm

quoting there from *SEC versus Edwards*, 540 U.S. 389, at page
393 from 2004.

The Tenth Circuit has likewise held that the word
solely "must not be given an unduly restrictive application"
and consideration must be given to economic reality.  Now,
that's an older case.  That's *Crowley versus Montgomery Ward &
Company*, 570 F.2d 877 at page 879, from the Tenth Circuit in
1978.

More recently, the Tenth Circuit has clarified that
"the word solely in that phrase does not mean literally solely.
Instead, to prevent an unduly restrictive application of the
*Howey* test, we have held that the word 'solely' in the *Howey*
definition more or less means significantly."  I'm quoting
there from *Foxfield Villa Associates, LLC versus Robben*, from
967 F.3d 1082 at page 1091, from the Tenth Circuit in 2020.

In this case, Plaintiff alleges that "because anyone
can buy the oils at the discounted 'wholesale' price directly
from Young Living," members do not and will not make money
directly through the sale of products.  That's paragraph 32,
and I'm quoting from Docket No. 131-1, paragraph 32.  And I
think that would be the amended complaint, the proposed amended
complaint.  Yeah, that's what that is, that's the proposed
amended complaint.

As a result "the financial success of any Young
Living Member is overwhelmingly dependent on the recruitment of

1　new people into the Young Living sales force." And that's

2　paragraph 23 of the proposed amended complaint.

3　　　　The recruitment of new members obviously requires

4　effort on the part of a member.

5　　　　But the only way to achieve the type of abundance

6　that plaintiff alleges is promised by Young Living is through

7　downline members. While the member must himself or herself

8　make minimum monthly purchases and recruit new members,

9　significant financial returns are only possible if those new

10　members, in turn, also make minimum monthly purchases and

11　recruit still more new members.

12　　　　Plaintiff alleges that the Young Living scheme is set

13　up in tiers to be reached by members such as Gold, Platinum,

14　and Royal Crown Diamond. That's paragraph 35.

15　　　　These tiers are unachievable, however, without

16　recruiting new members and earning commissions from those

17　downline members. And that's paragraph 36.

18　　　　For example, Plaintiff alleges that to achieve the

19　highest tier of Royal Crown Diamond, a Young Living member

20　would need a downline of more than 15,000 members. That's

21　paragraph 37.

22　　　　These allegations make clear that the amount of money

23　received by a member turns on the size of a member's downline

24　and that to achieve a significant financial return, a member

25　would need a massive downline, almost certainly more than a

1    member could recruit directly.

2         Although the parties have identified various cases

3    addressing similar facts or allegations, they have not cited,

4    nor have I found, any controlling precedent deciding whether

5    investment like the scheme alleged constitutes a security.

6         The issue is not easy because, on the one hand, in a

7    scheme such as that alleged here, a member must make at least

8    some efforts to recruit others if he or she wishes to achieve

9    the promised or hoped-for returns.

10         But on the other hand, the promised or hoped-for

11    returns require downline distributors to in turn purchase

12    products and recruit still more distributors.

13         Some courts have determined that because participants

14    in such a scheme are not merely passive investors but must

15    engage in recruiting, an investment in such a scheme is not a

16    security.  This appears to be what the Court concluded in

17    *Ranieri versus AdvoCare International, LP*, 336 F.Supp.3d 701 at

18    pages 714 to 715, from the Northern District of Texas in 2018.

19         The Court in *Kerrigan versus ViSalus, Incorporated*,

20    reached a similar conclusion, though it focused on the

21    fact-intensive nature of this inquiry.  And that's 112

22    F.Supp.3d 580, at pages 598 to 599 from the Eastern District of

23    Michigan in 2015.

24         Other courts have reached the opposite conclusion

25    when addressing facts or allegations similar to those alleged

in this case, however.  In *SEC versus International Loan Network, Incorporated*, for example, the DC Circuit held that the third prong of the *Howey* test was satisfied when "profits for investors are expected to accrue, if not solely, at least predominantly from the efforts of others, namely of the downline members from whose fees an investor expects to derive most of his wealth."  And I'm quoting there from 968 F.2d 1304 at page 1308 from the DC Circuit in 1992.

In *Webster versus Omnitrition International, Incorporated*, the Ninth Circuit stated that the relevant issue is" "whether the efforts made by those other than the investor are the undeniably significant ones."  And that's 79 F.3d 776 at page 784, from the Ninth Circuit in 1996.  And it concluded that in a pyramid scheme where "participants' efforts are focused not on selling products but on recruiting others to join the scheme...this is enough to bring investments in the program within the definition of 'investment contracts.'"  And that's a quote from the same page.

Finally, in *Smith versus LifeVantage Corporation*, Judge Nuffer of this court recently held that an investment in an MLM "where profits come if not solely, at least predominantly from the efforts of others, namely the downline members, falls under the definition of an investment contract governed by securities laws."  And that's 429 F.Supp.3d 1275 at 1282 from the District of Utah in 2019.

1          I conclude that the reasoning in these three cases is

2    consistent with the Tenth Circuit's guidance that "the word

3    solely in that phrase does not literally mean solely.  Instead,

4    to prevent an unduly restrictive application of the *Howey* test,

5    we have held that the word 'solely' in the *Howey* definition

6    more or less means significantly."  And, again, that's Foxfield

7    Villa Associates, 967 F.3d at 1091.

8          Because Plaintiff has alleged that Young Living

9    members cannot achieve meaningful financial returns without a

10   large downline of members who in turn make monthly minimum

11   payments and recruit still more members, I conclude that the

12   anticipated profits from members' investments come "if not

13   solely, at least predominantly," and at a bare minimum,

14   "significantly" from the efforts of others.

15         Taking Plaintiff's allegations as true, as I must at

16   this stage of the proceedings, I conclude that an investment in

17   Young Living satisfies the *Howey* test and is thus a security.

18         It follows that Plaintiff's RICO claims are preempted

19   by the PSLRA.

20         I accordingly deny Plaintiff's motion for leave to

21   amend her RICO claims and grant Defendants' motion to dismiss

22   those claims.

23         Plaintiff also seeks leave to amend her complaint to

24   include securities claims.

25         Leaving aside the issue of whether the motion for

1    leave to amend was untimely, which I have already addressed,

2    Defendants argue that the amendment would be futile because the

3    proposed securities claims would be subject to dismissal.

4            Defendants argue that these proposed claims are

5    subject to dismissal because they are time barred and because

6    Plaintiff's allegations are insufficient to state a claim under

7    the requirements that apply -- under the PSLRA.

8            I will first address whether the proposed securities

9    claims are time barred.

10           The parties agree that under 28 USC Section

11   1658(b)(1) through (2), the statute of limitations that governs

12   Rule 10(b) claims, under that statute, actions must be brought

13   the earlier of two years after discovery of facts constituting

14   the violation or five years after the violation occurred.

15           The parties likewise agree that under 15 USC

16   Section 77m, Plaintiff's Rule 12(2) claims must be brought

17   within one year of discovery of untrue statements or omissions.

18           It is frequently difficult to address a statute of

19   limitations defense on the pleadings.

20           As the Tenth Circuit has explained, "a complaint need

21   not anticipate any affirmative defenses that may be raised by

22   the defendant."  I'm quoting there from *Bistline versus Parker*,

23   918 F.3d 849 at page 876, from the Tenth Circuit, in 2019.

24           Rather, "it is the defendants' burden to plead an

25   affirmative defense."  And that's a quote from the same page.

1    It is thus "only proper to dismiss the complaint

2  based on an affirmative defense when the complaint itself

3  admits all the elements of the affirmative defense."  And

4  again, I'm quoting from the same page.

5    This rule applies to timeliness.

6    After all, Federal Rule of Civil Procedure 8 makes

7  clear that "affirmative defenses include statute of

8  limitations."

9    And *Bistline* itself, the case I have been quoting,

10  addressed a statute of limitations defense.

11    Defendants may well be able to establish that

12  Plaintiff's proposed securities claims are untimely at the

13  summary judgment stage.

14    But having reviewed the allegations, I conclude that

15  Plaintiff's allegations do not definitively establish that her

16  proposed securities claims are untimely and so I cannot

17  conclude that these claims are untimely at this stage of the

18  proceedings.

19    I will next consider whether the proposed securities

20  claims are adequately pled.

21    Defendants argue that Plaintiff's proposed securities

22  claims are deficient in two ways:  First, Plaintiff does not

23  allege specific misleading statements; and, two, Plaintiff

24  fails to allege specific allegations to support the required

25  scienter.

1          There is no doubt that security fraud claims

2     require that misrepresentations and omissions be pled with

3     specificity.

4          This district has previously recognized claims based

5     on scheme liability rather than the specific misstatements,

6     however.  See, for example, *Securities and Exchange Commission*

7     *versus Traffic Monsoon, LLC*, 245 F.Supp.3d 1275 from the

8     District of Utah in 2017.

9          As the Southern District of New York has explained,

10    scheme liability "hinges on the performance of an inherently

11    deceptive act that is distinct from an alleged misstatement."

12    And that's *SEC versus CKB168 Holdings, Limited*, 210 F.Supp.3d

13    421 at page 445, from SDNY in 2016.

14          In this case, Plaintiff appears to be asserting

15    "scheme liability" claims.

16          She must accordingly show that Defendants

17    "participated in an illegitimate, sham or inherently deceptive

18    transaction where their conduct or role had the purpose and

19    effect of creating a false appearance."  I'm quoting there from

20    *Smith* at 429 F.Supp.3d at page 1284.

21          It follows that the question is not whether Plaintiff

22    has identified specific statements, but rather whether she has

23    "pleaded facts supporting an inherently fraudulent scheme."

24    I'm quoting there from the same page.

25          I conclude that plaintiff has done so here.

1          For example, plaintiff has alleged the following, and
2     I'm going to quote some of these allegations.

3          "The defendants' operations are a pyramid scheme
4     because they are based on false promises of vast financial
5     rewards, which are impossible to achieve for new Members who
6     enter at the bottom of the pyramid and have no realistic chance
7     of moving up the ladder."  That's paragraph 49.

8          "Young Living promotes the pyramid scheme using
9     e-mails, electronic newsletters, Facebook, and videos posted to
10    hosting sites like YouTube and Vimeo.  These promotional
11    materials are inherently fraudulent because they promote an
12    illegal pyramid which itself is inherently fraudulent.  These
13    promotional materials are also specifically fraudulent because
14    they make false promises to the effect that prospective new
15    Members may earn riches if they will join and participate in
16    the pyramid scheme."  That's paragraph 56.

17         "Specifically, Defendants peddle the fleeting
18    promise of financial rewards, what they call 'abundance,'
19    through the unrelenting recruitment of new Members.  The
20    pyramid's very structure ensures that every new Member will
21    almost certainly lose large sums of money, chasing the elusive
22    promise of 'abundance' by trying to recruit additional new
23    Members from an ever-shrinking pool of available candidates."
24    That's paragraph 23.

25         "Ultimately, the Members are financially induced by

Defendants to recruit new representatives to join the sales

force through materially false representations and/or omissions

about the Young Living pyramid scheme."  That's paragraph 50.

The Young Living 2015 U.S. Income Disclosure

Statement states that the average annual income for all members

in 2015 was $30, or approximately one-third the cost of

joining, and far less than the $100 monthly minimum payment

required to maintain status as a commission-eligible Essential

Rewards Member."  That's paragraph 63.

"And the Members' losses are compounded by

the pyramid structure, which requires Young Living's Members to

continuously purchase and (as a result, hold) an ever-growing

inventory of unused product, in direct violation of the 70/30

rule established in the FTC's 1979 Amway ruling."  That's

paragraph 24.

"If a Member's earned commission is less than $25 in

a single month, Young Living will not pay that commission to

the Member.  Instead, Young Living issues a credit which can be

used by the member only to buy more product."  That's

paragraph 33.

"By any measure, the Defendants are unequivocally

operating a pyramid scheme."  And that's paragraph 43.

Turning to scienter, the Tenth Circuit recognizes

that both fraudulent intent and recklessness satisfy the

scienter requirement.  And you can see that, for example, in

*City of Philadelphia versus Fleming Companies, Incorporated*,
264 F.3d 1245 at pages 1259 to 1261, from the Tenth Circuit in
2001.

To be sure, Plaintiff's pleadings that expressly
relate to scienter are far from robust.

But in determining whether Plaintiff adequately
pleads scienter, I must "consider the complaint in its
entirety." And I'm quoting there from *Tellabs, Incorporated
verses Makor Issues & Rights, Limited*, 551 U.S. 308 at
page 310, in 2007.

And in considering the proposed amended complaint in
its entirety, I find that the proposed complaint adequately
alleges scienter, though perhaps barely so.

Among other things, Plaintiff alleges that Defendants
are operating a pyramid scheme worth billions of dollars almost
none of which is based upon the sale of products to actual
customers, that's paragraph 154a; that Young Living's
recruitment structure, by design, makes it nearly
impossible for members to receive significant commissions if
they are able to receive commissions at all, that's
paragraphs 28 through 33; and that Young Living promotes
recruitment to prop up the pyramid scheme. That's paragraphs
34 to 35.

Plaintiff further alleges that "all of the defendants
participate in the illegal fraud through their statements,

omissions and actions in furtherance of Young Living's operations as an illegal pyramid scheme."  That's paragraph 51.

These allegations regarding Young Living's deliberate structure and defendants' active involvement in the organization support a reasonable inference the defendants have knowledge of, or are at least deliberately indifferent to, the fraudulent nature of the scheme in which Plaintiff alleges they are engaged.

Plaintiff alleges other facts that support the same inference, including that similar schemes have previously been found to be illegal, and that's paragraphs 21 to 23; that Defendants encourage inventory loading contrary to an FTC ruling, that's paragraphs 40 to 42; and that the defendants are aware or should be aware based on their income disclosure statements that the vast majority of participant are losing, not earning, money contrary to the promises made in the marketing materials, and that's paragraph 63 to 65; and that Young Living uses fraudulent marketing materials to induce people into becoming members, and that's paragraph 56.

Because Plaintiff's proposed securities claims are not subject to dismissal, either on the ground that they are time barred or on the ground that they are insufficiently pled, I conclude that her proposed amendment is not futile with respect to these proposed claims.

For the foregoing reason, the Plaintiff's motion for

1  leave to amend her complaint is granted with respect to her

2  proposed securities claims.

3            So to summarize:

4            Docket No. 98, Defendants' Motion to Dismiss the

5  First Amended Complaint is granted;

6            Docket No. 131, Plaintiff's Motion for Leave to Amend

7  is denied as it relates to her proposed changes to the RICO

8  claims, and granted as it relates to her federal securities

9  claims.

10           It is so ordered.

11           All right.  Are there any questions about my ruling?

12           We'll start with the plaintiffs.  Any questions?

13           **MR. LINKIN:**  None, Your Honor.

14           **THE COURT:**  All right.  Thank you.

15           And we'll go to the defendants.  Any questions about

16  the rulings, Mr. Fielding?

17           **MR. FIELDING:**  None from us, Your Honor.

18           **MS. ADENDORFF:**  I'm sorry, I just have one question.

19  Are the plaintiffs going to refile a complaint without the RICO

20  claims, then?

21           **THE COURT:**  Well, I've granted them leave to amend to

22  include the securities claims but not to amend the RICO claims

23  which I've dismissed.  So procedurally probably the best thing

24  would be to file the amended complaint without the proposed

25  RICO claims.

1          Does that make sense?

2          **MR. LINKIN:**  It does, Your Honor.  We're happy to do

3     that.

4          **THE COURT:**  All right.  Very well.  And then that

5     will be the operative complaint at that point.

6          All right.  Any other questions?

7          **MR. LINKIN:**  Your Honor, if I may, just briefly, as I

8     noted during argument, we still don't have a scheduling order

9     in this case.  From the plaintiff's perspective, we'd like to

10    get that going.  We'd like to get the scheduling order in

11    place, we'd like to be able to start taking discovery in this

12    case and getting this case moving.

13         **THE COURT:**  That certainly makes sense.

14         Which is the magistrate judge that I referred this

15    matter to?

16         **MR. LINKIN:**  Mr. Von Maack might know the answer to

17    that question.  Actually, I'm not sure that we know the answer

18    here in this room right now, I'm embarrassed to say.

19         **THE COURT:**  Let me just take a look and see if I

20    can -- I'll just pull it up.  Give me just a second on my

21    CM/ECF.  And the reason I do that is what I'm going to

22    recommend is that you file a motion with the magistrate

23    judge --

24         **MR. LINKIN:**  It's Magistrate Judge Pead, Your Honor.

25         **THE COURT:**  Okay, yeah, Chief Judge Pead.  Yeah.  Why

1    don't you bring that matter to his attention.  I do think it

2    would be appropriate at this point to have a scheduling order

3    in place.  And he can help you with that.

4              **MR. LINKIN:**  I have one point of clarification.  And

5    I have not seen this happen personally, but I've heard tales of

6    woe that, by acknowledging Your Honor's ruling today and filing

7    an amended complaint that omits the RICO causes of action, that

8    that not be deemed as a waiver of any rights related to that in

9    so far as it relates to appeal.  I think it's customary in Utah

10   to just continue along as Your Honor has ruled, but I want to

11   make clear that if and when Plaintiff file -- well, not if, but

12   when Plaintiff files that amended complaint that comports with

13   Your Honor's ruling, she does not intend thereby to waive any

14   rights associated with the ruling.

15             **THE COURT:**  No, of course.  Now, it's an

16   interlocutory ruling, so you're not going to be able to appeal

17   it immediately without leave, but at the end of the case,

18   however it ends, if it's adverse to you, you know, that's

19   something you should be able to appeal, and your objection is

20   noted for the record.

21             **MR. VON MAACK:**  Thank you, Your Honor.

22             **THE COURT:**  All right.  Any other matters that --

23   well, any other questions or any other matters that we should

24   take up at this time?

25             **MR. FIELDING:**  None from the defendants, Your Honor,

1    unless my colleague, Ms. Adendorff, has any other questions.

2              **MS. ADENDORFF:**  No, Your Honor.

3              **THE COURT:**  All right.  And, again, please reach out

4    to Chief Judge Pead's chambers about getting a scheduling order

5    in place.  And you may need to make a filing or perhaps you

6    could even e-mail his chambers informally just being sure to

7    copy opposing counsel.

8              **MR. LINKIN:**  We'll do, Your Honor.

9              **THE COURT:**  All right.  Very well.  With that, absent

10   anything further, court is adjourned.  Thank you.

11              (Concluded at 4:24 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF COURT REPORTER

This is to certify that the proceedings in the foregoing matter were reported by me in stenotype and thereafter transcribed into written form;

That said proceedings were taken at the time and place herein named;

I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

In witness whereof I have subscribed my name this 24th day of June 2021.

_Teena Green_

Teena Green, RPR, CSR, CRR, CBC